RACHEL AUMICK, Individually )
and on behalf of the Heirs at Law )
of SHANE AUMICK, Deceased, )
)
    Plaintiff, )
)
      v. )    Case No.: 6:21-cv-03072-BP
)
CITY OF AVA, MISSOURI, et al., )
)
    Defendants. )

## DEFENDANTS CITY OF AVA, MISSOURI AND BERKSHIRE'S SUGGESTIONS IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

Defendants City of Ava, Missouri and Kaleb Berkshire, by and through their attorneys,

Schreimann, Rackers & Francka, LLC, and pursuant to Federal Rule of Civil Procedure 56, and

Local Rule 56.1(a), hereby submit their Suggestions in Support of their Motion for Summary

Judgment, as follows:

# TABLE OF CONTENTS

Table of Authorities .................................................................................................. 3

I.    **Statement of Uncontroverted Material Facts** .................................................... 5

II.   **Introduction** ............................................................................................................ 15

III.  **Standard of Review** .............................................................................................. 15

IV.  **Argument** ................................................................................................................ 16

    A.  Plaintiff's § 1983 Claims Against Officer Berkshire Fail as a Matter of Law

       (Count I) ............................................................................................................. 16

       1. *Plaintiff's Excessive Force Claim* ......................................................... 17

           a. It was not clearly established at the time that the use of prone restraint is

           unconstitutional. ............................................................................................. 17

           b.  Aumick did not have a constitutional right to be free from prone restraint

           when his actions were reasonably interpreted as continued resistance.......... 18

       2. *Plaintiff's Deliberate Indifference to Medical Needs Claim* ................................. 23

    B.  Plaintiff Fails to State a *Monell* Claim Against the City (Count 2) ............................. 26

    C.  Plaintiff's Negligence Claim Against Officer Berkshire is Barred by Official Immunity

       and the Public Duty Doctrine ................................................................................ 28

V.    **Conclusion** ............................................................................................................. 30

# TABLE OF AUTHORITIES

**Cases**

*Atkinson v. City of Mountain View, Mo.,* 709 F.3d 1201 (8th Cir. 2013) .................................... 28

*Ballard v. Heineman,* 548 F.3d 1132 (8th Cir. 2008) .................................................... 16

*Blue v. Harrah's N. Kansas City,* 170 S.W.3d 466 (Mo. App. W.D. 2005) ............................... 28

*Boude v. City of Raymore,* 855 F.3d 930 (8th Cir. 2017) ............................................... 29

*Brockington v. City of Sherwood,* 503 F.3d 667 (8th Cir. 2007) ..................................... 26

*Bryan v. Endell,* 141 F.3d 1290 (8th Cir. 1998) ....................................................... 24

*Carpenter v. Gage,* 686 F.3d 644 (8th Cir. 2012) ..................................................... 23

*Davis v. White,* 794 F.3d 1008 (8th Cir. 2015) ....................................................... 28

*De La Rosa v. White,* 852 F.3d 740 (8th Cir. 2017) ................................................... 17

*Estelle v. Gamble*, 429 U.S. 97 (1976) ............................................................ 23, 24

*Fonseca v. Collins,* 884 S.W.3d 63 (Mo. App. W.D. 1994) .............................................. 28

*Graham v. Connor,* 490 U.S. 386 (1989) ............................................................ 19, 23

*Greiner v. City of Champlin,* 27 F.3d 1346 (8th Cir. 1994) .......................................... 16

*Hanson v. Best,* 915 F.3d 543 (8th Cir. 2019) ....................................... 18, 22, 25, 26

*Harris v. City of Pagedale,* 821 F.2d 499 (8th Cir. 1987) .......................................... 27

*Humphries v. Pulaski Cnty. Special Sch. Dist.,* 580 F.3d 688 (8th Cir. 2009) ...................... 15

*Jolly v. Knudsen,* 205 F.3d 1094 (8th Cir. 2000) ..................................................... 24

*Larson v. Miller,* 76 F.3d 1446 (8th Cir. 1996) ..................................................... 27

*Lombardo v. City of St. Louis,* 141 S. Ct. 2239 (2021) ............................................... 18

*Mayard v. Hopwood,* 105 F.3d 1226 (8th Cir. 1997) ................................................... 18

*McGautha v. Jackson County,* 36 F.3d 53 (8th Cir. 1994) ............................................. 27

*Mirax Chem. Prods. Corp. v. First Interstate Commercial Corp.*, 950 F.2d 566 (8th Cir. 1991). 15

*Monell v. Department of Social Services*, 436 U.S. 658 (1978) ............................................ 26, 27

*Nelson v. Wright,* 162 F.3d 986 (8th Cir. 1998) ...................................................................... 19

*P.H. v. Dist. Of Kansas City,* 265 F.3d 653 (8th Cir. 2001) ...................................................... 27

*Pearson v. Callahan,* 129 S. Ct. 808 (2009)..................................................................... 16, 17

*Popoalii v. Correctional Medical Services,* 512 F.3d 488 (8th Cir. 2008)................................ 24

*Quinn v, St. Louis Cnty.,* 653 F.3d 745 (8th Cir. 2011) ............................................................ 29

*Ryan v. Armstrong,* 850 F.3d 419 (8th Cir. 2017) ...................................................... 18, 19, 21, 22

*Sanders v. Sears, Roebuck & Co.,* 984 F.2d 972 (8th Cir. 1993) ................................................ 27

*Saucier v. Katz,* 533 U.S. 194 (2001) ...................................................................................... 19

*Schaub v. VonWald,* 638 F.3d 905 (8th Cir. 2011) ................................................................... 24

*Schulz v. Long,* 44 F.3d 643 (8th Cir. 1995) ........................................................................... 19

*Smith v. City of Minneapolis,* 754 F.3d 541 (8th Cir. 2014)...................................................... 16

*Southers v. City of Farmington,* 263 S.W.3d 603 (Mo. banc 2008) ..................................... 28, 29

*Stanton v. Sims,* 134 S. Ct. 3 (2013) ....................................................................................... 16

*State ex rel. Tewihaus v. Adolf,* 706 S.W.2d 443 (Mo. banc 1986)............................................ 29

*Szabla v. City of Brooklyn Park,* 486 F.3d 385 (8th Cir. 2006)................................................. 28

*United States v. Pope,* 910 F.3d 413 (8th Cir. 2018) ................................................................ 23

*White v. Pauly,* 137 S. Ct. 548 (2017) ..................................................................................... 17

**Statutes**

42 U.S.C. § 1983 ....................................................................................................... 15, 16, 26

**Rules**

Fed.R.Civ.P. 56 ....................................................................................................................... 15

# STATEMENT OF UNCONTROVERTED MATERIAL FACTS[1]

1. Plaintiff Rachel Aumick brings this lawsuit on behalf of the heirs of Shane Aumick who is deceased. Doc. 55 (First Amended Complaint) at ¶ 1.

