```
 1        IN THE UNITED STATES DISTRICT COURT FOR THE
               WESTERN DISTRICT OF MISSOURI
 2
      RACHEL AUMICK, Individually   )
 3    and on behalf of the Heirs    )
      at Law of SHANE AUMICK,       )
 4    Deceased,                     )
                                    )
 5        Plaintiff,                )
                                    )
 6        -vs-                      )            No.
                                    )   6:21-CV-03072-BP
 7    DOUGLAS COUNTY, MISSOURI,     )
      et al.,                       )
 8                                  )
          Defendants.              )
 9

10

11

12

13

14      VIDEORECORDED DEPOSITION OF KALEB BERKSHIRE

15          TAKEN ON BEHALF OF THE PLAINTIFF

16                OCTOBER 22, 2021

17

18

19

20

21

22

23

24

25
```

**EXHIBIT**

$A$

```
1    sorry.
2              Q.    Do you know what city she lives in?
3              A.    Sure.   Mountain View.   Sorry.   I'm
4    horrible with this.
5              Q.    Any other family that may have the
6    same last name, or may not have the same last name as
7    you, that resides in the southern Missouri area?
8              A.    Okay.   So I have -- my youngest son,
9    he's one, and he has the same last name, he's a
10   Junior.   And then my daughter Grace, she lives in
11   Mountain View, she goes back and forth between her
12   mom and I.   My uncle Jim, he lives in West Plains, I
13   think.
14             Q.    Last name Berkshire?
15             A.    Yes, ma'am.
16             Q.    If at any time during the deposition,
17   if you think of someone else, just let us know.   What
18   is your educational background?
19             A.    High school and some college.
20             Q.    Where did you graduate high school?
21             A.    Willow Springs, Missouri.
22             Q.    And where did you attend college?
23             A.    It was APSU in Clarksville,
24   Tennessee.   I was in the military.
25             Q.    Did you receive an associate's degree
```

1    or bachelor's degree?

2            A.    I -- actually I didn't end up

3    finishing because I went into a different avenue at

4    the time.  I was in the regular -- well, the regular

5    Army and I decided to go into Special Operations

6    instead of finish college.

7            Q.    So explain to me Special Operations.

8    **Once you decided to leave college, where did you go**

9    **or how did you train to become part of Special**

10   **Operations?**

11           A.    It's a selection period.  I was a

12   Green Beret so you go and do a 24 day selection

13   period.  If you make it through the training then

14   they'll tell you to come back.  From that point you

15   move to Fort Bragg, it's almost two years.  It's

16   pretty intensive with the language, a new MOS, or

17   military occupation specialty, combined training, and

18   jump school.

19           Q.    **And did all of that training occur at**

20   **Fort Bragg?**

21           A.    Yes, ma'am.

22           Q.    **How long were you training at Fort**

23   **Bragg, two years?**

24           A.    Yeah.  It was approximately two

25   years.

```
 1              Q.    When did you begin working with the
 2    City of Ava?
 3              A.    Well, according to this it says
 4    May 24th.
 5              Q.    What position or job title did you
 6    have with the City of Ava?
 7              A.    Patrolman.
 8              Q.    Was there any training that you had
 9    to undergo prior to your hire with the City of Ava?
10              A.    Just the normal board -- just the
11    normal sheriff's academy for the state and then the
12    POST evaluation test.
13              Q.    And what does POST stand for?
14              A.    I knew you were going to ask me.  I
15    don't remember now off the top of my head.
16              Q.    So you had sheriff's academy training
17    and then POST?
18              A.    Yeah.  It's a POST exam.  It's pretty
19    much you go over -- it's a standardized test for
20    anybody who wants to go into law enforcement to take.
21              Q.    Did you have any on-the-job training
22    when you were first hired with the City of Ava?
23              A.    I had rode with Corporal
24    Butterworth -- I was going to say his name -- several
25    times prior to.  But I don't -- I don't know that it
```

1    was ever an official OJT so to speak.

2          Q.   Were there any trainings with regard

3    to the rules and regulations or policies and

4    procedures for the City of Ava Police Department that

5    you had any specific training on?

6          A.   No.  Everyone, when you get hired

7    you're given a standard operating procedure manual,

8    book, and go through it.

9          Q.   Did anyone in a supervisory capacity,

10   either the Chief, Corporal Butterworth, or someone

11   else, go through those general rules and regulations

12   in the manual with you upon your hire with the City

13   of Ava?

