Transcript of the Testimony of

# LEE MORROW, M.D.

April 6, 2022

AUMICK vs CITY OF AVA

6:21-cv-03072-BP



Alpha Reporting & Video
1911 S. National Ave., Suite 405
Springfield, MO 65804
Phone: 417-887-4110
transcripts@alphareportingservice.com
www.alphareportingservice.com

**Exhibit A**

1  the body with respect to who?  Officer Berkshire and
2  Steve Wood?
3  A. Correct.
4  Q. Anyone else?
5  A. Those were the only two individuals on the video that
6  I saw touching Mr. Aumick during this period.
7  Q. Okay.  Do you believe that Shane Aumick bears some
8  responsibility for his death?
9       MS. ALLEN:  I'm going to object.  That calls
10 for a legal conclusion and invades the province of
11 the jury.
12      But, Doctor, that being said, my objection's
13 for the record.  So you can go ahead and answer.
14 A. Well, I think that the ingestion of methamphetamine
15 contributed to Shane's death, and I put that into my
16 opinions here in several places.  And certainly
17 neither the officer nor the EMT gave Shane those
18 drugs.  So there Shane absolutely played a role in
19 this here in terms of taking the drugs, but taking
20 the drugs in and of itself didn't result in his
21 death.  There had to be a subsequent cascade of
22 events that led to the cardiac arrest.
23 Q. (By Mr. Hyde) Do you believe his resisting arrest
24 played a role in his death?
25      MS. ALLEN:  Same objection.

1　the tissues and the carbon dioxide away from the

2　tissues.  And when Steve Wood showed up -- you know,

3　any healthcare worker would recognize that bleeding

4　requires immediate attention.  When the EMT showed

5　up, I didn't see any assessment at all on Mr. Aumick

6　regarding his wounds.  Mr. Aumick was laying prone.

7　There was blood everywhere.  There was the back and

8　forth with the officer about a knife and knife

9　wounds.  It's entirely plausible that he could have

10　had substantial wounds somewhere else on his body,

11　and those would need to be immediately identified,

12　and it would change the urgency of the medical

13　response.

14　　　　So I guess the biggest problem with Mr. Wood

15　was that there was no EMT services.  He acted in more

16　of a police officer's role in restraining Shane.  And

17　there was literally no assessment of Mr. Aumick's

18　medical needs.

19　　　　There was also, I would argue, no real

20　monitoring.  So, you know, if he's not going to do an

21　assessment, there could at least be some closer

22　monitoring of what's happening with Mr. Aumick as

23　he's laying on the ground.  And the video shows a

24　prolonged period where he's completely still and not

25　making any noises after this, you know, very lengthy,

1       THE WITNESS:  I'm sorry.  Zoom sort of
2  sometimes mutes the other person's microphone.  So
3  thanks for waving at me.
4  A. So I think that there's no way of knowing when the
5  EMT arrives on scene whether the bleeding has stopped
6  or not.  If he's lying facedown, there could be
7  active bleeding underneath him, or there could be
8  internal bleeding if something -- he had stabbed
9  himself.  So there's no way of knowing that.  So the
10 bleeding is one piece of my criticism.  But as I
11 said, there was no assessment done, no real
12 monitoring.  And EMTs -- any healthcare provider, you
13 know, we're instructed ABCs -- airway, breathing,
14 circulation.  Those are the things that we have to
15 make sure are stable at all points in time.  And as
16 we see, Mr. Aumick's breathing was not stable here,
17 and that wasn't recognized.
18 Q. (By Mr. Hyde) Let's talk about this blood loss,
19 though, a little bit more.
20 A. Sure.
21 Q. So what do you believe Steve Wood should do when he
22 first arrives on this scene with no history about
23 Mr. Aumick and finds a person in police custody
24 cuffed in the prone position and sees this blood on
25 the house and the restrained person fighting while in

