# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MISSOURI

RACHEL AUMICK, Individually and )
on behalf of the Heirs at Law of SHANE )
AUMICK, deceased, )
 )
  Plaintiff, )
 )
V. )  **Case No. 6:21-cv-03072-BP**
 )
CITY OF AVA, MISSOURI, )
et al., )  **JURY TRIAL DEMANDED**
 )
  Defendants. )

## PLAINTIFF'S SUGGESTIONS IN OPPOSITION TO DEFENDANTS CITY OF AVA, MISSOURI AND BERKSHIRE'S MOTION FOR SUMMARY JUDGMENT

  **COMES NOW** Plaintiff, by and through counsel and hereby submits her Opposition to Defendants City of Ava, Missouri and Berkshire's Motion for Summary Judgment.

<u>Table of Contents</u>

Table of Authorities………………………………………………………… 3

INTRODUCTION…………………………………………………………….. 5

PLAINTIFF'S RESPONSE TO DEFENDANTS'
STATEMENT OF UNCONTROVERTED MATERIAL
FACTS AND ADDITIONAL STATEMENT OF
UNCONTROVERTED MATERIAL FACTS THAT
PRECLUDE SUMMARY JUDGMENT……………………………………….. 5

RESPONSE TO DEFENDANTS' STATEMENT
OF UNCONTROVERTED MATERIAL FACTS…………………………….. 5

PLAINTIFF'S ADDITIONAL STATEMENT OF
UNCONTROVERTED FACTS……………………………………………….. 23

ARGUMENT…………………………………………………………………….. 31

CONCLUSION…………………………………………………………………... 47

Certificate of Service……………………………………………………….. 48

*Atkinson v. City of Mountain View, Mo.*, 709 F.3d 1201 (8th Cir. 2013)……………….   44

*Benson v. Kansas City Bd. Of Police Com'rs*, 336 S.W.3d 120 (Mo.App.W.D. 2012)…   47

*Blazek v. City of Iowa*, 761 F.3d 920 (8th Cir. 2014)……………………………………   39

*Blue v. Harrah's N. Kansas City, LLC*, 170 S.W.3d 466 (Mo. App. W.D. 2005)……....   46

*Bd. of County Com'rs v. Brown*, 520 U.S. 397 (1997)…………………………………   44

*Camberos v. Branstad*, 73 F.3d 174 (8th Cir.1995)……………………………………   42

*Chambers v. Pennycook*, 641 F.3d 898 (8th Cir. 2011)………………………………   39

*City of Canton, Ohio v. Harris*, 489 U.S. 378 (1989)…………………………………   43, 44

*City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239 (1983)…………………………….   42

*Davis v. Lambert-St. Louis Intern. Airport,* 193 S.W.3d 760 (Mo. banc 2006)………..   45

*Davis v. White*, 794 F.3d 1008 (8th Cir. 2015)………………………………………   46

*Drummond ex rel. Drummond v. City of Anaheim,* 343 F.3d 1052 (9th Cir. 2003)…….   40

*Graham v. Connor*, 490 U.S. 386 (1989)………………………………………………   37, 44

*Hartsfield v. Colburn,* 371 F.3d 454 (8th Cir.2004)……………………………………   42

*Jackson v. City of Wentzville*, 844 S.W.2d 585 (Mo. App. E.D. 1993)……………….   46

*Johnson v. Carroll*, 658 F.3d 819 (8th Cir. 2011)……………………………………..   40

*Johnson v. City of Cincinnati*, 39 F.Supp.2d 1013 (S.D. Ohio 1999)…………………   40

*Jungerman v. City of Raytown*, 925 S.W.2d 202 (Mo. banc 1996)……………………   45

*Kinder v. Missouri Dept. of Corr.*, 43 S.W.3d 369 (Mo.App.2001)…………………..   47

*Krout v. Goemmer,* 583 F.3d 557 (8th Cir. 2009)……………………………………..   40

*Monell v. Dep't of Soc. Serv. of N.Y.,* 436 U.S. 658 (1978)…………………………..   42, 43

*Plumhoff v. Rickard*, 134 S. Ct. 2012, 2023(2014)…………………………………...   37, 38

*Schaub v. VonWald*, 638 F.3d 905, 914 (8th Cir. 2011)………………………………   42

*Simpson v. Hines*, 903 F.2d 400 (5th Cir. 1990)………………………………………   42

*Southers v. City of Farmington*, 263 S.W.3d 603 (Mo. banc 2008)………………..   45, 46

*Szabla v. City of Brooklyn Park, Minn.*, 486 F.3d 385 (8th Cir. 2007)……………       43

*Tatum v. Robinson*, 858 F.3d 544 (8th Cir. 2017)…………………………………..       37, 39

*Thompson v. King*, 730 F.3d 742 (8th Cir. 2013)…………………………………       42

*Thomas v. City of St. Louis, Missouri*, No. 4:18-CV-01566 JAR, 2021

WL 4622502 (E.D. Mo. Oct. 7, 2021)……………………………………………       40

*State ex rel. Twiehaus v. Adolf*, 706 S.W.3d 443 (Mo. 1986)………………………       46

*Walton v. Dawson*, 752 F.3d 1109 (8th Cir. 2014)…………………………………       31

*Weigel v. Broad*, 544 F.3d 1143 (10th Cir. 2008)…………………………………       40

*White v. Pauly*, 137 S.Ct. 548 (2017)………………………………………………       37

<u>INTRODUCTION</u>

This Court is well aware of the heavy burden that a party moving for summary judgment bears in succeeding with such a motion, so Plaintiff will not repeat those well settled standards here. Defendants have failed to meet that burden. When viewed in the light most favorable to Plaintiff, those facts compel denial of Defendants' motion because genuine issues of material fact exist.

**PLAINTIFF'S RESPONSE TO DEFENDANTS' STATEMENT OF UNCONTROVERTED MATERIAL FACTS AND ADDITIONAL STATEMENT OF UNCONTROVERTED MATERIAL FACTS THAT PRECLUDE SUMMARY <u>JUDGMENT</u>**

RESPONSE TO DEFENDANTS' STATEMENT OF
<u>UNCONTROVERTED MATERIAL FACTS</u>

1.      Plaintiff Rachel Aumick brings this lawsuit on behalf of the heirs of Shane Aumick who is deceased. Doc. 55 (First Amended Complaint) at ¶ 1.

    Response:      ADMIT

2.      Plaintiff Rachel Aumick is the surviving spouse of Shane Aumick. See Doc 55 at ¶ 5.

    Response:      ADMIT

3.      Defendant City of Ava ("the City") is a political subdivision in Missouri. Doc 55 at ¶ 6.

    Response:      ADMIT

4.      At all relevant times herein, Defendant Kaleb Berkshire was a police officer employed by the City.  Doc 55 at ¶ 8.

    Response:      ADMIT

5.	Officer Berkshire was previously in the military and received Special Operations Training at Fort Bragg.  Ex. A (Deposition of Kaleb Berkshire), p. 17, line 22 – p. 18, line 25

Response:	ADMIT to the extent that was his testimony in this case.

6.	Officer Berkshire received his law enforcement training from the Missouri Sheriff's Academy, as well as Missouri's POST Training.  Exhibit A, p. 23, line 8 – 20; Ex. B (Officer Berkshire's Training Records; Plaintiff's Deposition Exhibit 3) at p. 1-2.

Response:	ADMIT

7.	When he was hired with the City, Officer Berkshire was provided the policies and procedures for the Ava Police Department. Exhibit A, p. 24, line 2-15.

Response:	ADMIT to the extent that was his testimony, but DENY that he executed the Ava Police Department's Mission Statement as one has never been produced.

8.	Officer Berkshire also received training while he worked at the City for a little over a year.  Ex. A, p. 26, line 20 – p. 28, line 2; Ex. B.

Response:	ADMIT

9.	Officer Berkshire was trained on the contents of Ava's Use of Force policy. Ex. A, p. 108, line 1-10.

Response:	ADMIT to the extent that was his testimony.

10.	Officer Berkshire received training on the use of physical force and control holds during his law enforcement training.  Ex. A, p. 112, line 18-25.

Response:	ADMIT to the extent that was his testimony.

11.     Specifically, the restraint tactic used by Officer Berkshire in this case was taught to him as part of his training at the Missouri Sheriff's Academy.  Ex. A, p. 32, line 18 – p. 33, line 5.

Response:     DENY

12.     On April 4, 2020, Officer Berkshire was dispatched to a domestic call at 507 Pennington Avenue in Ava.  Doc 55 at ¶ 16.

Response:     ADMIT

13.     Dispatch reported to Officer Berkshire that there was a report of a female injured and a male subject intoxicated. Medical assistance was also requested by dispatch.  Ex. C (affidavit of Kaleb Berkshire) at ¶ 3.

Response:     ADMIT the Ava Police Report states as such on Call for Service.  *See* Ava Police Report at p. 1 attached hereto as Exhibit 2.

14.     The call from dispatch was that there was an assault on a family member, which would be domestic assault.  Ex. A, p. 59, line 10-19.

Response:     ADMIT that the Ava Police Department Report noted the crime as a domestic assault.  *See* Exhibit 2 at p. 1.

15.     Officer Berkshire was not familiar with Shane Aumick or his family prior to being dispatched.  Ex. A, p. 42, line 8-14.

Response:     ADMIT to extent that was his testimony.

16.     Upon arrival at the scene, Officer Berkshire found an individual later identified as Mari Aumick covered in blood on her arms and blouse.  Ex. A, p. 61, line 23 – p. 62, line 6.

Response:     ADMIT

17.     Officer Berkshire was told by a male later identified as Houston Thomas, that his stepson was inside the house with a knife and was rampaging in the house.  Mr. Thomas also said the stepson was intoxicated and not in the right frame of mind.  Ex. A, p. 62, line 7-19; Ex. C at ¶ 4.

