GENERAL ORDER V

SUBJECT: Response to Resistance

NUMBER:

EFFECTIVE DATE: 01-01-2017

REVIEW DATE:

AMENDS/SUPERSEDES:

NOTE: This rule or regulation is for internal use only, and does not enlarge an officer's civil or criminal liability in any way. It should not be construed as the creation of a higher standard of safety of care in an evidentiary sense, with respect to third party claims. Violations of this directive, if proven, can only form the basis of a complaint by this department, and then only in a non-judicial administrative setting.

I. Purpose

To establish guidelines governing the response to resistance and its limitations, and clearly describe prohibited activities.

All entry level officers shall be issued this order and thoroughly trained in its content prior to being authorized to carry firearms.

II. Definitions

A. Deadly Force: Any force applied in any manner by means that could reasonably be expected to cause death or serious physical injury. See RSMo. 563.011(1).

B. Excessive Force: Force beyond what is objectively reasonable is excessive force, and as a guide, Graham v. Conner, 109 S.Ct. 1865, 104 LEd.2d 443 (1989) set forth the objectively reasonable standard to determine whether the force applied was excessive. The "reasonable" test states:

1. Reasonableness is determined by balancing the nature and quality of the intrusion with the countervailing government interests.

2. The reasonableness analysis contemplates careful consideration of the facts and circumstances of the encounter, including:

a. The severity of the crime.



Ava 61

**Exhibit 6**

b. Whether the suspect poses an immediate threat to the safety of the officers and/or others.

c. Whether the suspect is actively resisting arrest or attempting to evade arrest by flight.

3. Reasonableness is to be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.

4. Not every push or shove violates the 4th Amendment.

5. The reasonableness standard must make an allowance for the fact that police officers are often forced to make split-second judgements in circumstances that are tense, uncertain, and rapidly moving.

6. The officer's underlying intent or motive is irrelevant to the "objective reasonableness" test; however, if the officer has evil or malicious intent or evidences a callous disregard for the suspect, the officer may be liable for punitive damages or possibly criminal culpability.

C. Firearms are any weapon from which a projectile is forcibly ejected by an explosive.

D. Non-deadly force is the force employed which is neither likely nor intended to cause death or serious physical injury.

E. Reasonable belief exists when facts or circumstances the officer knows before the application of force, or should know, are such as to cause an ordinary and prudent person to act or think in a similar way under similar circumstances.

F. Serious physical injury is any injury to the body that causes, or is likely to cause, acute or permanent disablement, disfigurement, injurious internal disturbances, severe psychological trauma, and any injury that requires significant medical treatment or hospitalization. See RSMo. 565.002(6).

G. Excited delirium is a state of extreme mental and physiological excitement, characterized by extreme agitation, hypothermia, hostility, exceptional strength and endurance without apparent fatigue.

III. General Policy

A. Officers are confronted frequently with situations where in order to accomplish a lawful objective, force has to be used. Control may be achieved through advice, warnings, and persuasion, or by the use of physical force. Obviously, there are

Ava 62

Case 6:21-cv-03072-BP   Document 102-6   Filed 07/21/22   Page 2 of 15

varying degrees of force that may be reasonable, depending on the totality of circumstances presented.

B. Officers will use the amount of force that is objectively reasonable to accomplish a lawful objective and purpose. When applying deadly force, an officer's objective must be to stop or incapacitate the suspect.

C. The use of <u>excessive/unreasonable force</u> shall result in corrective action up to and including termination, as well as potential criminal prosecution.

D. When practical, the response by officers will be progressive in nature. The point of entry into the response to resistance continuum will vary with each situation. The level of force may escalate at any time and officers must be prepared to meet the threat with that amount of force which is objectively reasonable to control the situation.

E. Officers employing physical force to overcome a subject's resistance which is at or exceeds Resistant Level I, as explained within Section IV of this General Order, will be required to complete a special response to resistance report in accordance with Department General Order (       ), Reporting response to resistance (Refer to model policy on reporting response to resistance).

IV. Progressive Response to Resistance

**Progressive force** refers to the escalation of force used by an officer in order to <u>control</u> a situation, from minimal force to maximum force. An illustration of the department's response to resistance: Confrontation/Control Continuum is presented as Addendum A of this order. The response to resistance by officers shall be in compliance with the training standards established by the department. Officers of this department may only use that level of force which is objectively reasonable under the circumstances to accomplish a lawful objective.