2. Plaintiff Rachel Aumick is the surviving spouse of Shane Aumick. See Doc 55 at ¶ 5.

3. Defendant City of Ava ("the City") is a political subdivision in Missouri. Doc 55 at ¶ 6.

4. At all relevant times herein, Defendant Kaleb Berkshire was a police officer employed by the City. Doc 55 at ¶ 8.

5. Officer Berkshire was previously in the military and received Special Operations Training at Fort Bragg. Ex. A (Deposition of Kaleb Berkshire), p. 17, line 22 – p. 18, line 25

6. Officer Berkshire received his law enforcement training from the Missouri Sheriff's Academy, as well as Missouri's POST Training. Exhibit A, p. 23, line 8 – 20; Ex. B (Officer Berkshire's Training Records; Plaintiff's Deposition Exhibit 3) at p. 1-2.

7. When he was hired with the City, Officer Berkshire was provided the policies and procedures for the Ava Police Department. Exhibit A, p. 24, line 2-15.

8. Officer Berkshire also received training while he worked at the City for a little over a year. Ex. A, p. 26, line 20 – p. 28, line 2; Ex. B.

9. Officer Berkshire was trained on the contents of Ava's Use of Force policy. Ex. A, p. 108, line 1-10.

---

[1] Facts are accepted as true by these Defendants for purposes of summary judgment only.

10.     Officer Berkshire received training on the use of physical force and control holds during his law enforcement training.  Ex. A, p. 112, line 18-25.

11.     Specifically, the restraint tactic used by Officer Berkshire in this case was taught to him as part of his training at the Missouri Sheriff's Academy.  Ex. A, p. 32, line 18 – p. 33, line 5.

12.     On April 4, 2020, Officer Berkshire was dispatched to a domestic call at 507 Pennington Avenue in Ava.  Doc 55 at ¶ 16.

13.     Dispatch reported to Officer Berkshire that there was a report of a female injured and a male subject intoxicated. Medical assistance was also requested by dispatch.  Ex. C (affidavit of Kaleb Berkshire) at ¶ 3.

14.     The call from dispatch was that there was an assault on a family member, which would be domestic assault.  Ex. A, p. 59, line 10-19.

15.     Officer Berkshire was not familiar with Shane Aumick or his family prior to being dispatched.  Ex. A, p. 42, line 8-14.

16.     Upon arrival at the scene, Officer Berkshire found an individual later identified as Mari Aumick covered in blood on her arms and blouse.  Ex. A, p. 61, line 23 – p. 62, line 6.

17.     Officer Berkshire was told by a male later identified as Houston Thomas, that his stepson was inside the house with a knife and was rampaging in the house.  Mr. Thomas also said the stepson was intoxicated and not in the right frame of mind.  Ex. A, p. 62, line 7-19; Ex. C at ¶ 4.

18.     Officer Berkshire approached the residence and an individual later identified as Shane Aumick came out of the house with a knife, stating he was going to kill everyone, and that people were there trying to kill them.  Ex. A, p. 63, line 7 – 17.

19.     Officer Berkshire told Mr. Aumick to place his weapon on the ground and to put his hands on his head multiple times.  Ex. C at ¶ 6.

20.     Officer Berkshire also radioed into dispatch to get an ambulance staged and that he needed backup. Exhibit A, p. 71, line 1- 11; Ex. C at ¶ 7.

21.     Dispatch did not apparently hear this request. Ex, A, p. 72, line 3 – 6.

22.     Officer Berkshire was able to disarm the knife from Mr. Aumick, but Mr. Aumick was able to get away from Officer Berkshire's grasp and ran back into the residence.  Ex. A, p. 73, line 6 – 17; Ex. C at ¶ 9.

23.     Officer Berkshire then went onto the porch to attempt to get Mr. Aumick to come out, and then realized that his body camera had not been activated, so he turned it on.  Ex. A, p. 74, line 20 – p. 76, line 3.

24.     The body camera Officer Berkshire was wearing does not automatically turn on and needs to be manually activated.  Ex. A, p. 47, line 22 – p. 48, line 9; Ex. C at ¶ 11.

25.     A copy of Officer Berkshire's body camera video of his encounter with Mr. Aumick from this point forward is attached at Exhibit D.

26.     As Officer Berkshire approached the door, he instructed Mr. Aumick to come to the door.  Mr. Aumick came to the doorway and was instructed to place his hands behind his back.  Mr. Aumick was placed in handcuffs.  Ex. A, p. 76, line 4-15; Ex. C at ¶ 12; Ex. D[2] at 6:14:08-6:15:19.[3]

_____

[2] Exhibit D is a video file which has been sent to the Clerk's Office.  Copies were also sent to counsel of record.

[3] In citing to the time of Exhibit D, Defendants are referring to the time stamps in the bottom right hand side of the video.

27.     Officer Berkshire reported the scene secured in order to get an ambulance on route. Ex. A, p. 83, line 3-15; Ex. D at 6:16:17-6:15:38.

28.     While Officer Berkshire had been told that Mr. Aumick was intoxicated, he appeared steady on his feet, and Officer Berkshire could not smell any intoxicants. Ex. A, p. 76, line 16-23.

29.     Officer Berkshire instructed Mr. Aumick to sit on the steps of the porch which he initially did.  Ex. C at ¶ 13; Ex. D at 6:15:23 - 6:15:34

30.     Officer Berkshire placed Mr. Aumick on the step of residence in a seated position rather than his patrol car because he thought it would be easier to control where Mr. Aumick was when the paramedics got there.  Ex. A, p. 87, line 3-8.

31.     Officer Berkshire asked Shane Aumick where he was bleeding from, and he said his hands.  Mr. Aumick did not appear to be in any visible medical distress to Officer Berkshire, so he then went to check on Mari Aumick, who also did not appear to be in any medical distress. Ex. C at ¶ 15; Ex. D at 6:16:47 – 6:17:50.

32.     Officer Berkshire asked Mari Aumick what Shane Aumick was on, and she responded "vodka."  Ex. D at 6:17:50 – 6:18:05.

33.     Officer Berkshire again radioed to dispatch that the scene was secure and to get an ambulance to the location.  He stated Mr. Aumick had bloody hands and that Officer Berkshire would be bringing him into the police station once medical checked him out.  Ex. D at 6:18:18 – 6:18:38.