14         A.   Corporal Butterworth gave them to me.

15   I think we brushed over a few but not in depth.

16         Q.   Do you recall, off the top of your

17   head, which ones you brushed over?

18         A.   I'm sorry, I don't.

19         Q.   Did -- was there any kind of exam or

20   any testing on those rules and regulations that you

21   had to undergo with the City of Ava?

22         A.   No, ma'am.

23         (WHEREIN, Exhibit 2 was marked for

24   identification.)

25         BY:  MS. ALLEN

```
 1              Q.    In between --
 2              A.    -- list.
 3              Q.    -- in time of the date of the
 4    application of April 16 of 2019 and your hire in May,
 5    did you have to undergo any training in preparation
 6    for your hire date with the City of Ava?
 7              A.    I honestly -- I don't remember.  I
 8    don't remember right now.
 9              (WHEREIN, Exhibit 3 was marked for
10    identification.)
11              BY:  MS. ALLEN
12              Q.    I'm going to hand to you what I've
13    marked for identification as Exhibit Number 3.
14              MS. ALLEN:  And I apologize, I only have
15    -- I'm not going to ask very many questions about it
16    but I only have a copy --
17              MR. HYDE:  Oh, no.  That's fine.  I don't
18    need one.
19              BY:  MS. ALLEN
20              Q.    That has been produced to us by the
21    City of Ava as documents that encompass your training
22    while employed there.  And take a look, flip through
23    there and let me know if there's anything that you
24    see missing or something that should have been
25    included that may not be there.
```

```
 1            A.    Okay.
 2            Q.    I just want to make sure that we've
 3   got --
 4            A.    That's actually everything.
 5            Q.    We've got what we got, yes.
 6            A.    Okay.
 7            Q.    Just let me know when you're finished
 8   with that.
 9            A.    Uh-huh.  There should be a
10   certification for Narcan to -- the city, we did a
11   class on it to be able to carry it in case we dealt
12   with an overdose.  And then I didn't see the normal
13   annual qualifications with handgun and rifle and
14   whatnot.
15            Q.    Okay.  Thank you.  When did you leave
16   the Ava Police Department?  And if you need to
17   refresh your recollection, I know we've got your time
18   sheets --
19            A.    It's on this, yeah.
20            Q.    -- as Exhibit Number 1.
21            A.    Yeah.  June 22nd was my last day
22   worked.
23            Q.    Of 2020?
24            A.    Oh.  Yes, sorry.
25            Q.    So you were with Ava for just over a
```

1    year?

2              A.    Yes.

3              Q.    Why did you leave the Ava Police

4    Department?

5              A.    I left the Ava Police Department

6    because the -- we worked eight hour shifts there, the

7    current department I work we work 12 hour shifts.  So

8    I get to see my family with the different shifts.  As

9    it was working eight hour shifts I had Tuesdays and

10   Wednesdays off and that's not very adherent to family

11   life.  So I didn't get to see, you know, any of the

12   stuff on weekends or whatnot.  That's why I left.

13             Q.    With regard to your employment at

14   City of Ava, did you have any write-ups or

15   disciplinary actions against you during your employ?

16             A.    No, ma'am.

17             Q.    Where are you currently employed?

18             A.    City of Licking.

19             Q.    How long have you been employed by

20   the City of Licking?

21             A.    Pretty much right after Ava.  I would

22   have to get -- I can get you the exact date if you'd

23   like.

24             Q.    Did you have your job lined up with

25   the City of Licking when you left Ava?

1    on another arrestee?

2            A.    Not that I remember.  There was other

3    arrests where they resisted but whereas Mr. Aumick

4    continued to resist and fight the entire time the

5    other suspects stopped and then we were able to get

6    them in the -- either into the back of the vehicle or

7    transport them.

8            Q.    **Do you recall how long you held those**

9    **other individuals in the restraint -- that same type**

10   **of restraint versus Mr. Aumick?**

11           A.    Same type of restraint?  I guess --

12           MR. BERTELS:  I'm going to object as vague

13   as what you mean by other type of restraint.  You can

14   answer, if you understand.

15           THE WITNESS:  Yeah.  I don't understand.

16   Just -- I guess what are you --

17           BY:  MS. ALLEN

18           Q.    **You mentioned that you restrained Mr.**

19   **Aumick --**

20           A.    Yes, ma'am.

21           Q.    **-- as well and used that same**

22   **restraint on three or four other individuals while**

23   **employed with the City of Licking, correct?**

24           A.    I don't know the exact number.  But

25   yes, I've used the technique prior, if that's what

1    you're asking.