1  Q. Do you believe Shane Aumick was acidotic while in the
2     restraints?
3  A. Yes.  I think that he had a couple of different
4     significant explanations for why he would be
5     acidotic.  Again, the only way one could know is to
6     take a sample of the blood and measure the pH level.
7  Q. And we don't know what that is, of course.
8  A. We do not.
9  Q. And so your opinion that you think at some point he's
10    suffering from acidosis is based on what?
11 A. It's based on all of that physiology I mapped out
12    which is why I went into such detail.  If you don't
13    provide enough oxygen to your tissues, they switch
14    over from the normal physiology which is aerobic
15    metabolism, creating energy for the body by using
16    oxygen to break down glucose to give you the energy
17    that you need.  That's the normal physiology.
18         If you don't have enough oxygen, you can't do
19    that, and your body has to have energy.  So it
20    switches from aerobic oxygen-based metabolism to
21    anaerobic nonoxygen-based metabolism.  And when that
22    happens, you very quickly start to produce lactate.
23    This is why, when you go out and run, you get cramps
24    in your calves.  The lactate builds up in the body
25    very quickly.

1　　　　So we had a situation where, because Shane

2　couldn't breathe and his oxygen levels were low, he

3　was creating lactate that way.  We know that he was

4　intoxicated on methamphetamine which revs the

5　metabolism way up.  So he would require a lot of

6　oxygen to make that happen.  So it sort of

7　predisposed him from this metabolic acidosis.

8　　　　At the same time that is going on, due to his

9　positioning, his breathing was ineffective, and he

10　wasn't blowing off -- exhaling all of the

11　carbon dioxide his body was generating.  And when

12　carbon dioxide builds up -- that is an acid.  And

13　when carbon dioxide builds up, we call that

14　respiratory acidosis.  So he had two major

15　pathways -- metabolic and respiratory -- to become

16　acidotic, and acidosis develops very quickly and

17　kills one very quickly.

18　Q. And he was first in your view -- he first had

19　metabolic acidosis?

20　A. I don't know that I can tell you with any degree of

21　certainty which came first.  I think, if we look at

22　the events, that both of them were happening at the

23　same time.

24　　　　MS. ALLEN:  I note that we've been going for an

25　hour.  Does anyone need a break?

1  Q. Well, one reason why is the things I read in 14 of
2     these 21 case reports. So I'm not a pathophysiology
3     expert, and I don't pretend to be.
4  A. Sure.
5  Q. But my question is usually -- my theory is usually
6     you would have some physical findings on autopsy if
7     the person died of positional asphyxia. And you
8     disagree with that?
9  A. Well, I'm not a pathologist, and I don't do
10    autopsies. But as a physician, the mechanisms
11    whereby positional asphyxia results in death has to
12    do with restraining the normal musculature that
13    drives respiration, and that can happen in a way that
14    doesn't cause any gross abnormalities that one would
15    see at an autopsy.
16        So thinking specifically about Mr. Aumick's
17    case, you know, there could be autopsy findings
18    related to the handcuffs and pulling against the
19    handcuffs. But if one were to look at the chest
20    wall, the musculature of the rib cage, the
21    diaphragms, and the lungs themselves, there's no
22    structural changes to those entities. It's the
23    positioning that causes those structures to not be
24    able to function normally as opposed to directly
25    damaging them.

1  this down to Steve Wood -- and I'm using what you

2  told me, but I want to make sure I've got it.  You're

3  critical of Steve Wood in, number one, his failure to

4  properly assess the blood loss?

5  A. Correct.

6  Q. And, number two, in his delay in monitoring this

7  patient once the patient became still?

8  A. Correct.

9  Q. And is that it?

10          MS. ALLEN:  I'll just object that that does not

11  fully cover the testimony provided by the doctor

12  prior.  Other than that, you can go ahead and

13  elaborate, Doctor.

14  Q. (By Mr. Hyde) Or you cannot elaborate, Doctor.  Just

15  tell me if I've got it wrong.  I do want you to tell

16  me if I've got it right.