Response:     ADMIT

18.     Officer Berkshire approached the residence and an individual later identified as Shane Aumick came out of the house with a knife, stating he was going to kill everyone, and that people were there trying to kill them.  Ex. A, p. 63, line 7 – 17.

Response:     DENY as no body camera footage exists and Ms. Aumick testified that she did not see Berkshire draw his weapon, but that he walked to the door, walked up on the porch and Shane came out the door and that's when Berkshire handcuffed him.  She testified that the knife was down on the ground before the officer arrived and Shane never picked that knife back up.  *See* deposition of Meri Aumick at p. 75, l. 22 – p. 76, l. 2 and p. 78, ll. 3-9 attached hereto as Exhibit 3.

19.     Officer Berkshire told Mr. Aumick to place his weapon on the ground and to put his hands on his head multiple times.  Ex. C at ¶ 6.

Response:     DENY as no body camera footage exists and Ms. Aumick testified that she did not see Berkshire draw his weapon, but that he walked to the door, walked up on the porch and Shane came out the door and that's when Berkshire handcuffed him.  She testified that the knife was down on the ground before the officer arrived and Shane never picked that knife back up.  *See* Exhibit 3 at p. 75, l. 22 – p. 76, l. 2 and p. 78, ll. 3-9.

20.     Officer Berkshire also radioed into dispatch to get an ambulance staged and that he needed backup. Exhibit A, p. 71, line 1- 11; Ex. C at ¶ 7.

Response:    DENY that Berkshire radioed into dispatch to get an ambulance staged and that he needed back up at the time represented as no body camera footage exists and Ms. Aumick testified that she did not see Berkshire draw his weapon, but that he walked to the door, walked up on the porch and Shane came out the door and that's when Berkshire handcuffed him. She testified that the knife was down on the ground before the officer arrived and Shane never picked that knife back up. *See* Exhibit 3 at p. 75, l. 22 – p. 76, l. 2 and p. 78, ll. 3-9.

21.    Dispatch did not apparently hear this request. Ex, A, p. 72, line 3 – 6.

Response:    ADMIT to the extent that is his testimony and DENY as this is cause for speculation.

22.    Officer Berkshire was able to disarm the knife from Mr. Aumick, but Mr. Aumick was able to get away from Officer Berkshire's grasp and ran back into the residence. Ex. A, p. 73, line 6 – 17; Ex. C at ¶ 9.

Response:    DENY as no body camera footage exists and Ms. Aumick testified that she did not see Berkshire draw his weapon, but that he walked to the door, walked up on the porch and Shane came out the door and that's when Berkshire handcuffed him. She testified that the knife was down on the ground before the officer arrived and Shane never picked that knife back up. *See* Exhibit 3 at p. 75, l. 22 – p. 76, l. 2 and p. 78, ll. 3-9.

23.    Officer Berkshire then went onto the porch to attempt to get Mr. Aumick to come out, and then realized that his body camera had not been activated, so he turned it on. Ex. A, p. 74, line 20 – p. 76, line 3.

Response:    DENY as no body camera footage exists and Ms. Aumick testified that she did not see Berkshire draw his weapon, but that he walked to the door, walked up on the porch and Shane came out the door and that's when Berkshire handcuffed him. She testified

that the knife was down on the ground before the officer arrived and Shane never picked that knife back up. *See* Exhibit 3 at p. 75, l. 22 – p. 76, l. 2 and p. 78, ll. 3-9.

24.    The body camera Officer Berkshire was wearing does not automatically turn on and needs to be manually activated. Ex. A, p. 47, line 22 – p. 48, line 9; Ex. C at ¶ 11.

    Response:    ADMIT to the extent that was his testimony.

25.    A copy of Officer Berkshire's body camera video of his encounter with Mr. Aumick from this point forward is attached at Exhibit D.

    Response:    ADMIT

26.    As Officer Berkshire approached the door, he instructed Mr. Aumick to come to the door. Mr. Aumick came to the doorway and was instructed to place his hands behind his back. Mr. Aumick was placed in handcuffs. Ex. A, p. 76, line 4-15; Ex. C at ¶ 12; Ex. D[1] at 6:14:08-6:15:19.[2]

    Response:    ADMIT

27.    Officer Berkshire reported the scene secured in order to get an ambulance on route. Ex. A, p. 83, line 3-15; Ex. D at 6:16:17-6:15:38.

    Response:    ADMIT

28.    While Officer Berkshire had been told that Mr. Aumick was intoxicated, he appeared steady on his feet, and Officer Berkshire could not smell any intoxicants. Ex. A, p. 76, line 16-23.

---

[1] Exhibit D is a video file which has been sent to the Clerk's Office with Defendants City of Ava, Missouri and Berkshire's Motion for Summary Judgment Suggestions in Support (Doc. 97) and as Exhibit D to Plaintiff's Response in Opposition to Defendants City of Ava, Missouri and Berkshire's Daubert Motion to Exclude Certain Expert Testimony of Hugh Mills (Doc. 100). Counsel for Plaintiff and Defendants' Ava and Berkshire have agreed to use the prior video exhibit already provided to the Court and have notified the Court's clerk as such to proceed accordingly.

Response:    ADMIT to the extent that was his testimony.

29.    Officer Berkshire instructed Mr. Aumick to sit on the steps of the porch which he initially did.  Ex. C at ¶ 13; Ex. D at 6:15:23 - 6:15:34

Response:    ADMIT that Berkshire instructed Mr. Aumick to sit on the steps of the porch and he complied.

30.    Officer Berkshire placed Mr. Aumick on the step of residence in a seated position rather than his patrol car because he thought it would be easier to control where Mr. Aumick was when the paramedics got there.  Ex. A, p. 87, line 3-8.

Response:    ADMIT to the extent that was his testimony.

31.    Officer Berkshire asked Shane Aumick where he was bleeding from, and he said his hands.  Mr. Aumick did not appear to be in any visible medical distress to Officer Berkshire, so he then went to check on Mari Aumick, who also did not appear to be in any medical distress.  Ex. C at ¶ 15; Ex. D at 6:16:47 – 6:17:50.

Response:    ADMIT to the extent that was his testimony.

32.    Officer Berkshire asked Mari Aumick what Shane Aumick was on, and she responded "vodka."  Ex. D at 6:17:50 – 6:18:05.

Response:    ADMIT

33.    Officer Berkshire again radioed to dispatch that the scene was secure and to get an ambulance to the location.  He stated Mr. Aumick had bloody hands and that Officer Berkshire would be bringing him into the police station once medical checked him out.  Ex. D at 6:18:18 – 6:18:38.

Response:    ADMIT

34.    Officer Berkshire asked Mr. Aumick is he was on anything other than alcohol because we there was a paramedic coming and they needed to know, to which Mr. Aumick responded "fuck no." Ex. D at 6:18:45 – 6:18:58.

Response:    ADMIT

35.    Officer Berkshire instructed Mr. Aumick to stop several times over the course of the next few minutes while Mr. Aumick was sitting on the porch steps because he was yelling and kicking at Officer Berkshire's feet every time Officer Berkshire would get close to the officer.  Mr. Aumick was also threating to start shooting again. Ex, A, p. 88, line 5-11; Ex. D at 6:19:02 – 6:21:30.

Response:    ADMIT to the extent Berkshire asks Shane to stop while he is seated on the porch in handcuffs, but DENY that Shane was visibly kicking Berkshire.

36.    At this point, Mr. Aumick was under arrest on suspicion of domestic assault, assault on a law enforcement officer, and resisting arrest.  Ex. C at ¶ 20.

Response:    DENY as the Ava Police Department Report noted the only crime as a domestic assault.  *See* Exhibit 2 at p. 1.

37.    Officer Berkshire again checked on the status of the ambulance that he had requested.  Ex. D at 6:20:25 – 6:20:32.

Response:    ADMIT

38.    Mr. Aumick laid himself down on the step and then rolled himself onto the ground.  Ex. D at 6:21:10 – 6:21:42.

Response:    DENY that Shane rolled himself onto the ground.  During the process of searching him for weapons, Defendant Berkshire turns Shane over from his back into a prone position on his stomach.  *Id.* at 06:21:47.

39.     Because Mr. Aumick never stopped and complied, and was very argumentative, Officer Berkshire was concerned at this time that Mr. Aumick may try and escalate the situation again.  Ex. A, p. 88, line 16-23; Ex. C at ¶ 23.

Response:     DENY as Shane laid in the prone position on the ground with his hands cuffed behind his back when Defendant Berkshire kneels down on his back.  *Id*. at 06:22:19.

40.     Officer Berkshire then instructed Mr. Aumick to cross his feet and place them against his back side which Mr. Aumick did, but he was still able to buck his body up and move his legs trying to kick at Officer Berkshire despite being told to stop. Exhibit A, p. 89, line 12 - p. 90, line 2; Ex. D at 6:21:48 – 6:22:18.

Response:     ADMIT and in addition note that Defendant Berkshire was kneeling on Shane's back at this time with Shane's hands cuffed behind him.

41.     Officer Berkshire then moved into a side control position and placed his right knee momentarily into the middle of his back between his hip and right above his buttocks to control his lower body.  Mr. Aumick continued to fight Officer Berkshire.  Ex. A, p. 91, line 3 – 22; Ex. D at 6:22:18 – 6:22:38; Ex. C at ¶ 25.

Response:     DENY the use of "momentarily" and "continued to fight" as Shane was in Defendant Berkshire's prone restraint on his stomach on the ground with his hands cuffed behind his back.  *Id*. and Exhibit 2 at p. 5.

42.     Officer Berkshire's left knee was not on Mr. Aumick's neck or head at this time; rather it was off to the side in order to allow Officer Berkshire to move his arm up underneath and attempt to get pain compliance with Mr. Aumick's' arms.  Exhibit A, p. 91, line 23- p. 92, line 12; Ex. C at ¶ 26.