A. Level - Cooperative

In the course of normal patrol, the officer's contact with the general population is vastly more positive than negative, and likewise, much more prone to non-force than forceful confrontation. Even in exceptional cases, at times the officer may simply re-adjust his spatial positioning or elicit greater eye contact (body language methods) and gain reluctant compliance of the individual. Or the non-compliant individual may have the officer's request repeated or verbally convinced that increased reluctance need not progress to resistance (verbal persuasion methods) culminating in eventual compliance.

1. In dealing with people, each officer must attempt to make his/her contact one which inspires respect and generates cooperation and approval of the

Ava 63

public. A citizen's encounter with the police can be a frightening, emotional experience and under these circumstances, the risk of misunderstanding is great.

2. The manner and form in which an officer speaks to the individual(s) can be an effective means of exerting verbal force in order to control the situation. Verbal force may be in the form of warnings, advice, persuasion, volume and tone control and may, in and of itself, be progressive in nature, depending upon the circumstances. All are effective means of utilizing reasonable and necessary verbal force. If used properly, officers may not have to resort to the use of other forms of force.

3. The majority of arrests made by officers of this department are made peacefully; the prisoner is handcuffed, searched, and transported. In these situations there is neither resistance, nor the need to use force. On occasion, some form of physical maneuvering may be required to escort the individual from one location to another.

B. Resistance Level I

On occasion, police officers are faced with an uncooperative individual or one who refuses to be placed in custody and other alternatives would be, or have been, ineffective or inappropriate. Incidents of this nature require officers to use sufficient force to make the lawful arrest without unnecessarily aggravating the situation. The object of this level of force is to gain compliance and control while minimizing the risk of injury to the officer, the person being placed into custody, and innocent bystanders. As shown in Addendum A, control options could include: body language, verbal persuasion, contact controls, joint restraints, weapon assisted leverage techniques, and nerve center controls.

C. Resistance Level II

Resistance in this classification is active in its scope and intensity. The suspect's indifference is expressed via physical defiance. The individual may turn away from the officer and attempt to leave the scene. A suspect may actively resist the officer's attempts at controls. The critical aspect of Resistance Level II is that no direct force or violence has been directed toward the officer. It should be noted, however, that resisting a control technique could directly or indirectly injure the officer and, therefore, subsequent techniques deployed attempting to gain control of the suspect could legitimately escalate into a higher level of non-compliance. As shown in Addendum A, control options for this level of resistance could include: all techniques listed for Resistance Level I, as well as, weapon assisted pain compliance techniques, inflammatory agents, chemical irritants, and electro-muscular disruption systems (Taser).

### Electronic Control Device (ECD)

1. It is the policy of this agency to use only that level of force reasonably necessary to control or otherwise subdue violent or potentially violent individuals. ECD systems have been proven effective in furtherance of this policy, and are authorized for use in appropriate circumstances by trained personnel.

2. Electro-muscular disruption systems are hand held battery powered Electronic Control Devices (ECD). The ECD is designed to override the sensory and motor functions of the central nervous system, causing uncontrolled contractions of the muscle tissue.

3. The devices are battery operated, and will only be used with power sources recommended by the manufacturer.

4. Employees who carry the device must have satisfactorily completed the agency approved 4-hour training course, and subsequent annual two hour refresher courses.

    a. The device shall be carried fully armed with the safety on, in preparation for immediate use in appropriate circumstances.

    b. The device will be carried by general duty patrol officers in an approved holster on the support/weak side of the body, requiring the support/weak hand to draw. Those authorized to use the devices and not assigned to general duty patrol may utilize other department-approved holsters, and carry the weapon consistent with department training.

        i. The device will be carried on the support side in the manufacturer supplied holster, requiring support hand draw.
        ii. Officers approved to use the device shall be issued a minimum of one spare cartridge, and have it accessible in case of cartridge failure, need for re-application, or the first cartridges leads break during engagement. The spare cartridges shall be stored and carried in a manner consistent with training.
        iii. Cartridges shall be replaced consistent with the manufacturers' expiration period.

5. Use, Deployment, and Aftercare

a. The justification to use the device follows the same as OC spray, with the exception of special considerations as follows:

Persons who have been exposed to both technologies generally consider the discomfort effects of OC spray more significant than the electro muscular disruption device, but less incapacitating.

Persons exposed to the device generally recover in seconds or minutes, as compared to approximately one hour for OC spray.

The device is more likely than OC spray to stop persons under the influence of alcoholic beverage/controlled substances, or those suffering from mental instability.

b. The device shall be pointed at the ground in a safe direction with the safety on during loading, unloading, or any other required handling outside of an operational deployment.

c. In preparation of firing, the device shall be pointed in a safe direction, taken off safe, then aimed appropriately (center mass of the back is the primary aiming point, with lower center of mass-below the sternum, for frontal discharges or legs being secondary targets) using the fixed sights as the primary aiming device, and the laser dot as the secondary aiming device.