34.     Officer Berkshire asked Mr. Aumick is he was on anything other than alcohol because we there was a paramedic coming and they needed to know, to which Mr. Aumick responded "fuck no."  Ex. D at 6:18:45 – 6:18:58.

35.     Officer Berkshire instructed Mr. Aumick to stop several times over the course of the next few minutes while Mr. Aumick was sitting on the porch steps because he was yelling and kicking at Officer Berkshire's feet every time Officer Berkshire would get close to the officer.  Mr. Aumick was also threating to start shooting again. Ex, A, p. 88, line 5-11; Ex. D at 6:19:02 – 6:21:30.

36.     At this point, Mr. Aumick was under arrest on suspicion of domestic assault, assault on a law enforcement officer, and resisting arrest.  Ex. C at ¶ 20.

37.     Officer Berkshire again checked on the status of the ambulance that he had requested.  Ex. D at 6:20:25 – 6:20:32.

38.     Mr. Aumick laid himself down on the step and then rolled himself onto the ground. Ex. D at 6:21:10 – 6:21:42.

39.     Because Mr. Aumick never stopped and complied, and was very argumentative, Officer Berkshire was concerned at this time that Mr. Aumick may try and escalate the situation again.  Ex. A, p. 88, line 16-23; Ex. C at ¶ 23.

40.     Officer Berkshire then instructed Mr. Aumick to cross his feet and place them against his back side which Mr. Aumick did, but he was still able to buck his body up and move his legs trying to kick at Officer Berkshire despite being told to stop. Exhibit A, p. 89, line 12 - p. 90, line 2; Ex. D at 6:21:48 – 6:22:18.

41.     Officer Berkshire then moved into a side control position and placed his right knee momentarily into the middle of his back between his hip and right above his buttocks to control his lower body.  Mr. Aumick continued to fight Officer Berkshire.  Ex. A, p. 91, line 3 – 22; Ex. D at 6:22:18 – 6:22:38; Ex. C at ¶ 25.

42.     Officer Berkshire's left knee was not on Mr. Aumick's neck or head at this time; rather it was off to the side in order to allow Officer Berkshire to move his arm up underneath and attempt to get pain compliance with Mr. Aumick's' arms.  Exhibit A, p. 91, line 23- p. 92, line 12; Ex. C at ¶ 26.

43.     Officer Berkshire was not able to get Mr. Aumick to comply and quit resisting; Mr. Aumick continued to fight despite Officer Berkshire's instructions to stop resisting.  Exhibit A, p. 91, line 23- p. 92, line 12; Ex. C at ¶ 26.

44.     Paramedic Steven Wood arrived at the scene and was tasked with checking on an elderly female with dog bites.  Ex. E (Deposition of Steven Wood) p. 12, line 3-10.

45.     When Mr. Wood arrived at the scene, he heard yelling, screaming and cussing. He did not know what was going on. Ex. E, p. 22, line 17- p. 23, line 4.

46.     Mr. Wood made contact with Officer Berkshire and observed Shane Aumick, with Officer Berkshire by him. Exhibit E, p. 26, line 6-15.

47.     Upon arrival, Mr. Wood assessed Mr. Aumick's injuries when he kneeled down beside Aumick. Exhibit E, p. 53, line 20 - p. 54, line 4.

48.     Paramedic Wood spoke with Officer Berkshire.  Officer Berkshire directed Mr. Wood to where Mari Aumick was and stated the blood at the scene was Mr. Aumick's blood.  Ex. A, p. 92, line 16-21; Ex. D at 6:22:35 – 6:23:10; Ex. E, p. 27, line 1-12.

49.     Mr. Aumick continued to resist and said, "get off me."  Officer Berkshire responded that he would get off Mr. Aumick's back when he stopped resisting.  Ex. D at 6:23:10 – 6:23:18.

50.     At this time, Officer Berkshire was not on Mr. Aumick's back, but his right knee was actually on Mr. Aumick's buttocks.  Ex. A, p. 94, line 10-14, Ex. C at ¶ 30.

51.     Officer Berkshire estimates his knee was placed above Mr. Aumick's buttocks for 45-60 seconds.  Ex. C at ¶ 28.

52.     Officer Berkshire then stood up and again radioed to dispatch asking for backup from the County Sheriff's Office.  Ex. C at ¶ 31; Ex. D at 6:23:18 – 6:23:40.

53.     Officer Berkshire then moved into a modified side control position where one knee was at Mr. Aumick's hip, and the other was by his shoulder to allow him to attempt to raise Mr. Aumick's arms to get compliance.  Ex. C at ¶ 32.

54.     Officer Berkshire was not on Mr. Aumick's back at this point, rather his right knee was beside Mr. Aumick's buttocks.  Officer Berkshire applied pressure, raising Mr. Aumick's arms on his back to attempt to get pain compliance, however Mr. Aumick did not respond to the pressure at all.  Ex. C at ¶ 33.

55.     During this time, Mr. Aumick continued to kick Officer Berkshire, struggle, and refuse directions to stop resisting.  Ex. C at ¶ 34; Ex. D at 6:23:18 – 6:24:41.

56.     Paramedic Wood assisted Mary Aumick with minor bites and scrapes on her hands and forearms that had stopped bleeding.  Exhibit E, p. 12, line 11-15.

57.     Paramedic Wood found her injuries to be minor and knew she was being treated by his partner at the scene, so he went back to where Officer Berkshire was. Ex. E, p. 29, line 13- p. 30, line 2.

58.     At this time, according to paramedic Wood, Mr. Aumick was on his belly, handcuffed, fighting with Officer Berkshire, who was having trouble keeping Mr. Aumick on the ground. Mr. Aumick was kicking and striking the officer in the side, neck, and head area with his feet.  Ex. E, p. 31, line 4-11

59.     When he went back, paramedic Wood looked at Mr. Aumick's hands and saw there was bleeding that looked to have stopped and there were just small tissue lacerations on his hands. He observed no other injuries to Mr. Aumick.  Ex. E, p. 30, line 10- p. 31, line 1.

60.     Around this time, Mr. Wood held Mr. Aumick's ankles.  Ex. D at 6:24:37; Doc. 55 at ¶ 57.

61.     Neither of Officer Berkshire's knees were on Mr. Aumick at this time; instead, Officer Berkshire was down on the ground on one knee off to the side of Mr. Aumick trying to hold one of his arms up to control him.  Ex. C at ¶ 36; Ex. A, p. 94, line 18-25.