2            Q.    Where did you -- where did you learn

3    to use that type of technique?

4            A.    Would have been the sheriff's

5    academy.

6            Q.    What year in the sheriff's academy

7    did you learn to use that type of restraint?

8            A.    2019 or -- '19 to '20 was our

9    academy, I think, wasn't it?  '19.  I'd have to look.

10           Q.    2019?

11           A.    So it would have been -- yeah, 2019.

12           Q.    Do you recall the instructor's name

13   who taught you how to perform that restraint?

14           A.    It would have been Mrs. Price.

15   Price.

16           Q.    Do you know where Price is out of,

17   what city?

18           A.    I believe she's a juvenile officer

19   but she still works for the Missouri Sheriff's

20   Academy.

21           Q.    Do you recall what juvenile office

22   that she's out of in the State of Missouri?

23           A.    I don't.  I want to say it's out

24   towards Van Buren.  But again, I'm not a hundred

25   percent on what office she's out of.

1          Q.    Pardon me.  And then above him was
2    Chief Johnson, correct?
3          A.    Yes, ma'am.
4          Q.    During that shift, you were
5    dispatched to an incident involving Shane Aumick,
6    correct?
7          A.    Yes, ma'am.
8          Q.    Were you familiar with Shane Aumick
9    prior to being dispatched on April 4, 2020?
10         A.    No, ma'am.
11         Q.    Were you familiar with any of the
12   Aumick family there in Ava prior to being dispatched
13   on April 4 of 2020?
14         A.    No, ma'am.
15         Q.    Were you -- strike that.  Do you have
16   any independent recollection of that particular call
17   involving Shane Aumick?
18         A.    I guess -- can you clarify what you
19   mean?
20         Q.    Meaning, without looking at any
21   documents or video footage, do you have any
22   independent recollection or memory of your
23   interaction in the incident involving Shane Aumick
24   that night?  Or morning, excuse me.
25         A.    That morning.  I just remember when I

1    any massive objections, no.

2            Q.    Prior to your shift in which you

3    encountered Shane Aumick, did you determine whether

4    or not your body cam equipment was working

5    satisfactorily?

6            A.    I believe I had other calls that

7    night.  Again, I'd have to look.  I didn't know of

8    any issues, no, ma'am.

9            Q.    Prior to your shift where you

10   encountered Shane Aumick, if you had any problems

11   with the body cams pursuant to the policy you would

12   have brought that to the attention of your immediate

13   supervisor, correct?

14           A.    Yes, ma'am.  I would have let the

15   corporal know.  And then the policy was usually you

16   turn it in and then switch out for a camera that's in

17   the base station.

18           Q.    Did you, during your shift in which

19   you encountered Shane Aumick, manually deactivate

20   your body cam?

21           A.    No, ma'am.

22           Q.    During your shift in which you

23   encountered Shane Aumick, did you manually activate?

24           A.    Yes, ma'am.

25           Q.    Why did you do that?

1              A.    Because as you get out of the vehicle

2     we have -- the camera doesn't just come on itself,

3     you have to activate it.  And like I had said earlier

4     when I stepped out of the vehicle, when I was getting

5     out, I thought I had turned it on, I pressed the

6     button and I was under the assumption that it was on.

7     And again, it wasn't until I was calling Shane back

8     out that I glanced down and seen the wrong color

9     light on and that's when I made sure that it came on.

10             Q.    Are you aware of any circumstances in

11    which the body cam will automatically activate?

12             A.    Not that I know of.

13             Q.    Would you agree with me that Ava

14    Police Department adopted this policy for use of the

15    body cam in order to accurately document events,

16    actions, conditions, and statements made during

17    arrests?

18             A.    Yes, ma'am.

19             Q.    Would you agree with me that the Ava

20    Police Department states in this policy that its

21    officers shall follow the procedures for the body cam

22    equipment use as set forth in the policy?

23             A.    Yes, ma'am.  From everything that I'm

24    reading it -- yes.