17  A. Those are both concerns.  Again, airway, breathing,

18  circulation need to be assessed, reassessed,

19  re-reassessed and certainly anytime there's a change

20  in his clinical status.  It's something that we call

21  the direct methodology.  You detect that something is

22  wrong, then you intervene, and then you reassess.

23  That's D-I-R in direct.  The E-C-T is effective

24  communication in teamwork.  It's like a fundamental

25  thing that we do in the healthcare setting.

1      There was no detection.  There was no
2 intervention.  And there was no reassessment.  That's
3 what I'm critical of.  And, you know, there was no
4 need for him to be assisting with restraints.  There
5 was no attempt, once the patient had that change in
6 his overall clinical picture, to try to do any
7 reassessment and determine if we have a new problem.
8 That's what I'm critical of of the healthcare
9 provider.
10 Q. And the criticism on those assessments, as you've
11    outlined, do you believe Steve Wood was negligent?
12         MS. ALLEN:  I'll object.  It calls for a legal
13    conclusion and invades the province of the jury.  You
14    can go ahead and answer, Doctor.
15 A. I don't -- I think that that's a question that one
16    would have to ask of a fellow EMT.  I'm viewing it
17    from the perspective of a physician.
18 Q. (By Mr. Hyde) Okay.  And that was going to be my next
19    question.  If we take this situation of a paramedic
20    assessing a person in the dark on the ground in this
21    situation in police custody, you've actually never
22    done that?
23 A. If I have, sir, it has been 25 years back in the day.
24    Medicine residents, during their emergency department
25    rotation, did EMT ridealongs, and I think it's

1    offer opinions beyond what's contained in your
2    written report that we've went over here today, that
3    you'll let Ms. Allen know prior to trial and she'll
4    do what she needs to do?
5 A. Oh, absolutely.
6         MR. BERTELS:  I don't think I have any more
7    questions, sir.  Thank you for your time.
8                        EXAMINATION
9 BY MR. HYDE:
10 Q. Doctor, would you agree with me that you cannot say
11    with reasonable medical certainty that, if this man
12    had been assessed as you've outlined and CPR started
13    three minutes or four minutes earlier, that he would
14    have survived?
15 A. Can I say that with certainty?
16 Q. Yes, sir, reasonable medical certainty.
17         MS. ALLEN:  I'll object.  It calls for
18    speculation and lack of foundation as to the facts
19    that occurred.
20 A. I cannot say it with medical certainty because that's
21    a hypothetical scenario.  What I can tell you is that
22    the likelihood of successful CPR goes up
23    substantially if it is started as soon as possible
24    relative to the onset of a nonperfusing cardiac
25    rhythm, meaning if somebody's heart goes from normal

1   functional beating to one of these erratic rhythms
2   that doesn't allow it to pump blood, literally the
3   clock starts right then.  And the longer one waits to
4   start CPR, the less effective it's going to be.  That
5   is an indisputable fact.  And let me tell you the
6   decay in success rate is very fact.  Essentially if
7   it's more than a couple of minutes, the likelihood of
8   re-establishing a perfusing rhythm goes down to the
9   single digits.  And even if one restores a perfusing
10  rhythm, that doesn't mean that the patient is going
11  to neurologically recover.
12  Q. (By Mr. Hyde) I understand that.  I appreciate that.
13  But in the case of Shane Aumick, given his
14  presentation, methamphetamine, and everything you
15  know about the case, you cannot say with reasonable
16  medical certainty that, if CPR had been started three
17  minutes or four minutes earlier, he would have
18  survived.  You can't do that, can you?
19  A. I can't say that with medical certainty, no.
20       MR. HYDE:  Thank you, Doctor.  I don't think I
21  have anything else.
22       MS. ALLEN:  Doctor, you have the opportunity to
23  review your deposition and get a copy of that, or you
24  may waive your signature on review of the deposition.
25  So that is up to you if you would like to read and