Response:     DENY as Defendant Berkshire stated he placed his left knee up onto Shane's lower cranium to control his upper body.  Exhibit 2 at p. 5.

43.     Officer Berkshire was not able to get Mr. Aumick to comply and quit resisting; Mr. Aumick continued to fight despite Officer Berkshire's instructions to stop resisting. Exhibit A, p. 91, line 23- p. 92, line 12; Ex. C at ¶ 26.

Response: DENY the use of "continued to fight" as Shane was in Defendant Berkshire's prone restraint on his stomach on the ground with his hands cuffed behind his back. *Id*. and Exhibit 2 at p. 5.

44.     Paramedic Steven Wood arrived at the scene and was tasked with checking on an elderly female with dog bites. Ex. E (Deposition of Steven Wood) p. 12, line 3-10.

Response:     ADMIT to the extent that was his testimony.

45.     When Mr. Wood arrived at the scene, he heard yelling, screaming and cussing. He did not know what was going on. Ex. E, p. 22, line 17- p. 23, line 4.

Response:     ADMIT to the extent that was his testimony.

46.     Mr. Wood made contact with Officer Berkshire and observed Shane Aumick, with Officer Berkshire by him. Exhibit E, p. 26, line 6-15.

Response:     DENY as Defendant Wood wrote in his witness statement of April 7, 2020 that "officer [Berkshire] had his knee in the male's [Shane's] back". Exhibit 2 at p. 9.

47.     Upon arrival, Mr. Wood assessed Mr. Aumick's injuries when he kneeled down beside Aumick. Exhibit E, p. 53, line 20 - p. 54, line 4.

Response:     DENY as Defendant Wood acted in more of a police officer's role in restraining Shane and there was literally no assessment of Mr. Aumick's medical needs. *See* deposition of Dr. Lee Morrow at p. 24, ll. 14-18 attached hereto as Exhibit 4.

48.     Paramedic Wood spoke with Officer Berkshire. Officer Berkshire directed Mr. Wood to where Mari Aumick was and stated the blood at the scene was Mr. Aumick's blood. Ex. A, p. 92, line 16-21; Ex. D at 6:22:35 – 6:23:10; Ex. E, p. 27, line 1-12.

Response:      ADMIT

49.      Mr. Aumick continued to resist and said, "get off me."  Officer Berkshire responded that he would get off Mr. Aumick's back when he stopped resisting.  Ex. D at 6:23:10 – 6:23:18.

Response:      DENY the use of "continued to resist" as Shane was in Defendant Berkshire's prone restraint on his stomach on the ground with his hands cuffed behind his back.  *Id*. and Exhibit 2 at p. 5.

50.      At this time, Officer Berkshire was not on Mr. Aumick's back, but his right knee was actually on Mr. Aumick's buttocks.  Ex. A, p. 94, line 10-14, Ex. C at ¶ 30.

Response:      DENY as as Defendant Berkshire stated he placed his right knee into the middle of his back between his hip to control his lower body and not allow him to roll away while also placing my left knee up onto Shane's lower cranium to control his upper body and further, Defendant Wood wrote in his witness statement of April 7, 2020 that "officer [Berkshire] had his knee in the male's [Shane's] back".  Exhibit 2 at pp. 5 and 9.

51.      Officer Berkshire estimates his knee was placed above Mr. Aumick's buttocks for 45-60 seconds.  Ex. C at ¶ 28.

Response:      DENY as Defendant Berkshire stated he placed his right knee into the middle of his back between his hip to control his lower body and not allow him to roll away while also placing my left knee up onto Shane's lower cranium to control his upper body, Defendant Berkshire and Defendant Wood continued to restrain Shane until he went slack, and further Wood wrote in his witness statement of April 7, 2020 that "officer [Berkshire] had his knee in the male's [Shane's] back".  Exhibit 2 at pp. 5, 6 and 9.

52.      Officer Berkshire then stood up and again radioed to dispatch asking for backup from the County Sheriff's Office.  Ex. C at ¶ 31; Ex. D at 6:23:18 – 6:23:40.

Response:     DENY as Defendant Berkshire stated he placed his right knee into the middle of his back between his hip to control his lower body and not allow him to roll away while also placing my left knee up onto Shane's lower cranium to control his upper body, Defendant Berkshire and Defendant Wood continued to restrain Shane until he went slack, and further Wood wrote in his witness statement of April 7, 2020 that "officer [Berkshire] had his knee in the male's [Shane's] back". Exhibit 2 at pp. 5, 6 and 9.

53.     Officer Berkshire then moved into a modified side control position where one knee was at Mr. Aumick's hip, and the other was by his shoulder to allow him to attempt to raise Mr. Aumick's arms to get compliance. Ex. C at ¶ 32.

Response: DENY as Defendant Berkshire stated he placed his right knee into the middle of his back between his hip to control his lower body and not allow him to roll away while also placing my left knee up onto Shane's lower cranium to control his upper body, Defendant Berkshire and Defendant Wood continued to restrain Shane until he went slack, and further Wood wrote in his witness statement of April 7, 2020 that "officer [Berkshire] had his knee in the male's [Shane's] back". Exhibit 2 at pp. 5, 6 and 9.

54.     Officer Berkshire was not on Mr. Aumick's back at this point, rather his right knee was beside Mr. Aumick's buttocks. Officer Berkshire applied pressure, raising Mr. Aumick's arms on his back to attempt to get pain compliance, however Mr. Aumick did not respond to the pressure at all. Ex. C at ¶ 33.

Response:     DENY as Defendant Berkshire stated he placed his right knee into the middle of his back between his hip to control his lower body and not allow him to roll away while also placing my left knee up onto Shane's lower cranium to control his upper body, Defendant Berkshire and Defendant Wood continued to restrain Shane until he went slack,

and further Wood wrote in his witness statement of April 7, 2020 that "officer [Berkshire] had his knee in the male's [Shane's] back". Exhibit 2 at pp. 5, 6 and 9.

55.     During this time, Mr. Aumick continued to kick Officer Berkshire, struggle, and refuse directions to stop resisting. Ex. C at ¶ 34; Ex. D at 6:23:18 – 6:24:41.

Response: DENY the use of "resisting" as Shane was in Defendant Berkshire's prone restraint on his stomach on the ground with his hands cuffed behind his back. *See* Exhibit 1 at 06:23:18-6:24:41 and Exhibit 2 at p. 5.

56.     Paramedic Wood assisted Mary Aumick with minor bites and scrapes on her hands and forearms that had stopped bleeding. Exhibit E, p. 12, line 11-15.

Response:     ADMIT to the extent that was his testimony.

57.     Paramedic Wood found her injuries to be minor and knew she was being treated by his partner at the scene, so he went back to where Officer Berkshire was. Ex. E, p. 29, line 13- p. 30, line 2.

Response:     ADMIT to the extent that was his testimony.

58.     At this time, according to paramedic Wood, Mr. Aumick was on his belly, handcuffed, fighting with Officer Berkshire, who was having trouble keeping Mr. Aumick on the ground. Mr. Aumick was kicking and striking the officer in the side, neck, and head area with his feet. Ex. E, p. 31, line 4-11

Response:     DENY the use of "fighting" as Shane was in Defendant Berkshire's prone restraint on his stomach on the ground with his hands cuffed behind his back. *See* Exhibit 1 at 06:22:37 and Exhibit 2 at p. 5.

59. When he went back, paramedic Wood looked at Mr. Aumick's hands and saw there was bleeding that looked to have stopped and there were just small tissue lacerations on his hands. He observed no other injuries to Mr. Aumick. Ex. E, p. 30, line 10- p. 31, line 1.

Response: DENY as Defendant Wood acted in more of a police officer's role in restraining Shane and there was literally no assessment of Mr. Aumick's medical needs. *See* deposition of Dr. Lee Morrow at p. 24, ll. 14-18 attached hereto as Exhibit 4.

60. Around this time, Mr. Wood held Mr. Aumick's ankles. Ex. D at 6:24:37; Doc. 55 at ¶ 57.

Response: ADMIT

61. Neither of Officer Berkshire's knees were on Mr. Aumick at this time; instead, Officer Berkshire was down on the ground on one knee off to the side of Mr. Aumick trying to hold one of his arms up to control him. Ex. C at ¶ 36; Ex. A, p. 94, line 18-25.

Response: DENY as Defendant Berkshire stated he placed his right knee into the middle of his back between his hip to control his lower body and not allow him to roll away while also placing my left knee up onto Shane's lower cranium to control his upper body, Defendant Berkshire and Defendant Wood continued to restrain Shane until he went slack, and further Wood wrote in his witness statement of April 7, 2020 that "officer [Berkshire] had his knee in the male's [Shane's] back". Exhibit 2 at pp. 5, 6 and 9

62. Officer Berkshire used this position so that he would not be on Mr. Aumick's back in order to control him, especially while in handcuffs. Based on his training and experience, if you could control the hips, arm and shoulder, you can control the suspect. Ex. C at ¶ 37; Exhibit A, p. 95, line 1-8.

Response: DENY as Defendant Berkshire stated he placed his right knee into the middle of his back between his hip to control his lower body and not allow him to roll away

while also placing my left knee up onto Shane's lower cranium to control his upper body, Defendant Berkshire and Defendant Wood continued to restrain Shane until he went slack, and further Wood wrote in his witness statement of April 7, 2020 that "officer [Berkshire] had his knee in the male's [Shane's] back". Exhibit 2 at pp. 5, 6 and 9

63.     This position is called a side control position, which is a tactic where an officer can control the individual from the side and the officer is not putting knees into the person. The side control position controls the hips and the upper torso. Exhibit A, p. 100, line 20- p. 101, line 25; Ex. C at ¶ 38.