E. The effective range of the device is based on the cartridge involved, with optimal range generally being 12 to18 feet. It is important to note that the closer the device is to the suspect, the less the probes spread with generally a reduction in effectiveness (neuro-muscular incapacitation).

F. The subject should be secured as soon as practical while disabled by ECD power or immediately after, to minimize the number of cycles needed and time exposed to overcome resistance and bring the subject under control. In determining the need for additional energy cycles, officers should be aware that an energized subject may not be able to respond to commands during or immediately following exposure. Handcuffing under power should be considered when safe, practical, and when additional officers are present.

G. The device has generally been approved for use in certain circumstances in the "drive or touch stun" mode. The standard method involves removing the cartridge and pressing the unit against an appropriate area of the body determined by training. It is important to note that when the device is used in this manner, it is:

(i) Primarily a pain compliance tool due to a lack of probe spread,

and the related decreased potential for neuromuscular incapacitation.
(ii) More likely to cause tissue damage.
(iii) More likely to result in citizen complaints.

In consideration of i-iii above, it is the policy of this agency to use the alternative "cartridge on drive stun" method of deployment, which involves leaving the cartridge attached to the device, firing the probes from close range, then repositioning the device and touching the suspect away from the point of probe contact, consistent with training. This allows for the use of the device in close quarter situations, with an increased potential for neuromuscular incapacitation. Officers are authorized to use the device in the standard method of "drive or touch stun", when facing exigent circumstances which justify the use of the device at close range, but do not reasonably allow its use in the alternative mode.

H. In ordinary circumstances, the deploying officer shall remove the darts from the suspect in the field using the procedure outlined in training. Universal precautions shall be followed to protect the officer from the transfer of body fluid/material. The suspect shall be taken to the hospital for dart removal in cases where sensitive tissue impalement has occurred (i.e. groin, eye, female breast, face, neck), in cases where the suspect demands it, or the officer feels it would be necessary and appropriate. Photographs of the affected area should be taken after the dart is removed.

I. When the device has been used operationally, the officer will collect the air cartridge, wire leads, darts, and APHIDS as evidence.

6. Reporting

   a. The deploying officer shall notify his/her supervisor as soon as practical after using the device, and complete the appropriate response to resistance control form that documents the encounter.

D. Response Level I

In this level the officer is met with active, hostile resistance expressing itself in the form of physical attack upon the officer. Resistance keys upon the direction of the violence as well as the intensity and, therefore, includes a large realm of resistance activities. In each case, the specific judgment as to overall scope of the violence must err on the side of officer safety. In addition to the control options presented for Resistance Levels I and II, the officer could include intimate impact weapons as well as extended impact weapons in his range of force options.

1. Personal Impact Weapons: This level of unarmed force commonly involves the fist, hand, elbow, feet, knee, etc., of officers. The use of personal weapons can be employed by officers to defend them against unlawful assaults/suspect activity, and or overcome unlawful resistance, when higher levels of force are not necessary and other verbal and physical force alternatives would be, or have been, ineffective or inappropriate. Striking techniques may be delivered with an officer's open hand, fist, forearm, leg or foot. Primary target points are the major muscle mass areas such as the legs, arms, shoulders, torso, or side of the neck. Strikes to these target areas should create temporary muscle paralysis (all force must meet this standard, as noted in the preamble in the policy above).

2. Use of Baton: The baton shall only be used in accordance with current departmental training standards. The baton shall generally be used in situations where other verbal or lesser physical force alternatives would likely be, or have been, ineffective or inappropriate.

    a. Prior to being authorized to carry a baton, officers will be required to successfully complete the manufacturer's user certification course. Only certified instructors will be utilized to conduct certification and annual recertification courses for the department.

    b. Only batons issued by this department shall be authorized for use by employees.

    c. When carried, the baton will be secured in a manner consistent with established uniform standards. Other types of striking devices are strictly prohibited and shall not be carried while on duty or acting in an official capacity as a member of this department.

3. Police officers on occasion will interact with persons demonstrating unusual symptoms, including but not limited to:

    - Bizarre or unusually violent behavior
    - Signs of overheating/profuse sweating
    - Disrobing
    - Violence toward/attacking glass, lights, and reflective surfaces
    - Superhuman strength and endurance
    - Impervious to pain - self-mutilation
    - Disturbances in breathing patterns or loss of consciousness
    - Complaints of respiratory difficulty

It is the policy of this agency to immediately call for medical assistance in any case where one or more of these behaviors has been observed by officers, or is reasonably believed to be present-including cases where information concerning such behavior is received via 911 calls for assistance. (This is to ensure dispatchers and officers IMMEDIATELY call for an ambulance when they observe or are made aware-like by a caller to 911-that we are likely working a call with someone in this condition).