62.     Officer Berkshire used this position so that he would not be on Mr. Aumick's back in order to control him, especially while in handcuffs.  Based on his training and experience,  if you could control the hips, arm and shoulder, you can control the suspect.  Ex. C at ¶ 37; Exhibit A, p. 95, line 1-8.

63.     This position is called a side control position, which is a tactic where an officer can control the individual from the side and the officer is not putting knees into the person. The side control position controls the hips and the upper torso.  Exhibit A, p. 100, line 20- p. 101, line 25; Ex. C at ¶ 38.

64.     Officer Berkshire purpose in doing this was to get Mr. Aumick calm and to stop resisting so that the medical personnel could examine him before placing him under arrest and taking him to jail for various offenses.  Ex. C at ¶ 35.

65.     Officer Berkshire also used pain compliance techniques to attempt to get Mr. Aumick to comply with the instructions to stop resisting, but that was unsuccessful.  Ex. C at ¶ 40.

66.     Officer Berkshire again radioed dispatch informing of a combative suspect and requested that his supervisor to respond to the scene.  Ex. D at 6:25:32 – 6:26:02; Ex. C at ¶ 41.

67.     Mr. Aumick continued to kick Officer Berkshire and paramedic Wood, and Officer Berkshire continued to tell him to stop.  Ex. C at ¶ 42.

68.     Due to kicking a paramedic and a police officer, Mr. Aumick had now committed an additional crime of assault on a special victim.  Ex. C at ¶ 43.

69.     Mr. Aumick can be heard saying on the video to get off of him.  At this point in time, Officer Berkshire was off on his side controlling his arm and shoulder while Mr. Wood had ahold of Mr. Aumick's ankles. Exhibit A, p. 99, line 14- p. 100, line 5; Ex. D at 6:26:02 – 6:26:58.

70.     Mr. Aumick started to calm down and Officer Berkshire radioed to dispatch that the scene was secure.  Ex. D at 6:27:30 – 6:27:58; Ex. C at ¶ 46.

71.     Mr. Wood was present this whole time and had a hold of Mr. Aumick's ankles only. Ex. C at ¶ 47.

72.     Officer Berkshire spoke with Mr. Aumick's stepfather and told him Mr. Aumick would be going to jail and asked if Mr. Aumick's behavior on this date was normal.  Ex. D at 6:28:48 – 6:29:45.

73.     Mr. Wood then asked Officer Berkshire if Mr. Aumick was still conscious.  Officer Berkshire checked his breathing and pulse, and found respirations where reduced.   He also performed a sternum rub.  Paramedic Wood was present at this time.  Ex. D at 6:29:48 – 6:31:05; Doc 55 at ¶ 62.

74.     The paramedics and EMT's at the scene then started providing treatment to Mr. Aumick.  Ex. D at 6:31:30.

75.     Officer Berkshire performed chest compressions on Mr. Aumick at the instruction of the medical personnel on scene.  Ex. D at 6:33:52 – 6:35:02; Ex. C at ¶ 51.

76.     At the instructions of paramedics and EMT's, Officer Berkshire removed Mr. Aumick's handcuffs so they could treat him.  Ex. D at 6:35:25 – 6:36:26; Ex. C at ¶ 52.

77.     Paramedic Wood placed Mr. Aumick on a monitor and Mr. Aumick had no heartbeat and no pulse. Exhibit E, p. 42, line 7-22.

78.     Paramedic Wood then got the attention of his partner and started CPR. Exhibit E, p. 42, line 23- p. 43, line 1.

79.     The County Coroner pronounced Mr. Aumick deceased.  Doc. 55 at ¶ 67.

80.     The listed cause of death for Mr. Aumick according to Dr. Ransom A. Ellis, IV, D.O., who performed the full autopsy is "excited delirium" with contributing factors of "acute methamphetamine intoxication."  Ex. F (Medical Examiner's Report) at p. 1.

81.     The toxicology report for Mr. Aumick states he tested positive for methamphetamine, which a quantitative result of 484 ng/mL.  Ex. F at p. 7.

82.     Mr. Aumick's death certificate states the same cause of death as the medical examiner's report.  Ex. G.

83.     Ava Police Chief Reggie Johnson spoke with the County Coroner, as it was Chief Johnson's assumption that the County Coroner would investigate the death.  Ex. H (deposition of Reggie Johnson), p. 22, line 4-24.

84.     Chief Johnson also spoke with an investigator from the Missouri State Highway Patrol about the incident and was informed the Patrol was not going to get involved.  Ex. H, p. 45, line 9- p. 46, line 15.

85.     Chief Johnson presented the incident of Mr. Aumick's death to the local prosecutor. Ex. H, p. 65, line 21- p. 66, line 17.

## I.   INTRODUCTION

Plaintiff is the surviving spouse of Shane Aumick (hereinafter "Aumick")[4] who passed away on April 4, 2020.  Doc. 55 at ¶ 5.  Plaintiff has brought a three count First Amended Complaint relating to the passing of Aumick.  Among the defendants are the City of Ava, Missouri ("the City"), as well as Officer Kaleb Berkshire.  Doc. 55 at ¶¶ 6-7.  Count 1 is a claim against Officer Berkshire pursuant to 42 U.S.C. § 1983 for excessive force and alleged violation of the Fourteenth Amendment right to medical treatment.  Count 2 is a 42 U.S.C. § 1983 claim against the City for failure to train and supervise and to implement appropriate policies, customs, and practices.  Count 3 is a Missouri state law wrongful death claim for negligence brought against Officer Berkshire only.

## III.   STANDARD OF REVIEW

"The Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a).  A genuine issue of material fact exists "if a reasonable jury could return a verdict for the party opposing the motion." *Humphries v. Pulaski Cnty. Special Sch. Dist.*, 580 F.3d 688, 692 (8th Cir. 2009).  The Court must evaluate the facts in this case in the light most favorable to the nonmoving party, and the nonmoving party "must be given the benefit of all reasonable inferences." *Mirax Chem. Prods. Corp. v. First Interstate Commercial Corp.*, 950 F.2d 566, 569 (8th Cir. 1991).  However, "the nonmoving party may not rest on its pleadings; instead it

---

[4] In an attempt to avoid confusion, Defendants will refer to Shane Aumick, the individual involved in the incident as "Aumick."  Plaintiff Rachel Aumick, the surviving spouse who was not present at the incident, but brings the claims, will be referred to as "Plaintiff."

must set forth specific facts showing there is a genuine issue of material fact for trial." *Ballard v. Heineman*, 548 F.3d 1132, 1135 (8th Cir. 2008).