25             Q.    Officer, we have been going for about

```
 1   dispatcher told me when I was being dispatched to the
 2   residence?
 3              Q.   What I'm asking you -- my
 4   understanding is the officer ID, Officer Kaleb
 5   Berkshire, 424, --
 6              A.   Uh-huh.
 7              Q.   -- is this an incident report that
 8   you prepared?
 9              A.   Yes, ma'am.
10              Q.   Okay.  Why did you denote, up here at
11   the very top where it says crime, slash, incident
12   looks like an ordinance number and then it states
13   domestic assault.  What was the reasoning for you
14   putting that there?
15              A.   Because when we were -- when I was
16   dispatched to the residence it was called in that Mr.
17   Aumick was assaulting a family member, which would be
18   the domestic assault.
19              Q.   Do you recall, as you sit here today,
20   which family member Mr. Aumick was allegedly
21   assaulting?
22              A.   I believe -- I believe it was his
23   mother off the top of my head but I am not positive
24   on the call.
25              Q.   Would that have been Mary Aumick?
```

1    other?

2            A.   Yes, ma'am.

3            Q.   **Who is Coby Roberts?**

4            A.   He would be the deputy from Douglas

5    County Sheriff's Office.

6            Q.   And the last individual listed is

7    Steven J. Wood?

8            A.   Yes, ma'am.

9            Q.   And that is the gentleman employed by

10   Cox who provided the voluntary statement included in

11   your incident report, correct?

12           A.   Yes, ma'am.  He was also the

13   paramedic on scene.

14           Q.   If we move to Page 3 of your incident

15   report, it begins that on April 4 of 2020 at

16   approximately 0614 you received a report from

17   dispatch there was a domestic in progress at 507

18   Pennington Avenue.  The report -- the RP, reporting

19   party, stated the male was tearing the house apart

20   and that they needed an officer immediately.  Is that

21   correct?

22           A.   Yes, ma'am.

23           Q.   You state that your arrival time was

24   approximately 0616; is that correct?

25           A.   Yes.

1          Q.    And you found Ms. Aumick covered in
2    blood you state, correct?
3          A.    Yes, ma'am.
4          Q.    What area of her body was covered in
5    blood?
6          A.    Her arms, blouse.
7          Q.    You note that there was an elderly
8    male there who stated his stepson was inside with a
9    knife and tried to kill them and was rampaging in the
10   house, correct?
11         A.    I stated that, yes, Mr. Thomas had
12   blood on his hands and shirt.
13         Q.    What did you state after that?
14         A.    The elderly male stated that his
15   stepson was inside with a knife and tried to kill him
16   and was rampaging in the house.
17         Q.    Are you still referring to Houston
18   Thomas in making that statement?
19         A.    I believe so.  That's the stepdad.
20         Q.    And then in reference to the stepson,
21   are you referring to Shane Aumick?
22         A.    Yes.
23         Q.    The next line states that his stepson
24   was intoxicated and not in his right frame of mind,
25   correct?

1    knife, correct?

2              A.    Yes.   To the left, yes.

3              Q.    Then you radioed dispatch but

4    dispatch did not hear your initial radio contact is

5    what you've got written there, correct?

6              A.    Yes.

7              Q.    And at this point the suspect was

8    coming toward you brandishing the knife again in his

9    hand, is that --

10             A.    It was all in one motion, ma'am.  As

11   he's coming down I -- sorry.  I -- our radios are set

12   up to where I can use one hand to talk on the radio

13   and the other one -- that's why our service pistols

14   have lights on them.

15             Q.    At this point you stated one more

16   time that he needed to place the weapon on the ground

17   or you would have to hurt him and didn't want to.

18   Shane Aumick stepped quickly toward me and swung the

19   knife toward me but you leaned back as the blade --

20             A.    Yes.

21             Q.    -- came toward your face?

22             A.    Yes.

23             Q.    So is that the same incident you're

24   talking about or are these two separate ones?

25             A.    It's all the same incident, ma'am,

1    it's all...

2            Q.    The knife missed, leaving the suspect

3    off balance as he tried to swing the blade back

4    toward me?

5            A.    Uh-huh.

6            Q.    I was able to catch the suspect's arm

7    and twist the wrist to loosen the blade in his hand.

8    I was then able to disarm the knife from his left

9    hand throwing the blade into the grass.  Shane Aumick

10   was able to dislodge his arm from my grasp and ran

11   back into the porch and into the residence, correct?

12           A.    Yes, ma'am.

13           Q.    With regard to this opening paragraph

14   of your narrative, is there anything that you would

15   like to amend or correct?

16           A.    I don't know.  Not that I can think

17   of.  Not right now.  I don't know.

18           Q.    If you think of something as we go

19   through this, please let me know so that we can go

20   back and clarify it.

21           You then approached the residence

22   instructing Mr. Aumick to come out with his hands

23   where you could see them?