Response:     DENY as Defendant Berkshire stated he placed his right knee into the middle of his back between his hip to control his lower body and not allow him to roll away while also placing my left knee up onto Shane's lower cranium to control his upper body, Defendant Berkshire and Defendant Wood continued to restrain Shane until he went slack, and further Wood wrote in his witness statement of April 7, 2020 that "officer [Berkshire] had his knee in the male's [Shane's] back". Exhibit 2 at pp. 5, 6 and 9

64.     Officer Berkshire purpose in doing this was to get Mr. Aumick calm and to stop resisting so that the medical personnel could examine him before placing him under arrest and taking him to jail for various offenses. Ex. C at ¶ 35.

Response:     DENY the use of "stop resisting" as Shane was in Defendant Berkshire's prone restraint on his stomach on the ground with his hands cuffed behind his back. *Id*. and Exhibit 2 at p. 5.

65.     Officer Berkshire also used pain compliance techniques to attempt to get Mr. Aumick to comply with the instructions to stop resisting, but that was unsuccessful. Ex. C at ¶ 40.

Response: DENY the use of "stop resisting" as Shane was in Defendant Berkshire's prone restraint on his stomach on the ground with his hands cuffed behind his back. *Id*. and Exhibit 2 at p. 5.

66. Officer Berkshire again radioed dispatch informing of a combative suspect and requested that his supervisor to respond to the scene. Ex. D at 6:25:32 – 6:26:02; Ex. C at ¶ 41.

Response: ADMIT

67. Mr. Aumick continued to kick Officer Berkshire and paramedic Wood, and Officer Berkshire continued to tell him to stop. Ex. C at ¶ 42.

Response:

68. Due to kicking a paramedic and a police officer, Mr. Aumick had now committed an additional crime of assault on a special victim. Ex. C at ¶ 43.

Response: DENIED in that the Ava Police Department Report noted the crime as a domestic assault. *See* Ava Police Report at p. 1 attached hereto as Exhibit __.

69. Mr. Aumick can be heard saying on the video to get off of him. At this point in time, Officer Berkshire was off on his side controlling his arm and shoulder while Mr. Wood had ahold of Mr. Aumick's ankles. Exhibit A, p. 99, line 14- p. 100, line 5; Ex. D at 6:26:02 – 6:26:58.

Response: DENY as Defendant Berkshire stated he placed his right knee into the middle of his back between his hip to control his lower body and not allow him to roll away while also placing my left knee up onto Shane's lower cranium to control his upper body, Defendant Berkshire and Defendant Wood continued to restrain Shane until he went slack, and further Wood wrote in his witness statement of April 7, 2020 that "officer [Berkshire] had his knee in the male's [Shane's] back". Exhibit 2 at pp. 5, 6 and 9.

70.     Mr. Aumick started to calm down and Officer Berkshire radioed to dispatch that the scene was secure.  Ex. D at 6:27:30 – 6:27:58; Ex. C at ¶ 46.

Response:     DENY as to "calm down" as Shane Aumick pleaded again, "Get off me" and then goes silent (06:26:52) never responding to Defendant Berkshire's question, "Are you going to be calm now?" at 06:28:02.

71.     Mr. Wood was present this whole time and had a hold of Mr. Aumick's ankles only.  Ex. C at ¶ 47.

Response:     DENY as to "whole time" as the body camera footage should time Defendant Wood's presence at the scene.

72.     Officer Berkshire spoke with Mr. Aumick's stepfather and told him Mr. Aumick would be going to jail and asked if Mr. Aumick's behavior on this date was normal. Ex. D at 6:28:48 – 6:29:45.

Response:     ADMIT

73.     Mr. Wood then asked Officer Berkshire if Mr. Aumick was still conscious. Officer Berkshire checked his breathing and pulse, and found respirations here reduced.  He also performed a sternum rub.  Paramedic Wood was present at this time.  Ex. D at 6:29:48 – 6:31:05; Doc 55 at ¶ 62.

Response:     ADMIT

74.     The paramedics and EMT's at the scene then started providing treatment to Mr. Aumick.  Ex. D at 6:31:30.

Response:     ADMIT

75.     Officer Berkshire performed chest compressions on Mr. Aumick at the instruction of the medical personnel on scene.  Ex. D at 6:33:52 – 6:35:02; Ex. C at ¶ 51.

Response:     ADMIT to the extent that Exhibit 1 shows Defendant Berkshire starting chest compressions at 06:33:55 through 06:35:02.

76.     At the instructions of paramedics and EMT's, Officer Berkshire removed Mr. Aumick's handcuffs so they could treat him.  Ex. D at 6:35:25 – 6:36:26; Ex. C at ¶ 52.

Response:     ADMIT

77.     Paramedic Wood placed Mr. Aumick on a monitor and Mr. Aumick had no heartbeat and no pulse. Exhibit E, p. 42, line 7-22.

Response:     ADMIT

78.     Paramedic Wood then got the attention of his partner and started CPR. Exhibit E, p. 42, line 23- p. 43, line 1.

Response:     ADMIT

79.     The County Coroner pronounced Mr. Aumick deceased.  Doc. 55 at ¶ 67.

Response:     ADMIT

80.     The listed cause of death for Mr. Aumick according to Dr. Ransom A. Ellis, IV, D.O., who performed the full autopsy is "excited delirium" with contributing factors of "acute methamphetamine intoxication."  Ex. F (Medical Examiner's Report) at p. 1.

Response:     ADMIT

81.     The toxicology report for Mr. Aumick states he tested positive for methamphetamine, which a quantitative result of 484 ng/mL.  Ex. F at p. 7.

Response:     ADMIT

82.     Mr. Aumick's death certificate states the same cause of death as the medical examiner's report.  Ex. G.

Response:     ADMIT

83.     Ava Police Chief Reggie Johnson spoke with the County Coroner, as it was Chief Johnson's assumption that the County Coroner would investigate the death.  Ex. H (deposition of Reggie Johnson), p. 22, line 4-24.

Response:     ADMIT to the extent that is his testimony.

84.     Chief Johnson also spoke with an investigator from the Missouri State Highway Patrol about the incident and was informed the Patrol was not going to get involved. Ex. H, p. 45, line 9- p. 46, line 15.

Response:     ADMIT to the extent that is his testimony.

85.     Chief Johnson presented the incident of Mr. Aumick's death to the local prosecutor.  Ex. H, p. 65, line 21- p. 66, line 17.

Response:     ADMIT to the extent that was his testimony and that the Ava Police would do a report pursuant to policy which does not exist.

### PLAINTIFF'S ADDITIONAL STATEMENT OF UNCONTROVERTED FACTS

1.     Defendant Berkshire noted that on "4 April 2020 at approximately 0614" he received a report from dispatch of a disturbance at 507 Pennington Avenue.  *See* Exhibit 2 at p. 4.

2.     The actual crime listed on the Ava Police Report was a violation of Ordinance 0-010Y200013.  *Id*. at p. 1.

3.     Defendant Berkshire then stated his arrival time at the scene as 0616. *Id.*

4.     Upon encountering Shane Aumick, Defendant Berkshire requests, "I need you to turn around right now and put your hands behind your back." *See* Body Camera Video 1 at 06:14:11 previously provided to this Court as referenced in Exhibit 1.

5.     Defendant Berkshire handcuffs Shane with his hands behind his back.  *Id.* at 06:14:22.

6.      Defendant Berkshire tells Shane the handcuffing is "for your protection and my protection." *Id.* at 06:14:24.

7.      Defendant Berkshire requests that Shane "stand up" and he complies. *Id.* at 06:15:03.

8.      Defendant Berkshire requests that Shane "go ahead and turn" and he complies. *Id*. at 06:15:08.

9.      Defendant Berkshire asks Shane "whose blood is it on you" and he replies, "it's mine". *Id*. at 06:15:10.

10.     Defendant Berkshire asks Shane to "come here" to move him on the porch and he complies. *Id.* at 06:15:18.

11.     Defendant Berkshire tells Shane that he's going to have him sit down. *Id*. at 06:15:22.

12.     Defendant Berkshire requests Shane have a seat. *Id.* at 06:15:24.

13.     Shane complies and is seated on the front porch steps while still in handcuffs. *Id*. at 06:15:32.

14.     Defendant Berkshire then leaves Shane sitting on the front porch steps alone and enters the residence. *Id*. at 06:15:40.

15.     Defendant Berkshire requests Shane stay outside and he complies. *Id*. at 06:15:48.

16.     Defendant Berkshire tells Shane that he needs to be quiet. *Id*. at 06:15:54.

17.     Defendant Berkshire asks if there is an ambulance rolling towards the scene. *Id.* at 06:16:20.

18.     Defendant Berkshire confirms that he has the scene secure.  *Id*. at 06:16:36.

19.     Defendant Berkshire returns to Shane, who is still handcuffed sitting on the front porch, after Berkshire spent over a minute in the residence.

20.     Upon returning to Shane, Defendant Berkshire asks "where are you bleeding from?" *Id.* at 06:16:50.

21.     Shane replies to Defendant Berkshire that he is bleeding from his hands.  *Id.* at 06:16:54.

22.     Defendant Berkshire requests that Shane stay put while he checks on his mother and he complies*. Id*. at 06:16:58.

23.     Once again, Defendant Berkshire leaves Shane alone handcuffed on the front porch steps and walks away.  *Id*. at 06:17:00.

24.     Defendant Berkshire asks Ms. Aumick and Houston Thomas, "he had a knife?"  *Id*. at 06:17:22.

25.     Defendant Berkshire asks Ms. Aumick if she is going to want to press charges and she states that she does not.  *Id*. at 06:17:25.

26.     Defendant Berkshire states that, "they're going to have to check him out" once medical get here.  *Id*. at 06:17:36.

27.     Defendant Berkshire asks, "what's he on?" to which Ms. Aumick replied "vodka" and that's only thing she knew of.  *Id.* at 06:17:50.