E.  Response Level II

At this level is the violent subject who by his actions creates a reasonable assessment that his non-compliant activity has the potential to cause the officer great bodily harm and even death. Most officers will readily, almost instinctively, perceive when their actions are in defense of life and therefore, reasonable force options which range from the levels indicated earlier to include: extended range impact projectiles, weapons techniques with debilitating potential, service firearm, and supplemental firearms.

- A. All officers are equipped with a firearm to defend themselves or others against deadly force. An officer shoots when it is reasonably necessary to preserve his life or the life of another. When deadly force is used, it must be within the realization that the death of a person may occur.

- B. Justification for the use of deadly force must be limited to what <u>reasonably appears</u> to be the facts known or perceived by an officer at the time they decide to use such force. Facts unknown to an officer, no matter how compelling, cannot later be considered in determining whether the use of deadly force was reasonable.

- C. An officer may use deadly force in the defense of a citizen or himself from what he/she reasonably believes to be an immediate threat of death or serious physical injury. <u>Provided</u> that the further risk of death or serious physical injury to others if the violent felon is not apprehended exceeds the risks inherent in the use of deadly force to others.

- D. Deadly force may be used to prevent the escape of a fleeing felon when the officer has exhausted all other means of capture AND:

    - a. The officer reasonably believes that the person to be arrested has used deadly force in the commission of a felony, OR:

    - b. The officer reasonably believes that the person whose arrest is sought will inflict death or serious physical injury to the officer or others if apprehension is delayed.

E. Deadly force may be used to kill seriously injured or dangerous animals when no other disposition is reasonably practical. When feasible, officers must obtain approval from a supervisor before such action is taken.

V. Shoot to Stop

   A. Members shall fire weapons to stop an assailant from completing a potentially deadly act as described in this Order. For maximum stopping effectiveness and minimal danger to innocent bystanders, the officer shall shoot "center body mass".

   B. "Warning shots" are prohibited.

   C. Shots shall not be fired toward, into, or at a crowd or gathering.

VI. Shooting at or From Moving Vehicles

Officers shall not discharge a firearm at or from a moving vehicle, except as the ultimate measure of self-defense, or defense of another when the suspect is attempting to use deadly force.

VII. Display of Firearms

   A. Except for general maintenance, supervisory inspections, storage or authorized training; officers shall not draw or exhibit firearms unless circumstances create a strong reasonable suspicion that it may be necessary to lawfully use the weapon in conformance with other sections of this order.

   B. A firearm shall not be used as a hammer, pry bar, tool, or for any other purpose other than for which it was intended.

   C. A revolver shall not be carried or placed at any time in a "cocked" condition. Officers carrying semi-automatic pistols will return the weapon to the double action firing condition as soon as practical after discharging a round or rounds.

   D. Officers shall not engage in any "horse play", "quick-draw", or any other similar activity.

   E. Weapons shall not be used for any purpose other than approved range training, performance of duty, or as otherwise provided by law. Departmental weapons shall not be carried or utilized for hunting, or similar, non-law enforcement activity.

   F. No officer shall display or provide any weapon to a citizen to inspect, examine or otherwise handle.

G. No officer shall furnish his firearm to any citizen or civilian enlisting his assistance.

VIII. Deadly Force Other Than Firearms Prohibited

A. Deadly force may consist of the use of items, articles, instruments, or equipment other than firearms which are designed, intended, and routinely utilized for other legitimate police purposes such as vehicles, batons, flashlights, etc.

Deliberate use of any such item, article, instrument, or equipment for any purpose other than that for which it was designed and intended, or in a potentially deadly manner (i.e., as a club), is prohibited except in cases where the use of deadly force is specifically authorized by this order.

B. Striking to the head should be avoided, it may occur only as a <u>LAST RESORT</u> when no other means of control exists and the use of deadly force is reasonable.

**NOTE:** <u>Lateral Vascular Neck Restraints (LVNR and other similar holds which restrict the ability to breathe are prohibited).</u>

IX. Less Lethal Extended Range Impact Projectiles

A. The primary impact projectile used by the Ava Police Department is the 12 gauge sock shaped/drag stabilized lead shot filled bean bag round. Effectiveness is the potential of the round to cause incapacitation, and reduce the subject's ability to continue their inappropriate behavior. The level of energy necessary to cause incapacitation creates the potential for injury, but when properly deployed, creates a low probability of causing serious physical injury or death.