## IV.    ARGUMENT

A. <u>Plaintiff's § 1983 Claims Against Officer Berkshire Fail as a Matter of Law (Count 1).</u>

Count 1 is a claim brought pursuant to 42 U.S.C. § 1983 against Officer Berkshire. Plaintiff alleges Officer Berkshire's use of a prone restraint was excessive force, which resulted in Shane Aumick's death. Doc. 55 at ¶ 85. Plaintiff also alleges Officer Berkshire was deliberately indifferent to Aumick's objectively serious medical needs. Doc. 55 at ¶¶ 94 – 99. Both claims fail as Officer Berkshire is entitled to qualified immunity.

Qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Pearson v. Callahan*, 129 S. Ct. 808, 815 (2009). Qualified immunity balances two important interests - the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably. *Id*. Qualified immunity applies regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact. *Id*. The purpose of qualified immunity is to allow public officials to perform their duties "as they think right, rather than acting out of fear for their own personal fortunes." *Greiner v. City of Champlin*, 27 F.3d 1346, 1351 (8th Cir. 1994). Qualified immunity provides "breathing room" for public officials to make reasonable mistakes of judgment and will protect "all but the plainly incompetent or those who knowingly violate the law." *Stanton v. Sims*, 134 S. Ct. 3, 5 (2013).

A plaintiff has the burden to establish that the alleged constitutional right that was violated was clearly established at the time of the incident.  *Smith v. City of Minneapolis*, 754 F.3d 541, 546 (8th Cir. 2014).  In 2017, the U.S. Supreme Court mandated that "clearly established law" must be particularized to the facts of each case.  *White v. Pauly*, 137 S.Ct. 548, 552 (2017).  Following *White*, the Eighth Circuit has noted, a plaintiff must identify "controlling Eighth Circuit authority placing the question beyond debate," or "a robust consensus of cases of persuasive authority," to demonstrate whether the particular conduct, under similar circumstances, violated clearly established law.  *De La Rosa v. White*, 852 F.3d 740, 747 (8th Cir. 2017).  Where "there is no consensus to be found in the prior decisions," the Court must not substitute its hind-sight analysis for the officers' on the-scene assessment.  *Id*.; *White*, 137 S.Ct. at 552.

Courts employ a two-part inquiry to determine whether public officials are entitled to qualified immunity: (1) whether the facts, taken in the light most favorable to the plaintiff,  show that the official's conduct violated a constitutional right; and (2) whether the right was "clearly established."  A court has discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.  *Pearson*, 129 S.Ct. at 815.  Under either prong, Officer Berkshire is entitled to qualified immunity on both claims in Count I.

1. *Plaintiff's Excessive Force Claim*

   a. It was not clearly established at the time that the use of prone restraint is unconstitutional.

Officer Berkshire will start with the second prong for the convenience of this Court. Plaintiff cannot satisfy her burden on showing "controlling authority" from the Supreme Court or Eighth Circuit that places the constitutional question of use of prone restraint "beyond debate" as she must do.  *De La Rosa*, 852 F.3d at 746.  This is because the Eighth Circuit, a year before this

incident, held in *Hanson v. Best*, 915 F.3d 543 (8th Cir. 2019), *cert denied* 205 L.Ed. 2d 42 (U.S.,

Oct. 7, 2019), that it has not deemed prone restraint unconstitutional in and of itself.  *Id*. at 548.

There, officers were alleged to have violated an individual's Fourth Amendment rights by keeping

him restrained in a prone position for an excessive length of time, causing his death.  *Id*.  In granting

the officers qualified immunity, the court noted it:

> [H]as not deemed prone restraint unconstitutional in and of itself the few times we
> have addressed the issue.  *See Ryan v. Armstrong*, 850 F.3d 419, 427-28 (8th Cir.
> 2017) (affirming qualified immunity where officers held arrestee down in prone
> position and tased him); *Mayard v. Hopwood*, 105 F.3d 1226, 1228 (8th Cir.
> 1997) (affirming the reasonableness of force used in placing a resisting, hobbled
> suspect in a prone position to transport her to the jail).

*Hanson*, 915 F.3d at 548.

Therefore, the court in *Hanson* held the constitutional right at issue is not clearly

established, and the officers were entitled to qualified immunity.  *Id*.  If the constitutional right

was not clearly established in 2019, it also was not clearly established in April of 2020 when this

incident occurred.  Therefore, just like the officers in *Hanson*, Officer Berkshire is entitled to

qualified immunity.

Officer Berkshire is aware of the Supreme Court's holding in *Lombardo v. City of St. Louis*,

141 S.Ct. 2239 (2021), which is a case involving prone restraint.  But *Lombardo* deals only with

the first prong of qualified immunity as to whether the use of force was excessive, and the case

was sent back for more analysis on only that issue.  *Id*. at 2241-42.  The Supreme Court specifically

stated that it was not expressing any view as to whether any rights to be free from such force were

clearly established at the time of the incident, so it did not address the second prong.  *Id*. at 2242.

As the right to be free from prone restraint while resisting an officer's instructions and fighting the

officer was not clearly established at the time, Officer Berkshire is entitled to qualified immunity.

      b.   Aumick did not have a constitutional right to be free from prone restraint when

<u>his actions were reasonably interpreted as continued resistance</u>.

The first prong in the qualified immunity analysis is whether a constitutional right was violated. Plaintiff claims the violation occurred when a prone restraint was used. However, this assertion has been rejected by the Eight Circuit. Plaintiff does not contest the lawful basis to detain Aumick on April 4, 2020, nor is it alleged Aumick did not commit any crimes. Plaintiff only takes issue with the use of prone restraint. Under *Graham v. Connor*, 490 U.S. 386 (1989), the use of force is not constitutionally excessive if the "officers' actions are objectively reasonable in light of the facts and circumstances confronting them." *Id*. at 397. In applying this objective reasonableness standard, a court must pay close attention to the particular facts of the case. *Nelson v. Wright*, 162 F.3d 986, 990 (8th Cir 1998). It should consider factors, such as the severity of a suspected crime, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting or evading arrest. *Graham*, 490 U.S. at 396; *see also Ryan*, 850 F.3d at 427. The issue of reasonableness must be examined from the perspective of the facts known to the officer at the time of the incident. *Schulz v. Long*, 44 F.3d 643, 648 (8th Cir. 1995). The Supreme Court "caution[s] against the '20/20 vision of hindsight' in favor of deference to the judgment of reasonable officers on the scene." *Graham*, 490 U.S. at 393, 396; *Saucier v. Katz*, 533 U.S. 194, 205 (2001). It is well-established the right to make an arrest "necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham*, 490 U.S. at 396.