24           A.    Yes.

25           Q.    You drew your pistol with the light

1    on sweeping the porch with my weapon and flashlight

2    in my left hand?

3              A.    Yeah.

4              Q.    Were your weapon and your flashlight

5    in your left hand?

6              A.    So it was at this point that I had

7    pulled the other -- so I had a cross grip.  So I had

8    a smaller -- I wish I had it on me.  It's a smaller

9    flashlight in my left hand and then the other -- the

10   pistol was in my right hand in a braced position.

11   And I was calling him out.

12             Q.    Was this the second time that you

13   brandished your weapon --

14             A.    Yes, ma'am.

15             Q.    -- with regard to Mr. Aumick?  Then

16   you move onto the porch with your weapon raised.  You

17   were in defensive posture, ready to use deadly force

18   if necessary; is that correct?

19             A.    Yes.

20             Q.    Can you demonstrate for me what that

21   posture, what that looked like, your defensive

22   posture, ready to use deadly force if necessary on

23   the porch that morning?

24             A.    Yes, ma'am.  So it was at the point I

25   was getting ready -- coming up the steps.  So there

```
 1    was -- do you want me to stand up?
 2              Q.    That's fine.  Go ahead, yeah.
 3              A.    Okay.
 4              Q.    If that's easier.
 5              A.    So he may stand up with me.  So as I
 6    was coming up the steps I was squatted anyway 'cause
 7    you take your -- the weight up off your -- so I was
 8    squatted like this and I had the pistol in my right
 9    hand and the flashlight right here.  And as I was
10    coming up I was coming up the steps and trying to see
11    through -- again, the whole front part of the house
12    was covered with blood and then the front door had
13    two or three big huge swipes of blood across it.
14              So I was -- as I was calling out to him
15    again I was trying to deescalate everything and I'm
16    saying in essence, hey, man, just -- I need you to
17    come out, you're not -- you're not -- you're not
18    necessarily getting arrested.  I need you to put
19    these -- you need to put these cuffs on for your
20    protection, for mine.  Trying to get the lowest level
21    to calm him down because everything had just gone to,
22    like, 100.  And trying to get everything back down to
23    him calm to where I felt that I could get control of
24    the situation.
25              And as I was calling him out it was during
```

1    this time that I glanced down and I noticed that my

2    camera hadn't turned on so I ensured that the camera

3    turned on.

4         And as I'm calling him out then, I mean,

5    you can see from that point forward I was trying to

6    talk to him in nice, calm, reassuring tones.  I was

7    trying to calm him back down.  He did finally come

8    towards me and I had him turn around, put his hands

9    on -- I believe it was on the back of his head.  I

10   got him in cuffs, locked him in cuffs.  And I believe

11   it was at that point that I moved him over to the

12   side of the porch steps and sat him down with his --

13   excuse me, his feet crossed so he couldn't ambulate,

14   like take off sprinting on me, it would take him a

15   second to stand up.

16        **Q.   Understanding that you had been told**

17   **Mr. Aumick was intoxicated, did he, or was he steady**

18   **on his feet, based upon your observations?**

19        A.   I didn't smell any intoxicants.  When

20   he was moving he -- he did not appear to have the

21   sway of some individuals, when they're intoxicated

22   they'll kind of sway in a circle.  To me it did not

23   appear that way.

24        **Q.   When you turned on your body cam,**

25   **where were you located?**

1          (Video was played.)

2          BY:  MS. ALLEN

3          Q.    So at approximately 6:16 and

4   approximately 42 seconds you report that you had the

5   scene secured, correct?

6          A.    Yes.  To try and get the ambulance en

7   route.  And you also have to realize a scene can go

8   from being secure to uncooperative in -- they can

9   fight at any moment.  But yes, at this point right

10  now I called in that he was secured.

11         Q.    Okay.  And by secured, what did you

12  mean?

13         A.    That he wasn't fighting at this point

14  in time.  That I had him cuffed and sat down then I

15  wanted med as soon as possible.

16         (Video was played.)

17         BY:  MS. ALLEN

18         Q.    Okay.  So at approximately 6:17 and

19  9 seconds you approach Mary Aumick and state you're

20  going to check on your mom to Mr. Aumick, correct?

21         A.    Yeah.

22         (Video was played.)