28.     Defendant Berkshire states once again that the scene is secure while standing away from the residence with Ms. Aumick and Houston Thomas. *Id*. at 06:18:20.

29.     Defendant Berkshire requests the ambulance stating that the male [Shane Aumick] has bloody hands. *Id.* at 06:18:21.

30.     Defendant Berkshire states that once medical checks Shane out that he was bringing him in because he was still pretty intoxicated. *Id*. at 06:18:31.

31.     Defendant Berkshire returns to Shane, who is still in handcuffs, sitting on the front porch. *Id.* at 06:18:41.

32.     Defendant Berkshire lets Shane know that a paramedic is coming to address his medical needs. *Id*. at 06:18:52.

33.     Defendant Berkshire requests that Shane sit tight and he complies. *Id*. at 06:19:00.

34.     Defendant Berkshire again leaves Shane sitting on the front porch of the residence in handcuffs to go to his patrol vehicle. *Id.* at 06:19:00.

35.     Defendant Berkshire enters his patrol vehicle while Shane is still sitting on the front porch of the residence in handcuffs. *Id.* at 06:19:43.

36.     Defendant Berkshire then drives his patrol vehicle closer to the residence with his headlights shining directly on Shane sitting on the front porch of the residence in handcuffs. *Id.* at 06:19:54.

37.     Defendant Berkshire approaches Shane who is still sitting on the front porch of the residence in handcuffs, but has become agitated by the headlights shining directly on him and in his eyes.  *Id*. at 06:20:03.

38.     Defendant Berkshire again asks dispatch if an ambulance is coming while Shane is still sitting on the front porch of the residence in handcuffs.  *Id*. at 06:20:29.

39.     Shane begins making multiple requests that Defendant Berkshire turn the lights off while sitting handcuffed on the front porch.  *Id.* at 06:20:54.

40.     Defendant Berkshire confirms that the lights are on and Shane remains sitting on the front porch in handcuffs.  *Id.* at 06:20:58.

41.     Shane lays back against the porch steps while still seated in handcuffs.  *Id.* at 06:21:13.

42.     Shane again requests that Defendant Berkshire turn off the patrol car headlights directly shining on him and into his eyes.  *Id.* at 06:21:19.

43.     Defendant Berkshire then pats Shane down and finds no weapons upon his person.  *Id*. at 06:21:33.

44.     During the process of searching him for weapons, Defendant Berkshire turns Shane over from his back into a prone position on his stomach.  *Id.* at 06:21:47.

45.     Defendant Berkshire then requests that Shane cross his legs while in the prone position with his hands cuffed behind his back and he complies.  *Id.* at 06:21:49.

46.     While he is speaking, Shane lays motionless in the prone position on the ground with his hands cuffed behind his back.  *Id.* at 06:22:19.

47.     Defendant Berkshire kneels down on Shane while he is in the prone position on the ground with his hands cuffed behind his back. *Id*. at 06:22:21.

48.     For the first time, Defendant Berkshire requests Shane "stop resisting"; however, Shane is in the prone position on the ground with his hands cuffed behind his back with Berkshire kneeling on his back. *Id.* at 06:22:29.

49.     Defendant Berkshire moved into a side control position placing his right knee into the middle of Shane's back between his hip to control his lower body and not allow Shane to roll away while also placing Berkshire's left knee up onto Shane's lower cranium to control his upper body but allow Shane to breath but ensure that Berkshire could use pain compliance if necessary which he did. *See* Exhibit 2 at pp. 4-5.

50.     Defendant Berkshire states with recognition to Defendant Wood that "[H]e's pretty, I mean he's fucking gone." Exhibit 1 at 06:22:37.

51.     Per Defendant Wood's Voluntary Statement on April 7, 2020 to the Ava Police Department, he wrote in part "on scene Officer had male on ground on belly handcuffed." *See* Exhibit 2 at p. 9.

52.      Defendant Wood noted that Defendant Berkshire had his "knee in the male's back". *Id.*

53.     Defendant Wood wrote that Shane seemed to be intoxicated or on some type of drugs. *Id.*

54.     Defendant Wood helped restrain Shane by grabbing his ankles. *Id.*

55.     Defendant Berkshire tells Shane, "I'll get off your back when you stop."  Exhibit 1 at 06:23:13.

56.     Shane Aumick pleads, "Please help me sir."  *Id.* at 06:23:50.

57.     Shane Aumick pleads for Defendant Berkshire to "Get off me."  *Id.* at 06:24:13.

58.     Shane Aumick pleaded again, "help me."  *Id.* at 06:24:23.

59.     Shane Aumick stated he was having trouble breathing and unable to respond.  *Id.* at 06:24:24.

60.     Shane Aumick pleaded again, "help me."  *Id.* at 06:24:26

61.     Defendant Berkshire requests Defendant Wood to look at Shane.  *Id.* at 06:24:38.

62.     While restraining Shane's ankles, Defendant Wood states that they need to get some light on Shane.  *Id*. at 06:24:42.

63.     Defendant Berkshire states that Shane is cut up.  *Id.* at 06:24:45.

64.     While restraining Shane's ankles and without "getting some light on him", Defendant Wood states it just looks like some wounds.   *Id.* at 06:24:50.

65.      Defendant Berkshire threatens to use his taser on Shane.  *Id.* at 06:25:01.

66.     Shane Aumick pleads "Get off."  *Id.* at 06:25:17.

67.     Shane Aumick pleads "Stop."  *Id.* at 06:25:19.

68.     Shane continues to plead with Defendant Berkshire uttering "Stop" and "Get off" until he can only be heard making grunting noises. *Id.* at 06:25:27.

69.     Shane Aumick pleaded again, "Get off me." *Id.* at 06:26:40-46.

70.     Defendant Berkshire giggles, proceeds to have a conversation with Defendant Wood asking how his [Wood's] night has been going while refusing Shane's request to get off of him claiming he keeps kicking even though Defendant Woods has restrained his ankles for a number of minutes. *Id.* at 06:26:30.

71.     Shane Aumick pleaded again, "Get off me" and then goes silent. *Id*. at 06:26:52.

72.     Defendant Berkshire then radios at the scene is under control. *Id.* at 06:27:35.

73.     Defendant Berkshire has a paramedic helping him hold Shane Aumick down. *Id.* at 06:27:53.

74.     Defendant Berkshire asks Shane, "Are you going to be calm now?" *Id.* at 06:28:02.

75.     Shane Aumick does not respond, nor does he ever respond. *Id.* at 06:28:03

76.     Defendant Berkshire carries on a conversation with another individual at the scene, Houston Thomas, while kneeling on Shane's back as he still lies in the prone position with his hands cuffed behind his back. *Id.* at 06:28:47-06:29:45

77.     Defendant Wood asks Defendant Berkshire if Shane is still conscious. *Id.* at 06:29:48.

78.     Defendant Berkshire without checking Shane responded, "yeah." *Id.* at 06:29:49.

79.     Defendant Berkshire rolled Mr. Aumick over stating, "Well, I think he is." *Id.* at

06:30:00.

80. Defendant Berkshire says, "Shit." *Id.* at 06:30:05.

81. Ava police officer, Dwayne Butterworth, testified that he had concerns that this alleged knife incident between Shane Aumick and Berkshire was not on his body camera footage because that was not in compliance with Ava Police Department's policies. *See* deposition of Dwayne Butterworth at p 25, ll. 6-15 attached hereto as Exhibit 5.

84. Officer Butterworth went on to explain the importance of body camera footage was "[j]ust to make sure that no one says that we've said or done something that didn't happen" and also to document what actually did happen. *Id.* at p. 26, ll. 3-9.

85. Meri Aumick was an eyewitness at the scene when Defendant Berkshire arrived at the residence on April 4, 2020 and did not see Defendant Berkshire draw his weapon when he arrived, but instead walked up on the porch to the front door asking Shane to come out and that's when Berkshire handcuffed him. *See* Exhibit 3 at p. 75, l. 22 – p. 76, l. 2.

86. Ms. Aumick testified that the knife was down on the ground before the officer arrived and Shane never picked that knife back up. *Id*. at p. 78, ll. 3-9.

<u>ARGUMENT</u>

The Court must view the facts in the light most favorable to Plaintiff Aumick, the non-moving party. *Walton v. Dawson*, 752 F.3d 1109, 1114 (8th Cir. 2014). The events giving rise to this action occurred on April 4, 2020 when Defendant Berkshire was called to the residence at 507 Pennington Avenue in Ava, Missouri. Upon Defendant Berkshire's arrival, there begins a genuine issue of material facts that are in dispute. In the Ava Police Department report, Defendant Berkshire stated the following:

## AVA POLICE DEPARTMENT
## 504 SPRINGFIELD ROAD

Page   **3**

**Narrative**

**Incident** Cont'd

Incident # **20-04-0856**

| Crime / Incident (Primary) | Attempt | Type | | Seq |
|---|---|---|---|---|
| ORDIN.0-010Y200013 . DOMESTIC ASSAULT | ☐ | | *Narrative Report* | *1* |

On 4 April 2020 at approximately 0614 I ( Officer Kaleb Berkshire) received a report from dispatch that there was a domestic in progress at 507 Pennington Ave. The RP stated the male was tearing the house apart and that they needed an Officer immediately.