B. The potential for causing death or serious physical injury with such projectiles is a reality. This potential is greatly reduced when impacts to the head, neck, and chest are avoided, and when appropriate medical examination is provided in cases where the subject is struck in an area that might conceal a closed injury such as the back, thoracic and abdominal cavities, and the groin. When engaging a target, the officer should evaluate the effectiveness of each round during the volley. Compliance and/or incapacitation are the desired goal, and alternative target areas/response should be considered when rounds are not effective. Alternative target area/response considerations will be based on the circumstances the officer is encountering, and the established department safety priorities.

C. The use of kinetic energy impact projectiles are considered a Level I response to resistance, when deployed to areas of the suspects body that are considered unlikely to cause death or serious physical injury.

1. The use of kinetic energy impact projectiles is considered a Level II-Deadly Force, if <u>intentionally</u> deployed at the head or neck.

2. The less lethal projectiles will be delivered to suspect target areas based on the circumstances, established safety priorities, and the level of force authorized.

The baton-training chart is the recognized model for determining contact areas for kinetic energy impact weapons, based on potential for injury.



Light Areas - These areas will be considered when incapacitation is necessary, and a minimal potential for injury is the appropriate response.

Medium Areas - These areas will be considered when an escalation of force above light (areas) is necessary and appropriate, acknowledging an increase in the potential for death or serious physical injury.

Head/Neck - Intentional impacts to these areas will be avoided unless use of deadly force is reasonable, necessary, and appropriate.

**The chest should be avoided unless the need to stop the behavior justifies the risk of potential injury.**

1) Training in the use of extended range impact projectiles will consist of an approved department end user program, with annual recertification.

X  Training

Officers shall receive in-service training on an annual basis regarding defensive tactics and the use of physical force and control holds. This training will be consistent with current legal trends and generally accepted law enforcement procedures.

A. Only certified instructors will be utilized to present this training. Although not required, it is preferred that the instructors be sworn members of this department.

B. A training syllabus will be prepared by the lead instructor and submitted for review to the Professional Standards Section, prior to the first class.

C. The Professional Standards Section will review the material and forward the appropriate recommendation to the Chief of Police based on the syllabus content.

D. Areas of concern on the training syllabus will be brought to the attention of the Police Chief for appropriate review.

E. All training syllabi will be approved by the Chief of Police prior to implementation.

F. The Professional Standards Section is responsible for coordinating the training program; to include the scheduling process, equipment, and facility acquisition.

 1. Entries of this training shall be made on the officer's individual training record.

 2. A list of officers failing to attend or pass the required training shall be prepared and forwarded to each Bureau Commander for appropriate corrective action.

G. All sworn personnel below the rank of major shall be required to attend these training sessions as scheduled, unless excused for a justifiable reason by the appropriate Bureau Commander. All other sworn personnel are encouraged to attend.

General Order
Addendum A

RESPONSE TO RESISTANCE:

SUBJECT'S ACTION

```
N  ┌                    1. Controlled Confrontation
O  │
F  │                    2. Body Language
O  │        O                                              COOPERATIVE
R  L        P           3. Verbal Persuasion
C           T
E           I
            O           4. Contact Controls
   ┌        N                                              RESISTANT LEVEL I
   │        A           5. Inflammatory Agents/Chemical Irritants
   │        L
O  │
R  │                    6. Joint Restraints
D  │
I  │                    7. Weapon Assisted Leverage
N  │                       Techniques
A  │
R  │                    8. Nerve Center Controls
Y  │
   │                    9. Weapon Assisted Pain
F  │                       Compliance Techniques
O  │        O                                              RESISTANT LEVEL II
R  │        P           10. Electro-muscular Devices
C  │        T
E  │        I
   L        O           11. Intimate Impact Weapons
            N                                              RESPONSE LEVEL I
E           A           12. Weaponless Techniques with
X  ┌        L              Debilitating Potential
T  │
R  │                    13. Extended Impact Weapons
A  │                                                       RESPONSE LEVEL II
   │                    14. Weapon Techniques with
O  │                       Debilitating Potential
R  │
D  │                    15. Service Firearm
I  │
N  │
A  L                    16. Supplemental Firearm
R
Y
```

Ava 74

F  
O  
R  
C  
E

Note: The illustration does not represent a specific course of action or conduct, but rather, serves as a guide to possible methods of response available to an officer in reaction to a subject's behavior.

## AUTHORITY

A. This policy is issued by the authority of the Chief of Police. Any policy additions, deviations or revisions shall be made only at the direction of the Chief of Police.

By Authority of:

_____  
Reggie D. Johnson. Chief of Police

Ava 75