Here, based on the totality of the circumstances, the use of force was constitutional due to Aumick's unexpected, violent, and continued resistance beginning after he was placed in handcuffs. While Aumick was calm initially after being placed in handcuffs, after he set on the steps for a period of time, he began yelling and kicking at Officer Berkshire whenever the officer

got close. SOF #35. Aumick also threatened to start shooting. Officer Berkshire instructed Mr. Aumick to stop several times. SOF #35. At this point, Mr. Aumick was under arrest on suspicion of domestic assault, assault on a law enforcement officer, and resisting arrest. SOF #36.

Aumick was the one who originally put himself in the prone position, rolling himself on the ground. SOF #38. Due to Aumick's actions up to this point in not complying with reasonable requests, Officer Berkshire was concerned Aumick might try and escalate the situation again, so he instructed Aumick to cross his feet and place them against his back side. In this position, Aumick tried to kick at Officer Berkshire despite being told to stop. SOF # 39;40. Due to Aumick's kicking, Officer Berkshire moved into a side control position and placed his right knee momentarily into the middle of his back between his hip and right above his buttocks to control his lower body, and Aumick continued to fight. SOF #41. Officer Berkshire attempted to use pain compliance on Aumick, but Aumick refused to comply and kept resisting despite Officer Berkshire's repeated instructions to stop. SOF #42;43. While Aumick can be heard saying on video "get off me," he is also seen struggling, resisting, and not complying with Officer Berkshire's reasonable orders. SOF #49. Officer Berkshire estimates his knee was placed above Mr. Aumick's buttocks for approximately 45-60 seconds. SOF #51. Officer Berkshire then moved into a modified side control position where one knee was at Aumick's hip, and the by his shoulder to allow him to attempt to raise Aumick's arms to get compliance. However, Aumick did not respond to the pressure at all. SOF #53; 54. During this time, as shown in the video, Aumick continued to kick Officer Berkshire, struggle, and refuse directions to stop resisting. SOF #55.

Around this time, paramedic Wood held Mr. Aumick's ankles. Officer Berkshire was off to the side of Aumick trying to hold one of his arms up to control him. SOF #60;61. This position is called a side control position, which is a tactic where an officer can control the individual from

the side and the officer is not putting knees into the person. The side control position controls the hips and the upper torso. SOF #63. The purpose of doing this was to get Mr. Aumick calm and to stop resisting so that the medical personnel could examine him before placing him under arrest and taking him to jail for various offenses. SOF #64. Pain compliance techniques were also used again but were unsuccessful. SOF #65. Despite being told countless times to stop resisting, Aumick continued to kick Officer Berkshire, and was now kicking paramedic Wood as well, meaning Aumick had now committed an additional crime of assault on a special victim. SOF #67,68. Officer continued to hold Aumick's shoulder, with one knee by his shoulder and the other knee by his head. Aumick finally started to calm down and Officer Berkshire radioed dispatch that the scene was secure. SOF #69; 70.

Due to Aumick's continued resistance, the use of force gradually increased, in proportion to the degree of resistance he presented. Officer Berkshire attempted to control Aumick first by using verbal commands, prone positioning, and side control techniques. Aumick continued to resist during these efforts and never complied with officer repeated commands to "stop resisting," to "stop," and to calm down, continually kicking those around him. As a result of Aumick's resistance, Officer Berkshire was unable to get him to calm down for Aumick to be checked by medical staff before transport to jail.

The Eighth Circuit has previously refused to find a constitutional violation for excessive force where police officers used prone restraint when confronted with a violently resisting inmate, placing the inmate prone, using bodyweight and leg restraints to control him, and deploying a taser. *Ryan v. Armstrong*, 850 F.3d 419 (8th Cir. 2017). There, law enforcement officers attempted to extract a detainee from his cell, which the detainee resisted. *Id*. at 424. Officers held the detainee down in the prone position and one officer twice deployed his taser in drive stun mode to allow

the other officers to place the detainee's wrists and ankles in restraints.  *Id*.  In holding that this use

of force was not excessive, the Court explained that "[a]mong the most important [factors] is the

observation that [the detainee] was actively resisting the extraction procedure by ignoring

directives to lie down on his bunk and resisting the [officers'] efforts to subdue him once they

entered his cell."  *Id*. at 428.

Similarly, the undisputed facts from the video in this case show that even after being placed

in the prone position, Aumick continued to fight, yell, kick, buck, and refuse multiple orders to

stop.  Once it started, Aumick's resistance was ongoing, combative and aggressive, which resulted

in him kicking a police officer and a paramedic.  While awaiting medical personnel, Aumick

continued to fight the restraints and yell unintelligibly.  As shown in the video, he continued to

move his body, continued to struggle, and continued to fight throughout the encounter.  His

aggressive behavior presented a serious threat to both officer and bystander safety.  In light of his

violence, which is supported by the body camera video, placing and maintaining Aumick in a

prone position, using the officers' weight momentarily, and using a side control technique to hold

him to the ground was reasonable in this situation.  *Ryan*, 850 F.3d at 427-28.  In response to

Aumick's continued resistance, Officer Berkshire, in his judgment, determined he could not let

Aumick be checked by medical and transported to jail until he had stopped resisting.  Like in *Ryan*,

Aumick was actively resisting by ignoring multiple directives.  Due to Aumick's ongoing

resistance, the decision by Berkshire that it was not safe to put him in another position was

objectively reasonable.

Moreover, no law exists supporting Plaintiff's position that the use of prone restraint is, in

and of itself, a constitutional deprivation.  As stated before, in *Hanson*, 915 F.3d 543, the court

held officers who were alleged to have violated an individual's Fourth Amendment rights by

keeping him restrained in a prone position for an excessive length of time, causing his death, were entitled to qualified immunity. *Id*. at 548. Simply put, Plaintiff can point to no caselaw in this Circuit finding a constitutional right to be free from prone restraint, especially when the individual is not complying with the officer's instructions like Aumick was. While Plaintiff will likely argue that Aumick was in handcuffs when the prone restraint was used, it is important to remember that "[h]andcuffs limit but do not eliminate a person's ability to perform harmful acts." *United States v. Pope*, 910 F.3d 413, 417 (8th Cir. 2018). Also, a suspect is not subdued when "he fails to comply with orders to lie still." *Carpenter v. Gage*, 686 F.3d 644, 649 (8th Cir. 2012). Here, Aumick refused countless orders as indicated in the video, and he was therefore not subdued even though he was in handcuffs, as Plaintiff will likely claim.