23         BY:  MS. ALLEN

24         Q.    At that point you asked, he had a

25  knife?

```
 1                    (Video was played.)
 2              BY:  MS. ALLEN
 3              Q.    At this point, why didn't you move
 4   Mr. Aumick into your patrol car?
 5              A.    Because I was waiting for the
 6   ambulance to get here.  I was waiting for -- my logic
 7   was that the -- it would be easier for me to control
 8   where he was at as soon as the paramedics got there.
 9              Q.    What do you mean it would be easier
10   for you to control where he was at when the
11   paramedics got there?
12              A.    If he starts kicking and resisting in
13   the back of the vehicle, or actually the front seat
14   of the vehicle, it's -- it gets almost impossible to
15   get them out without injuring myself, injuring Mr.
16   Aumick, injuring the paramedic.  Whereas there was no
17   injury to -- risk of him if he would just sit there,
18   so...
19                    (Video was played.)
20              BY:  MS. ALLEN
21              Q.    Is this your police --
22              A.    Yes, ma'am.
23              Q.    -- vehicle you're approaching?
24              A.    Yes.  Because it was dark I was
25   trying to turn the lights so that I -- the front
```

```
 1    headlights would light up the whole front yard.  That
 2    was all.
 3                (Video was played.)
 4                BY:  MS. ALLEN
 5                Q.    When you're directing Mr. Aumick to
 6    stop, what are you meaning by stop?  He was
 7    handcuffed, sitting on the porch steps, correct?
 8                A.    Yes, ma'am.  He was also yelling and
 9    -- I don't think you can quite see it.  But he would
10    kick at my legs and feet every time that I would even
11    be remotely by him.
12                (Video was played.)
13                THE WITNESS:  He just threatened to start
14    shooting again.
15                BY:  MS. ALLEN
16                Q.    Did you have any concern of him
17    shooting you at that point while he was handcuffed,
18    sir?
19                A.    My concern was that he never stopped
20    and complied, he was still very argumentative, very
21    noncompliant with everything I said.  So yes, I was
22    concerned that at a different point in time that he
23    may try and escalate again.
24                (Video was played.)
25                BY:  MS. ALLEN
```

1           Q.   Are you doing anything at this point

2   to restrain Mr. Aumick?

3           A.   Yes.  I had him cross his legs and

4   then they were bent back up against his butt and I

5   had my knee leaned into the back part of his crossed

6   legs.

7           Q.   If we look at your report on Page 4,

8   your narrative.

9           A.   Page 4?

10          Q.   Yes.  It says page at the top.

11          A.   I gotcha.  Okay.

12          Q.   Okay.  A few lines up from the last

13   paragraph you state, I instructed Shane to cross his

14   feet and place them against his backside?

15          A.   Uh-huh.

16          Q.   Did -- is that a yes?

17          A.   Yes.

18          Q.   Did he do that?

19          A.   Yes.

20          Q.   I was able to catch his foot and make

21   him comply.  Even with the leg -- suspect's legs

22   crossed and my weight on his crossed legs he was able

23   to buck his body up and move his legs trying to kick

24   me.

25          A.   Yes.

```
 1              Q.   Did that happen?
 2              A.   Yes.
 3              Q.   It was at that point I moved into a
 4    side control position, placing my right knee into the
 5    middle of his back between his hip to control his
 6    lower body.  Did you, in fact, do that?
 7              A.   I'm trying to catch up to where
 8    you're at, I'm sorry.  Okay.  It was at this point --
 9    crossed -- yes.  If you continue to watch the video,
10    he continues to kick and buck.  The side control that
11    I am -- did you --
12              Q.   Right.  I was asking.  You then
13    state, I moved into a side control position.
14              A.   Yes.  Standing at his side with my --
15              Q.   Placing my right knee into the middle
16    of his back between his hips to control his lower
17    body.  Did you do that?
18              A.   Yeah.  Momentarily on the -- it
19    wasn't really on so much of his back but into the
20    lower portion of his, I guess, butt crack.  And then
21    when I'm saying that -- wait.  While placing my left
22    knee --
23              Q.   Up onto --
24              A.   -- up onto -- into the pocket by his
25    head so that I could maintain and try and use pain
```

```
 1    compliance with his arms in the cuffs.  But as you
 2    watch the video he continues to fight and kick and
 3    buck and he never complies.  And so that was when --
 4    when that didn't work that's when I moved off to the
 5    side.
 6            Q.   I'm sorry.  You moved off to the side
 7    where?
 8            A.   Of his person.  I moved onto -- I'd
 9    have to show you on the video.  It would be easier to
10    explain on the video.
11            Q.   And I just want to ask you.  Did you
12    have your right knee in the middle of his back, as
13    you write here, and your left knee up onto his lower
14    cranium to control his upper body?
15            A.   No, not in the way that you're
16    describing it.  I had my knee --
17            Q.   Sir, I'm using your words and your
18    report.  So I'm not describing or -- anything but --
19    other than what you've written here, sir.
20            MR. BERTELS:  Objection, argumentative.
21    Move to strike.
22            BY:  MS. ALLEN
23            Q.   I'm asking did you or did you not do
24    as you've written here in your report marked for
25    identification as Exhibit Number 7?
```