    Upon arrival at approximately 0616 I found an elderly female, Mari Aumick covered in blood, there was an elderly male, Houston Thomas, on the north side of Pennington who had blood on his hands and shirt. The elderly male stated that his step son was inside with a knife and tried to kill them and was rampaging in the house. That his step son was intoxicated and not in his right frame of mind. I turned south toward the residence as the suspect, Shane Aumick date of birth 11 Jan 1983 with a Social Security number of 139 76 2198, burst out of the home. The suspect was brandishing the knife stating he was going to kill everyone that people where there trying to kill them. The suspect descended down the stairs from the porch I placed my light on him and pulled my weapon on him. I clearly stated he needed to drop his weapon, I repeated my self four or five times, warning him that if he didn't I would have to shoot him. At this point the suspect did not drop the knife and was stepping toward me, I began to step of at an angle from him to place distance between our selves while stating to drop his weapon. The suspects mother had gotten out of my patrol car where I had told her to stay until the incident was under control. Mari Aumick began pleading from me to not hurt him as she was standing on the south side of Pennington. I felt that I could disarm the suspect without shooting him at this point. I placed my weapon back in my holster while holding my light on the suspect instructing him to place his weapon on the ground and to put his hands on his head. I radioed into dispatch to get an ambulance staged and that an Officer was distressed and that I needed backup en route to contact Douglas County Sheriff Office and to get a unit en route, also to get a supervisor en route. Dispatch did not hear my initial radio contact. At this point the suspect began coming toward me brandishing the knife in his hand. I stated one more time that he needed to place the weapon on the ground or I would have to hurt him and I didn't want to. Shane Aumick stepped quickly toward me and swung the knife toward me but I leaned back as the blade came toward my face. The knife missed leaving the suspect off balance as he tried to swing the blade back toward me. I was able to catch the suspects arm and twist his wrist to loosen the blade in his hand. I was then able to disarm the knife from his left hand, throwing the blade into the grass by the porch. Shane Aumick was able to dislodge his arm from my grasp and ran back into the porch and into the residence.

    I approached the residence instructing the suspect to come out with his hands where I can see them. I drew my pistol with the light on sweeping the porch and doorway with my weapon and flashlight in my left hand. The entire porch was covered with blood as well as the front wall of the building and door and doorway. The front glass was smeared with blood making it difficult to see into the residence. I could hear the suspect inside of the residence moving around. The suspect stated he had a gun and would shoot everyone. I instructed the suspect that if he didn't come out slowly with his hands where I could see them if I had to enter the residence I would have to shoot him. I repeated my instructions three or four times clearly and loudly to the suspect. I heard movement toward the door so my weapon was raised and I was in a defensive posture ready to use deadly force if necessary. Shane Aumick walked slowly toward the doorway with his hands approximately chest level, from what I could

| Officer ID | *Officer Kaleb Berkshire* | *424* | Reviewed By | Approved | Date<br>/ / |
|---|---|---|---|---|---|

Printed By/On: CHIEF / 04/13/2020 10:15:29
CrimeStar® Law Enforcement Records Management System
Licensed to: AVA MO POLICE DEPARTMENT



Defendant Berkshire noted that on "4 April 2020 at approximately 0614" he received a report

from dispatch of a disturbance at 507 Pennington Avenue. (ASOF 1)   Berkshire then stated

his arrival time at the scene as 0616. (ASOF 3)   His body camera footage of 04/04/2020

begins at 06:14:01 when Berkshire is opening the front door of the residence for Shane Aumick to exit and be handcuffed. (ASOF 4, 5)  According to the body camera footage, Shane was in handcuffs at approximately 06:14:25. (ASOF 4, 5, 6)  By 06:16:00 on the body camera footage, Shane has been handcuffed and seated on the porch while Berkshire is conducting a search of the residence. (ASOF 7, 8, 9, 10, 11, 12, 13, 14)  At 06:17:04, Berkshire approached Meri Aumick and Houston Thomas to discuss what happened. (ASOF 23, 24, 25, 26, 27, 28, 29, 30)  At 06:17:22, Berkshire inquired "[H]e had a knife?" of Ms. Aumick and Mr. Thomas.  (ASOF 24)

There is no dispute that there is no body camera footage of the "alleged knife altercation" between Shane Aumick and Berkshire referenced on Page 1 in Paragraph 2 of his narrative report.  The time-stamped body camera footage that does exist does not correlate to the times listed on the first page of Berkshire's narrative in the police report.  Another Ava police officer, Dwayne Butterworth, testified that he had concerns that this alleged knife incident between Shane Aumick and Berkshire was not on his body camera footage because that was not in compliance with Ava Police Department's policies. (ASOF  81) Officer Butterworth went on to explain the importance of body camera footage was "[j]ust to make sure that no one says that we've said or done something that didn't happen" and also to document what actually did happen. (ASOF 82)

Meri Aumick was an eyewitness at the scene when Defendant Berkshire arrived at the residence on April 4, 2020.  Ms. Aumick testified that she did not see Berkshire draw his weapon, but that he walked to the door, walked up on the porch and Shane came out the door and that's when Berkshire handcuffed him. (ASOF  85)  She testified that the knife was down on the ground before the officer arrived and Shane never picked that knife back up.  (ASOF 86)  In viewing the facts in the light most favorable to Plaintiff Aumick, then the Court should

decide that the "alleged knife altercation" between Shane Aumick and Berkshire as described by Defendant Berkshire is fiction.

**1.      Events of April 4, 2020 Leading Up To the Death of Shane Aumick.**

Only then is Defendant Berkshire's body camera is turned on.  Upon encountering Shane Aumick, Defendant Berkshire requests, "I need you to turn around right now and put your hands behind your back." (ASOF 4)  Defendant Berkshire handcuffs Shane with his hands behind his back telling him that the handcuffing is "for your protection and my protection."  (ASOF  5, 6)  Defendant Berkshire requests that Shane "stand up" and he complies. (ASOF 7)  Defendant Berkshire requests that Shane "go ahead and turn" and he complies. (ASOF  8)  Defendant Berkshire asks Shane "whose blood is it on you" and he replies, "it's mine". (ASOF  9  Defendant Berkshire asks Shane to "come here" to move him on the porch and he complies. (ASOF  10)  Defendant Berkshire tells Shane that he's going to have him sit down, requests he have a seat and he complies. (ASOF  11, 12, 13) At this point, Shane is seated on the front porch steps while still in handcuffs and Defendant Berkshire then leaves Shane sitting on the front porch steps alone and enters the residence. (ASOF  14)  Defendant Berkshire requests Shane stay outside and he complies.  (ASOF  15) During this sequence of events, Defendant Berkshire handcuffs Shane's hands behind his back and requests he sit on the front porch to which he complies.  (ASOF 19)  Shane Aumick is not resisting arrest.

Defendant Berkshire asks if there is an ambulance rolling towards the scene and confirms that he has the scene secure. (ASOF  17)  Defendant Berkshire returns to Shane, who is still handcuffed sitting on the front porch, and asks "where are you bleeding from?" acknowledging his need for medical care.  (ASOF 20)  Shane replies to Defendant Berkshire that he is bleeding from his hands.  (ASOF 21)  Defendant Berkshire requests that Shane stay

put while he checks on his mother and he complies. (ASOF 22)  Once again, Defendant Berkshire leaves Shane alone handcuffed on the front porch steps and walks away. (ASOF 23)  Shane Aumick is not resisting arrest.

Defendant Berkshire again requests the ambulance stating that the male [Shane Aumick] has bloody hands and states that once medical checks Shane out that he was bringing him in because he was still pretty intoxicated. (ASOF 26, 28, 29, 30)  Defendant Berkshire returns to Shane, who is still in handcuffs, sitting on the front porch and him know that a paramedic is coming to address his medical needs.  (ASOF 31)  Defendant Berkshire requests that Shane sit tight and he complies. (ASOF 32, 33)  Defendant Berkshire again leaves Shane sitting on the front porch in handcuffs alone to go to his patrol car.  (ASOF 34, 35)  Shane Aumick is not resisting arrest.

Defendant Berkshire then drives his patrol vehicle closer to the residence with his headlights shining directly on Shane sitting on the front porch of the residence in handcuffs. (ASOF 36)  Shane  becomes agitated by the headlights shining directly on him and in his eyes begins making multiple requests that Defendant Berkshire turn the lights off. (ASOF 37, 39)  Defendant Berkshire confirms that the lights are on and Shane remains sitting on the front porch in handcuffs. (ASOF 40)  Then attempting to avoid the glare of the headlights, Shane lays back against the porch steps while still seated in handcuffs and again requests that Defendant Berkshire turn off the patrol car headlights directly shining on him and into his eyes.  (ASOF 41, 42)  Defendant Berkshire does not turn off the headlights of his patrol car. Shane Aumick is not resisting arrest.

At this point, Defendant Berkshire pats Shane down looking for weapons upon his person. (ASOF  43)  During the process of searching him for weapons and finding none, Defendant Berkshire turns Shane over from his back into a prone position on his stomach.

(ASOF 44)  Defendant Berkshire then requests that Shane cross his legs while in the prone position with his hands cuffed behind his back and he complies. (ASOF  45)  While he is speaking, Shane lays motionless in the prone position on the ground with his hands cuffed behind his back.  (ASOF  46)  Defendant Berkshire kneels down on Shane while he is in the prone position on the ground with his hands cuffed behind his back.  (ASOF  47)  For the first time, Defendant Berkshire requests Shane "stop resisting"; however, Shane is in the prone position on the ground with his hands cuffed behind his back with Berkshire kneeling on his back.  (ASOF  48)  Defendant Berkshire moved into a side control position placing his right knee into the middle of Shane's back between his hip to control his lower body and not allow Shane to roll away while also placing Berkshire's left knee up onto Shane's lower cranium to control his upper body but allow Shane to breath but ensure that Berkshire could use pain compliance if necessary which he did.  (ASOF  49)  Per Defendant Wood's Voluntary Statement on April 7, 2020 (three days after Shane's death) to the Ava Police Department, he wrote in part "on scene Officer had male on ground on belly handcuffed" and had his "knee in the male's back." (ASOF  51, 52)

Defendant Berkshire tells Shane, "I'll get off your back when you stop." (ASOP 55 ) Shane pleads, "Please help me sir." (ASOF  56)  Shane pleads for Defendant Berkshire to "Get off me." (ASOF  57)  Shane pleaded again, "help me."  (ASOF  58)  Shane stated he was having trouble breathing and unable to respond. (ASOF  59)  Shane Aumick pleaded again, "help me." (ASOF  60)

Defendant Berkshire threatens to use his taser on Shane. (ASOF 65)  Shane pleads "Get off."  (ASOF  66)  Shane Aumick pleads "Stop." (ASOF 67)  Shane continues to plead with Defendant Berkshire uttering "Stop" and "Get off" until he can only be heard making grunting noises. (ASOF 68)  Defendant Berkshire refuses Shane's request to get off of him

claiming he keeps kicking even though Defendant Woods has restrained his ankles for a number of minutes. (ASOF 70)  Shane Aumick pleaded again, "Get off me" and then goes silent.  (ASOF 71)

## 2.     Application of the *Graham* Factors In Use of Force Against Shane Aumick.

Officers' excessive uses of force violate the Fourth Amendment if "objectively unreasonable." *Graham v. Connor*, 490 U.S. 386, 397 (1989). Objective unreasonableness is "judged from the perspective of a reasonable officer on the scene," in light of "the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id*. at 396.  A "defendant cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2023(2014). Under "existing precedent," the constitutional question that the officer faced must have been "beyond debate." *Id.*  While the court must not "define clearly established law at a high level of generality," *id*., there does not need to be "a case directly on point."  *White v. Pauly*, 137S. Ct.548 (2017) (per curiam).