In sum, the *Graham* factors are met here because: (1) Aumick was suspected of serious crimes including domestic assault, assault on a law enforcement officer, resisting arrest, and later, assault on a paramedic; and (2) he violently resisted for a continuous period of time, despite repeated commands to stop resisting, presenting an ongoing threat to the safety of the officer and paramedic at the scene. *Graham*, 490 U.S. at 396. Officer Berkshire's use of force was reasonable, in direct response to Aumick's increased agitation and proportionate to his degree of resistance. Therefore, Plaintiff cannot establish Aumick's Fourth Amendment rights were violated, and Officer Berkshire is entitled to qualified immunity on the first prong as well.

    *2. Plaintiff's Deliberate Indifference to Medical Needs Claim*

Plaintiff also brings a claim in Count 1 claiming Officer Berkshire was indifferent to the medical needs of Aumick. Such allegations are analyzed under the Eighth Amendment deliberate indifference standard. *Carpenter,* 686 F.3d at 650. To prevail on such a claim, Plaintiff must prove that Officer Berkshire acted with deliberate indifference to Aumick's serious medical

needs. *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). The deliberate indifference standard includes "both an objective and a subjective component: 'The [Plaintiff] must demonstrate (1) that [he] suffered [from] objectively serious medical needs and (2) that the prison officials actually knew of but deliberately disregarded those needs.'" *Jolly v. Knudsen,* 205 F.3d 1094, 1096 (8th Cir. 2000). Allegations of mere negligence will not suffice. *Estelle*, 429 U.S. at 106.

In order to show he suffered from an objectively serious medical need to satisfy the first prong, Plaintiff must show Aumick "has been diagnosed by a physician as requiring treatment" or has an injury "that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention." *Schaub v. VonWald*, 638 F.3d 905, 914 (8th Cir. 2011). In order to establish the second subjective prong, Plaintiff "must show more than negligence, more even than gross negligence." *Popoalii v. Correctional Medical Services,* 512 F.3d 488, 499 (8th Cir. 2008). In other words, "there must be actual knowledge of the risk of harm, followed by deliberate inaction amounting to callousness." *Bryan v. Endell*, 141 F.3d 1290, 1291 (8th Cir. 1998).

Here, as shown in the video footage, Plaintiff cannot satisfy either prong of the deliberate indifference standard as Berkshire had no actual knowledge of a risk of harm to Aumick, nor did he take deliberate inaction towards him. When Officer Berkshire first encountered Aumick, Aumick said he was bleeding from his hands, but did not appear to be in any medical distress. SOF #31. Officer Berkshire radioed dispatch and asked for an ambulance, stating Aumick had bloody hands and would be checked out by medical. SOF #32. Officer Berkshire checked on the status of the ambulance again before medical personnel arrived. SOF #37.

Nowhere in the body camera video is Aumick bleeding or shown to be in medical distress before medical personnel arrive. When paramedic Wood arrived, Officer Berkshire said the blood at the scene was Aumick's blood. SOF #48. The body camera footage does show Aumick to be

in any kind of respiratory distress prior to paramedic Wood arriving, or when he first arrived. At no point in the video does Aumick request medical assessment or transport to the hospital. Aumick denied taking anything other than alcohol, and even his own mother stated that was all he had taken. SOF #32; 34.

The evidence in the record shows Officer Berkshire could not have deliberately disregarded any medical need of Aumick, because there were none. Three sperate times he called an ambulance so that medical personnel could attend to Aumick. SOF #20; 27; 33. This action alone shows Officer Berkshire was not deliberately indifferent. When a medical issue did arise, Officer Berkshire stayed beside Aumick and assisted medical personnel in providing chest compressions upon request. SOF #76. While Aumick unfortunately passed away as a result of excited delirium and methamphetamine intoxication, that fact alone does not mean Officer Berkshire deliberately disregarded anything. SOF #81-83. Medical personnel were at the scene and did not assess any issue with Aumick either. Paramedic Wood observed Aumick's hands and saw that the bleeding had stopped and there were just small lacerations present. SOF #59. If it was not obvious to medical professionals like a paramedic that there was an issue with Aumick, it cannot not have been obvious to a lay person like Officer Berkshire. Plaintiff therefore cannot satisfy either the objective or the subjective prong of a deliberate indifference claim.

In addition, Plaintiff cannot satisfy the second qualified immunity prong as it was not clearly established that Officer Berkshire was deliberately indifferent to an individual behaving the way Aumick was when medical personnel were present to examine him. Again, the Eighth Circuit's opinion in *Hanson*, 915 F.3d 543, is instructive. There, the decedent's family also alleged the deceased was clearly suffering from excited delirium syndrome such that transporting him directly to jail was inappropriate. *Id*. at 550. However, the Eighth Circuit found "this allegation

is undercut by the paramedics' presence at the scene, and the undisputed fact that the paramedics performed a medical assessment of [the deceased.] "Because medical professionals never suggested [plaintiff] had emergency medical needs, the urgent nature of [plaintiff's] condition could not have been 'obvious' to a layperson." *Id*. at 651. Furthermore, "because the officers called paramedics in the hopes of safely transporting [the deceased] and then stayed beside [him] as he was transported, they did not 'deliberately disregard' his medical needs." *Id*. For these reasons, the officers were entitled to qualified immunity.

Here, Officer Berkshire is entitled to qualified immunity because he called for medical personnel multiple times. He also knew Aumick was observed by a paramedic at the scene, a medical professional who did not indicate there was a medical emergency. Just as in *Hanson*, if Aumick's condition was not obvious to medical personnel, it would not have been obvious to Officer Berkshire. For these reasons, just like the officers in *Hanson*, Officer Berkshire is entitled to qualified immunity.

B. Plaintiff Fails to state a *Monell* Claim Against the City (Count 2).

Count 2 is a claim against the City for failure to implement appropriate policies, customs, and practices, as well as failure to train and supervise. Under *Monell v. Department of Social Services,* a public entity may be held liable under § 1983 only "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury . . . ." 436 U.S. 658, 694 (1978). "T[he Eighth C]ircuit has consistently recognized a general rule that, in order for municipal liability to attach on a public entity like the City, individual liability must first be found on an underlying substantive claim." *Brockington v. City of Sherwood*, 503 F.3d 667, 674 (8th Cir. 2007). As stated above in Section A, there is no viable § 1983 claim against Officer Berkshire. Therefore, the City is entitled

to a judgement as a matter of law on the claim against it in Count 2 as well, and Plaintiff's *Monell* claim fails at the outset.