1            A.    I placed my right knee down on -- it
2    would be on his -- by his -- for lack of better term,
3    his butt crack.  And then the other one was not on
4    his neck or head, it was in the side, it was off to
5    the side.  So I guess -- I apologize for not making a
6    clearer picture.  However, my knee was not on his
7    head or neck, it was to the side of it to allow me to
8    move my one arm up underneath and attempt to get
9    compliance with his arms, raising his shoulders and
10   arms in an elevated position to try and attempt to
11   get pain compliance which at no point he did.  It
12   was...
13            Q.    Let's look at this a little bit.
14            (Video was played.)
15            BY:  MS. ALLEN
16            Q.    Who are you speaking to at this
17   point, sir?
18            A.    It would be a paramedic.
19            Q.    And is that the paramedic Steve Wood?
20            A.    I'm not sure.  I couldn't see the
21   name tape on it.  It's one of the two.
22            Q.    Mr. Wood prepared a voluntary
23   statement --
24            A.    Uh-huh.
25            Q.    -- for the Ava Police Department

```
 1              Q.    Paramedic.
 2              A.    Yes.
 3              Q.    Okay.  Do you have any reason to
 4    dispute the statement that Mr. Wood provided to the
 5    Ava Police Department?  Sorry, I think I hit play
 6    before you answered the question.
 7              A.    No.
 8              (Video was played.)
 9              BY:   MS. ALLEN
10              Q.    At that point you state you'll get
11    off his back when he stops.  Is that the position you
12    recall being in at that point in time?
13              A.    To clarify, I said back but I was on
14    his butt.
15              (Video was played.)
16              THE WITNESS:  Now I'm standing.
17              BY:   MS. ALLEN
18              Q.    What position are you in now, Officer
19    Berkshire, to your recollection, with regard to Mr.
20    Aumick's body?
21              A.    Leaning over him on the -- just prior
22    to this -- prior to you stopping it I was actually
23    off to the back -- my knee was down on the ground
24    trying to hold one arm up and place it on the
25    forearm.
```

```
 1              Q.    And how do you recall that as you sit
 2     here today?
 3              A.    Because that's the position that I
 4     tried to stay in off to the side so that I wouldn't
 5     be on his back or in the middle of it or anything
 6     else to control him, especially when he's in cuffs.
 7     If you can control their hips and that arm and
 8     shoulder you control them.
 9              Q.    Where did you write this in your
10     report, that you had changed positions?
11              A.    I guess I didn't specify.  I thought
12     it was clear in the video.
13              Q.    We can't see your position in the
14     video, would you agree with me?
15              A.    No, I don't agree with you.  Because
16     there's several times that you can see throughout the
17     video that I'll be either off to the side or standing
18     up a large portion and leaning over him.
19              (WHEREIN, Exhibit 9 was marked for
20     identification.)
21              (Video was played.)
22              BY:  MS. ALLEN
23              Q.    I'm going to hand to you what I
24     marked for identification as Exhibit 9, sir.  Are you
25     familiar with this policy and procedure of the City
```

```
 1    the side or not, sir.  Is this your shadow that we're
 2    seeing here?
 3              A.    My shadow's right here.
 4              Q.    When you state, she was outside, he
 5    was inside, I had to go back and bring her back in,
 6    what was that in response to?
 7              A.    I don't know at this time.
 8              Q.    Was that a question Mr. Wood asked
 9    you?
10              A.    I don't know.
11              Q.    The paramedic?
12              A.    I don't know who or what the question
13    was in reference to at this point.
14              (Video was played.)
15              BY:   MS. ALLEN
16              Q.    Would you agree with me, sir, that
17    Mr. Aumick asked you to get off?
18              A.    Yes, that's what he stated.
19              Q.    What were you on?
20              A.    I was off to the side.  I was
21    controlling his shoulders.
22              Q.    Where is that written in your report
23    that you were off to the side controlling Mr.
24    Aumick's shoulders?
25              A.    It's not -- I don't believe it -- I
```

```
 1    stated that -- that was part of the side control.
 2    But you're also not noting that he continues to
 3    threaten and kick and tell -- he continues to
 4    threaten myself and the paramedic and continues to
 5    fight the entire time.