*Graham* directs this court's attention to three factors: "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396, 109 S.Ct. 1865. In *Tatum*, by these factors and other facts and circumstances, a reasonable jury could find that Robinson's use of pepper spray was objectively unreasonable. *Tatum v. Robinson*, 858 F.3d 544, 548 (8th Cir. 2017).   Moreover, the Ava Police Department's Response to Resistance policy is guided by the *Graham* court's

definition of "excessive force" such that it sets forth an objectively reasonable standard of which Defendant Berkshire was aware at the time he wrote his report in this case. *See* Ava Policy-Response to Resistance attached hereto as Exhibit 6.

Here's how the *Graham* factors apply here:

**Severity of the crime at issue:** The crime listed on the Ava Police Department Report is a violation of Ordinance 0-010Y200013-Domestic Assault. Exhibit 2 at p. 1. No other crimes are listed on the police report. Knowing that Defendant Berkshire was trained on the Ava policy setting forth the *Graham* factors, one has to ask if the purpose behind including the "alleged knife altercation" with Shane Aumick in his police narrative was on his mind when bolstering the "severity of the crime at issue". Regardless, the Court must view the facts in the light most favorable to the non-moving party who disputes this allegation by Defendant Berkshire as it is not supported by the body camera footage or eyewitness account. Shane was handcuffed upon the officer's arrival and remained as such until his death.

**Whether the suspect poses an immediate threat to the safety of the officers or others:** As noted above, Shane was compliant with Defendant Berkshire's requests. Shane was handcuffed sitting, at times alone, on the front porch of the residence. Defendant Berkshire then moves his patrol vehicle so that its headlights are shining right on Shane and into his eyes causing him to become agitated. Defendant Berkshire then searches Shane's person for any weapons and in the process rolls him onto the ground into the prone position. At this point and for the next approximately 8 minutes, Shane Aumick is in the prone position on the ground with his hands cuffed behind his back and Berkshire kneeling on his back while at various times exerting pain compliance by elevating his wrists. While Defendants argue that Shane posed a threat, totality of evidence shows that Defendant Berkshire escalated the situation by: (1) shining his headlights in Shane's eyes agitating him; (2) kneeling on Shane's

prone body while handcuffed behind his back and (3) then instructing Defendant Wood to intervene and join in the restraint. Otherwise, Shane would have just continued sitting on the front porch of the residence handcuffed.

***Whether he is actively resisting arrest or attempting to evade arrest by flight***:  As noted above, Shane was compliant with Defendant Berkshire's requests. Astonishingly, there were a number of times that Defendant Berkshire left Shane sitting alone on the front porch in handcuffs and he did not actively resist arrest, run or attempt to evade arrest by flight…essentially, he was already arrested. The first time that Defendant Berkshire requests Shane "stop resisting", Shane is in the prone position on the ground with his hands cuffed behind his back with Berkshire kneeling on his back. (ASOF 48) Plaintiff argues that Shane Aumick is not resisting. Shane Aumick is trying to breathe. These factors weigh in favor of Plaintiff.

3.    **Plaintiff's Excessive Force Claim Against Defendant Berkshire Survives Summary Judgment.**

As described above, the objective criteria weigh in Plaintiff's favor. Moreover, as early as the mid-1990's, the U.S. Department of Justice had issued advisory guidelines for officers to learn to recognize factors contributing to positional asphyxia and where possible avoid the use of prone restraints. *See* Positional Asphyxia-Sudden Death, U.S. Department of Justice, National Institute of Justice, June 1995 attached hereto as Exhibit 7. It has clearly been established that a suspect's Fourth Amendment rights were violated by uses of force such as kicking and choke restraint of non-resisting suspect even if the kicking and choking causes only *de minimis* injuries. *Chambers v. Pennycook*, 641 F.3d 898 at 907-08 (8th Cir. 2011). See also *Tatum* at 552 (unreasonable to use pepper spray against a non-resisting, non-fleeing individual, suspected of a non-violent misdemeanor); *Blazek v. City of Iowa*, 761 F.3d 920, 925 (8th Cir. 2014) (it was excessive force to jerk an individual up by his arms with

39

sufficient force to cause an injury to the individual's shoulder when the individual was not resisting arrest, posed no threat to officers, was not suspected of a serious offense, and was handcuffed and under control); *Johnson v. Carroll*, 658 F.3d 819, 828 (8th Cir. 2011) ("At the time of this incident, the law was sufficiently clear to inform a reasonable officer that it was unlawful to throw to the ground and mace a nonviolent, suspected misdemeanant who was not fleeing or herself resisting arrest, who posed little or no threat to anyone's safety, who never received verbal commands to remove herself, and whose only action was to engage in a protective maneuver."); *Krout v. Goemmer,* 583 F.3d 557, 566 (8th Cir. 2009) ("[T]he use of ... gratuitous force against a suspect who is handcuffed, not resisting, and fully subdued is objectively unreasonable under the fourth amendment."). *Thomas v. City of St. Louis, Missouri*, No. 4:18-CV-01566 JAR, 2021 WL 4622502, at *8 (E.D. Mo. Oct. 7, 2021).

For more than two decades, courts have consistently held that holding down a handcuffed, prone suspect is dangerous and unreasonable. See, e.g. *Weigel v. Broad*, 544 F.3d 1143, 1152 (10th Cir. 2008) ("[T]he law was clearly established that applying pressure to [the suspect's] upper back, once he was handcuffed and his legs restrained, was constitutionally unreasonable due to the significant risk of positional asphyxiation associated with such actions . . . . A reasonable officer would know these actions present a substantial and totally unnecessary risk of death to the person.") (emphasis added); *Drummond ex rel. Drummond v. City of Anaheim,* 343 F.3d 1052, 1061-62 (9th Cir. 2003) (holding that the "law was clearly established" and that "Any reasonable officer should have known" that "pressing their weight on [the suspect's] neck and torso . . . despite the fact that his hands were cuffed behind his back and he was offering no resistance" constituted excessive force) (emphasis added); *Johnson v. City of Cincinnati*, 39 F.Supp.2d 1013, 1019- 20 (S.D. Ohio 1999) (finding information existed in law enforcement community that put officers on notice of dangers of

asphyxia); *Simpson v. Hines*, 903 F.2d 400, 403 (5th Cir. 1990) (finding ample evidence of excessive force where plaintiff "could have died of asphyxiation resulting from the pressure exerted when [defendant] sat on his chest").

While Defendants argue that Shane Aumick did not have a constitutional right to be free from Defendant Berkshire's "prone restraint" when his actions were reasonably interpreted as continued resistance, Plaintiff contends the evidence shows Shane was just trying to breathe. As described above, Shane was handcuffed with his hands behind his back the entire duration of this incident. During three separate occasions, Defendant Berkshire left Shane alone handcuffed sitting on the front porch. Shane never ran away, walked away or for that matter, moved much. He just sat there. It was not until Defendant Berkshire kneeled onto Shane's back while he was handcuffed in the prone position on the ground that he began to request Berkshire "get off me". As the body camera footage shows, Shane Aumick appears to be moving in tandem with Defendant Berkshire as he attempts to get him off his back so that he can breathe. This is a genuine issue of material fact as to whether Shane was "resisting arrest" or "trying to breath" while Defendant Berkshire kneeled on his body while on the ground in the prone position handcuffed.

**4.      Plaintiff's Deliberate Indifference Claim Against Defendant Berkshire Survives Summary Judgment.**

While Defendant Berkshire did call for an ambulance, he ignored the pleas of Shane Aumick to get off his back so that he could breathe over the course of approximately 8 minutes. Moreover, Defendant Berkshire continued to maintain Shane in a prone restraint while he lay motionless and silent for more than 3 minutes. With all the military and police training that Defendant Berkshire boasts, he was deliberately indifferent to the medical needs of Shane Aumick.

The Due Process Clause of the Fourteenth Amendment requires the government to provide medical care to individuals who have been injured while being apprehended by police. *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983). To establish a claim for deliberate indifference to serious medical needs, a plaintiff must establish both objective and subjective components. *Thompson v. King*, 730 F.3d 742, 746 (8th Cir. 2013). The objective component requires plaintiff to show an objectively serious medical need. *Id*. The subjective component requires plaintiff to show the "defendant knew of, but deliberately disregarded, such need." *Id*.

A serious medical need is "one that has been diagnosed by a physician as requiring treatment, or one that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention." *Camberos v. Branstad,* 73 F.3d 174, 176 (8th Cir.1995). A medical need that would be obvious to a layperson makes verifying medical evidence unnecessary. *Hartsfield v. Colburn,* 371 F.3d 454, 457 (8th Cir.2004); *Schaub v. VonWald*, 638 F.3d 905, 914 (8th Cir. 2011).