Furthermore, Plaintiff can point to no evidence in the summary judgment record to support such a claim. "A municipal custom is a practice of municipal officials that is not authorized by written law, but which is 'so permanent and well-settled . . . as to [have] the force of law.'" *Harris v. City of Pagedale*, 821 F.2d 499, 504 n.7 (8th Cir. 1987). To establish a constitutional violation resulting from such a custom, a plaintiff must show that an alleged injury was caused by municipal employees engaging in a widespread and persistent pattern of unconstitutional misconduct that municipal policymakers were either deliberately indifferent to or tacitly authorized. *Larson v. Miller*, 76 F.3d 1446, 1453 (8th Cir. 1996). A plaintiff must show there was a policy, custom or official action that caused an actionable injury. *Sanders v. Sears, Roebuck & Co.*, 984 F.2d 972, 975-76 (8th Cir. 1993). Plaintiff must produce evidence that, at the time of the incident, there was a widespread and persistent failure to address and supervise City employees, which led to the issues in this case.

But Plaintiff cannot put forth any evidence of a widespread pattern of incidents like this one occurring, and her claim fails. *McGautha v. Jackson County*, 36 F.3d 53, 57 (8th Cir. 1994). ("Liability for an unconstitutional custom or usage . . . cannot arise from a single act."). Nor can she put forth any evidence of the City's knowledge of such conduct at the time it occurred, *P.H. v. Sch. Dist. of Kansas City*, 265 F.3d 653, 659 (8th Cir. 2001) ("[A governmental entity] may not be found to have been deliberately indifferent to or to have tacitly authorized conduct of which it was unaware"). Plaintiff can point to no evidence giving rise to an inference that the problems complained of in this case are widespread or persistent, or even that this is more than a onetime

occurrence. An "isolated incident" such as this one cannot support a claim that the City was deliberately indifferent. *See Szabla v. City of Brooklyn Park,* 486 F.3d 385, 393 (8th Cir. 2006).

To succeed on a failure to train and to supervise claim, Plaintiff must show that the City had knowledge of prior incidents of police misconduct and deliberately failed to take remedial action. *Atkinson v. City of Mountain View, Mo.*, 709 F.3d 1201, 1214 (8th Cir. 2013). The record indicates that Officer Berkshire received his training from the police academy and was a licensed police officer at the time of the incident. SOF #6. Moreover, other than this single incident, nothing indicates that the City's officers ever had any issue like this before. Without prior incidents, this claim fails. For all these reasons, Plaintiff claim in Count II fails as matter of law, and the City is entitled to summary judgment.

C. Plaintiff's Negligence Claim Against Office Berkshire is Barred by Official Immunity and the Public Duty Doctrine (Count 3).

In Count 3, Plaintiff brings a Missouri state law wrongful death claim against Officer Berkshire. However, this claim is barred by the Missouri state law doctrines of official immunity and the public duty doctrine. Official immunity "protects public employees from liability for alleged acts of negligence committed during the course of their official duties for the performance of discretionary acts." *Southers v. City of Farmington*, 263 S.W.3d 603, 610 (Mo. banc 2008). "[A] police officer has the benefit of official immunity." *Fonseca v. Collins*, 884 S.W.2d 63, 66 (Mo. App. W.D. 1994). Discretionary acts require "the exercise of reason in the adaptation of means to an end and discretion in determining how or whether an act should be done or course pursued." *Id*. The decision to arrest someone has been found by Missouri courts to a discretionary act. *Blue v. Harrah's N. Kansas City*, 170 S.W.3d 466, 479 (Mo. App. W.D. 2005). An "officer's decision to use force in the performance of his duties is discretionary." *Davis v. White*, 794 F.3d 1008, 1013 (8th Cir. 2015) (applying Missouri law).

In *Boude v. City of Raymore*, 855 F.3d 930 (8th Cir. 2017), the court affirmed summary judgment based on official immunity to a police officer on Missouri tort claims. *Id*. at 935. The court rejected an argument that whether official immunity was waived because of the officer acting in bad faith was a jury question. *Id*. The court noted that in Missouri, a bad-faith allegation survives summary judgment if a plaintiff states "facts from which it could reasonably be inferred that [defendant] acted in bad faith or from an improper or wrongful motive" *Id*. (*citing State ex rel. Tewihaus v. Adolf*, 706 S.W.2d 443, 447-48 (Mo. banc 1986). Here, there are no such facts in the summary judgment record. Plaintiff's First Amended Complaint also does not allege such acts, and even if it did, conclusory allegations that an officer acted in bad faith are insufficient. *See Quinn v. St. Louis Cty.*, 653 F.3d 745, 752 (8th Cir. 2011). The acts of Aumick in refusing instructions, continually resisting, and being under the influence of methamphetamine are what led to the actions of Officer Berkshire, not any bad faith or improper motive. Berkshire is therefore entitled to official immunity.

Alternatively, as a public employee Officer Berkshire is also immune from suit under the public duty doctrine which states that "a public employee is not civilly liable for the breach of a duty owed to the general public, rather than [to] a particular individual." *Southers*, 263 S.W.3d at 611. It is "based on the absence of a duty to the particular individual, as contrasted to the duty owed to the general public." *Id*. This doctrine "shields public officers, and the governmental bodies that employ them, from liability." *Id*. at 612. Thus, a public employee cannot be held liable in tort by an individual where the duty alleged to have been breached was owed to the general public. Here, Officer Berkshire responded to the scene after being dispatched to a call for a domestic dispute. SOF # 12-14. The response of Officer Berkshire therefore came pursuant to duty he owed the public as a police officer for the City of Ava, and not to Plaintiff's decedent

specifically. For all these reasons, Officer Berkshire is entitled to sjudgment as a matter of law on Count 3.

## V. CONCLUSION

For the reasons set forth herein, Defendants City of Ava, Missouri and Berkshire's Motion for Summary Judgment should be sustained.

WHEREFORE, Defendants City of Ava, Missouri and Kaleb Berkshire pray that this Court enter Summary Judgment in their favor and against Plaintiffs as to all counts against in them in Plaintiffs' First Amended Complaint, and for such other relief as the Court deems just and proper under the circumstances.

Respectfully Submitted,

SCHREIMANN, RACKERS & FRANCKA, L.L.C.

/s/ Ryan Bertels
Chris Rackers, #41894
Ryan Bertels, #55167
931 Wildwood Drive, Suite 201
Jefferson City, MO 65109
573/634-7580
573/635-6034 (facsimile)
cpr@srfblaw.com
rb@srfblaw.com

Attorneys for Defendant City of Ava, Missouri Police Department and Kaleb Berkshire

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the above and foregoing was served upon all parties of record, via the Court's filing system on June 30, 2022.

/s/ Ryan Bertels