 6              Q.    Right.  But you declined to tase him,
 7    correct?
 8              A.    Ma'am, I was trying to use the least
 9    possible force.  I think you would probably -- I
10    think you would be just as upset if I did tase him
11    then we'd be having a completely different
12    conversation.
13              Q.    Yes.  And Mr. Aumick may be alive
14    today, correct?
15              MR. BERTELS:  Objection, calls for
16    speculation, lacks -- if you know, you can answer.
17    Asks for a medical testimony too, calls for expert
18    testimony.  You can answer, if you know.
19              BY:  MS. ALLEN
20              Q.    You mentioned that you were in the
21    side position and had Mr. Aumick by his shoulders?
22              A.    Uh-huh.
23              Q.    I'm asking you, where in your report
24    did you document that?
25              A.    It's right here where I say it was at
```

```
 1    this point I moved between --
 2              Q.     Which page are you on, sir?
 3              A.     It's on Page 4, ma'am.
 4              Q.     Okay.
 5              A.     I repeatedly instructed the suspect
 6    to stop, to stop resisting.  I instructed -- chains
 7    across his feet, placed him against his backside.  I
 8    was able to catch his foot.  This is as we were
 9    talking earlier, and proceeded to continue through.
10    Even with the suspect's legs crossed and my weight
11    across his legs he was able to buck up and -- buck up
12    and move his legs trying to kick at -- to kick me.
13    It was at this point I moved into a side control
14    position, the side control position with my right
15    knee up in the middle of his butt -- or I said back
16    here but it's into his butt, on the side.
17              I guess the side control position, I'm
18    assuming that the reader knows body control and
19    Jujitsu.  Jujitsu side control you control from the
20    side, you're not putting your knees into him.  It's a
21    side position to control the knee -- excuse me, the
22    hips and then the upper torso, the head.  That's why
23    I was controlling -- taking control of -- had my one
24    knee on the side and then the other side and then
25    trying to control his shoulders.
```

```
 1              Q.    I'm going to hand you what I've
 2    marked for identification as Exhibit 10.  Are you
 3    familiar with the City of Ava's response to
 4    resistance policy?
 5              A.    I knew it better at one point.  I
 6    would have to read it now.
 7              Q.    Were you thoroughly trained in its
 8    contents?
 9              A.    Yes.  When we were hired we went over
10    the uses of force and when that is necessary.
11              Q.    On Page 2 there is a reference,
12    Paragraph G, to excited delirium is a state of
13    extreme mental and physiological excitement
14    characterized by extreme agitation, hypothermia,
15    hostility, exceptional strength and endurance without
16    apparent fatigue.  What thorough training did you
17    receive regarding excited delirium pursuant to the
18    City of Ava policy?
19              A.    I don't remember any training on the
20    excited delirium.
21              Q.    Okay.  If we move to -- and you'll
22    see a note down here where it has a Bates stamp, as
23    we call it, Ava 65.
24              A.    Okay.
25              Q.    That relates to the use of taser, --
```

KALEB BERKSHIRE 10/22/2021

Page 112

```
 1              A.    Just from the -- through the
 2    sheriff's academy they taught PPCT, which is in the
 3    -- in accordance with the same restraints.
 4              Q.    If you flip to Page Ava 72 under
 5    training, officer shall receive in-service training
 6    on an annual basis regarding defensive tactics and
 7    the use of physical force and control holds.  Did I
 8    read that correctly?
 9              A.    Yes, ma'am.
10              Q.    Did you receive training on defensive
11    tactics and the use of physical force and control
12    holds?
13              A.    Not while I was there, no.
14              Q.    It further states, this training will
15    be consistent with current legal trends and generally
16    accepted law enforcement procedures.
17              A.    Okay.
18              Q.    You did not receive any training with
19    the City of Ava in regard to the use of physical
20    force and control holds; is that your testimony?
21              A.    My testimony is that I received it
22    while during the academy.  The -- according to state
23    law it's -- with POST you have a year that that
24    training's good.  So by the next year, that next
25    annual date you have to have that training again.
```

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

Case 6:21-cv-03072-BP   Document 97-1   Filed 06/30/22   Page 35 of 35