Defendant Berkshire was right there on top of Shane Aumick when he pleaded for his life for approximately 8 minutes. Defendant Berkshire continued to stay right on top of Shane when he made his last plea at 06:26:52 and then fell silent. (ASOF 71) Defendant Berkshire asked Shane, "Are you going to be calm now?" at 06:28:02. (ASOF 74) No response is ever given, hence Shane is unresponsive. Defendant Berkshire does not check on Shane's condition until 06:30:05. Plaintiff's deliberate indifference claim against Defendant Berkshire should be allowed to go to the jury to decide.

**5.** **Plaintiff's *Monell* Claim in Count 2 Survives Summary Judgment.**

With respect to Count 2 for Defendant City's failure to implement policies and its failure to train and supervise, the first element of a *Monell* claim is the establishment of a

constitutional violation. The second element is evidence that either the constitutional violation flowed from a City policy or the constitutional violation was caused by the City's deliberate indifference in failing to train its employees or enact adequate policies. *Monell v. Dep't of Soc. Serv. of N.Y.*, 436 U.S. 658, 690-95 (1978) (violation flows from policy); *City of Canton, Ohio v. Harris*, 489 U.S. 378, 389-92 (1989) (failure to train).

**A. Defendant City Has No Policy Regarding the Use of Prone Restraint.**

A municipality is responsible under § 1983 when "execution of a government's policy or custom . . . inflicts the injury . . . ." *Monell,* 436 U.S. at 694. Meaning, the policy is the "moving force of the constitutional violation." *Id.* "Where a plaintiff claims that a particular municipal action itself violates federal law, or directs an employee to do so, resolving [the] issues of fault and causation is straightforward." *Szabla v. City of Brooklyn Park, Minn.*, 486 F.3d 385, 389-90 (8th Cir. 2007). "To establish a constitutional violation, no evidence is needed other than a statement of the municipal policy and its exercise." *Id*. at 389-90.

Since the mid-1990's, the United States Department of Justice has warned law enforcement for decades about the dangers of prone restraint and as early as 1995: "The risk of positional asphyxia is compounded when an individual with predisposing factors becomes involved in a violent struggle with an officer or officers, particularly when physical restraint includes behind-the-back handcuffing combined with placing the subject in a stomach-down position." *See* Exhibit 7 at p. 2. While the law enforcement concerns with use of prone restraint documented for years, as of 2020, Defendant City has no policy, no procedure and no training in its police department regarding use of the prone restraint.

Should the Court entertain Defendant City's Response to Resistance policy as the guidance in place, the prone restraint is not addressed in said policy. *See* Exhibit 6. On the first page of said policy, the *Graham* factors are set forth in defining "excessive force." *Id.*

at p. 1. On page 8, the policy then addresses "personal impact weapons" which includes the use of the officer's body including but not limited to his hands and knees "to defend them against unlawful assaults/suspect activity, and or overcome unlawful resistance, when higher levels of force are not necessary and other verbal and physical force alternatives would be, or have been, ineffective or inappropriate." *Id.* at p. 8. The policy notes that all force must meet the standard referring back to the *Graham* factors listed under the definition of "excessive force." *Id*. As described above, application of the *Graham* factors in use of force against Shane Aumick weigh in Plaintiff's favor and she hereby incorporates her argument laid out previously herein.

**B. Defendant City of Ava's Failure to Train its Officers or Enact Constitutional Policies Amounts to Deliberate Indifference.**

Even absent an unconstitutional policy, Defendant City would still be liable based on its failure to train. See *City of Canton*, 489 U.S. at 388. Liability is established "where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *Id*. Where the need for more or different training is obvious and the inadequacy is likely to result in the violation of constitutional rights, a municipality is deliberately indifferent to the need for more training. *Id*. at 390.

Notice is given heavy weight in determining deliberate indifference. *Atkinson v. City of Mountain View, Mo.*, 709 F.3d 1201, 1216 (8th Cir. 2013). But a plaintiff does not have to show "a pattern of constitutional violations." See *Bd. of County Com'rs v. Brown*, 520 U.S. 397, 409 (1997). A constitutional violation "may be a highly predictable consequence" of a municipality's failure to train. *Id*. "The likelihood that the situation will recur and the predictability" that officers who are not adequately trained will violate citizens' rights can justify a finding of deliberate indifference. *Id*. Moreover, a "high degree of predictability"

may support an inference that the municipality's deliberate indifference led to the "very consequence that was so predictable." *Id.* at 410-11.

As noted in the First Amended Complaint (Doc. 55), the knowledge of the dangers of the prone restraint has been in place since the mid-1990's. The United States Department of Justice has warned law enforcement for decades about the dangers of prone restraint and as early as 1995: "The risk of positional asphyxia is compounded when an individual with predisposing factors becomes involved in a violent struggle with an officer or officers, particularly when physical restraint includes behind-the-back handcuffing combined with placing the subject in a stomach-down position. (Doc. 55 at ¶83) Defendant City's complete lack of policy, procedure or training on the use of prone restraint in its police department led to the constitutional violations alleged by Plaintiff amounting to deliberate indifference.

**6.     Plaintiff's Wrongful Death Claim Against Defendant Berkshire Survives Summary Judgment.**

Public officials in Missouri are afforded immunity for tasks undertaken in relation to the official's performance of discretionary duties. *Davis v. Lambert-St. Louis Intern. Airport,* 193 S.W.3d 760, 763 (Mo. banc 2006). Whether an act is discretionary, however, is based on the facts of each case, particularly on such factors as the nature of an official's duties, and the extent to which the act involves policymaking or the exercise of professional expertise and judgment. *Jungerman v. City of Raytown*, 925 S.W.2d 202, 205 (Mo. banc 1996), *abrogated on other grounds by Southers v. City of Farmington*, 263 S.W.3d 603 (Mo. banc 2008). Discretionary acts require the exercise of reason in the adaptation of means to an end and discretion in determining how or whether an act should be done or course pursued. *Davis*, 193 S.W.3d at 763.

Discretionary acts are not protected by official immunity if the conduct is willfully wrong or done with malice. *Southers v. City of Farmington*, 263 S.W.3d 603, 612 (Mo. banc

2008).  Defendant Berkshire is not entitled to official immunity as it does not apply to discretionary acts done in bad faith or with malice. *Davis v. White*, 794 F.3d 1008, 1013 (8th Cir. 2015) citing *Blue v. Harrah's N. Kansas City, LLC*, 170 S.W.3d 466, 471 (Mo. App. W.D. 2005). "A defendant acts with malice when he wantonly does that which a man of reasonable intelligence would know to be contrary to his duty and which he intends to be prejudicial or injurious to another." *Id.* citing *State ex rel. Twiehaus v. Adolf,* 706 S.W.3d 443, 447 (Mo. 1986).   A jury may well conclude that Defendant Berkshire's decision to initiate a prone restraint of Shane Aumick under these circumstances consciously ignored police protocol and the danger posed to him.

A number of minutes after restraining Shane Aumick, Defendant Berkshire giggles, proceeds to have a conversation with Defendant Wood asking how his [Wood's] night has been going while refusing Shane's request to get off of him claiming he keeps kicking even though Defendant Woods has restrained his ankles for a number of minutes. (ASOF 70) Shane Aumick pleaded again to Berkshire, "Get off me" and then goes silent. (ASOF 71) Defendant Berkshire then radios at the scene is under control. (ASOF 72)  At 06:28:02, Defendant Berkshire asks Shane, "Are you going to be calm now?"  (ASOF 74)  Shane Aumick does not respond, nor does he ever respond. (ASOF 75)  Defendant Berkshire then carries on a conversation with another individual at the scene, Houston Thomas, while kneeling on Shane's back as he still lies in the prone position with his hands cuffed behind his back. (ASOF 76)

As such, Defendant Berkshire is not entitled to official immunity or protection under the public duty doctrine, which does not apply to public employees acting in bad faith or with malice. *Southers v. City of Farmington*, 263 S.W.3d 603, 611-12 (Mo. 2008) citing *Jackson v. City of Wentzville*, 844 S.W.2d 585, 588 (Mo. App. E.D. 1993).

Similarly, Missouri's public duty doctrine recognizes that a public officer owes a duty of care to the public and protects a public officer from civil liability for some negligence but does not insulate a public employee from all liability. *Benson v. Kansas City Bd. Of Police Com'rs*, 336 S.W.3d 120, 125 (Mo.App.W.D. 2012). The public duty doctrine does not shield public officials from liability resulting from the breach of a duty owed to particular individuals. *Kinder v. Missouri Dept. of Corr.*, 43 S.W.3d 369, 372 (Mo.App.2001). Such an interest exists when injury to a particular, identifiable individual is reasonably foreseeable as a result of an official's breach of duty. *Id.* For all the foregoing reasons outlined above and incorporated herein, Defendant Berkshire is not entitled to the protections of the public duty doctrine because Shane Aumick's death was a reasonably foreseeable consequence of his unnecessary use of the prone restraint.

<u>CONCLUSION</u>

Plaintiff respectfully requests this Court deny Defendants City of Ava, Missouri and Berkshire's Motion for Summary Judgment.

Respectfully submitted,

LAUREN ALLEN, LLC

<u>/s/ *Lauren Perkins Allen*</u>
Lauren Perkins Allen
Missouri Bar #49845
4717 Grand Ave., Ste. 130
Kansas City, Missouri 64108
T: 816.877.8120
F: 816.817.1120
Email: lpa@laurenallenllc.com

**ATTORNEY FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was filed via the Court's electronic filing system on this 21st day of July 2022, which sent notification to counsel of record.

*/s/ Lauren Perkins Allen*
*Attorney for Plaintiff*