IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

| | | |
|---|---|---|
| RACHEL AUMICK *Individually and on behalf of the Heirs of* SHANE AUMICK, *deceased,* | ) ) ) ) | |
| Plaintiff, | ) | |
| v. | ) ) | No. 21-03072-CV-S-BP |
| KALEB BERKSHIRE, *et al.*, | ) ) | |
| Defendants. | ) | |

## ORDER GRANTING MOTIONS FOR SUMMARY JUDGMENT

Pending are motions for summary judgment filed by Kaleb Berkshire and the City of Ava, Missouri, (Doc. 96), and Lester E. Cox Medical Centers and Stephen Wood, (Doc. 94.) For the following reasons, the motions are **GRANTED**.[1]

## I. BACKGROUND

This case involves a fatal encounter between Plaintiff's decedent Shane Aumick ("Shane") and Defendant Kaleb Berkshire, who was a police officer for Defendant City of Ava, Missouri ("Ava"). On April 4, 2020, the Ava police department received a report of a domestic disturbance; the report indicated that a female was injured due to an assault by an intoxicated male. Berkshire was dispatched to a house, where he found Shane's mother, Meri Aumick ("Meri"), covered in blood. Houston Thomas, Shane's stepfather, told Berkshire that Shane was inside the house with a knife and that Shane was intoxicated and acting strangely.

What happened next is disputed. The dispute arises in part because, while Berkshire was wearing a body camera, the camera only began filming when an officer manually activated it, and

---

[1] Plaintiff has filed an Amended Motion for Leave to File a Sur-Reply regarding the motion for summary judgment filed by Berkshire and the City of Ava, Missouri. (Doc. 111.) Despite opposition, the motion is **GRANTED**. Plaintiff's proposed sur-reply, (Doc. 111-1), is deemed filed, and the Court has considered it.

Berkshire had not yet activated his body camera. In the incident report filed by Berkshire, he claimed he first encountered Shane on the steps of the house, at which point Shane was still "brandishing the knife stating he was going to kill everyone." (Doc. 102-2, p. 4.)[2] However, viewed in the light most favorable to Plaintiff, Berkshire approached the house, and, when he was on the porch, Shane came out the front door. (*See* Doc. 102-3, pp. 2-3 (Meri Dep., pp. 75-76).) The knife Shane had wielded previously was somewhere on the ground, and he never picked it back up. (*Id*. at p. 4 (Meri Dep., p. 78).)

At that point, Berkshire realized his body camera was turned off and activated it. The remaining facts about the logistics of the encounter derive from Berkshire's body camera footage; because the Court reviewed that footage in assessing Defendants' motions to dismiss, the discussion of these facts will closely track the Court's order addressing those motions. (*See* Doc. 52.)

At some point after Shane initially emerged from the house, he appears to have returned inside because he is inside the house when the body camera footage begins. Berkshire instructed Shane to leave the house with his hands up. Shane complied, and Berkshire handcuffed him. (Doc. 97-4 (bodycam footage, at 06:14:27).)[3] Berkshire then directed Shane to sit on the front steps of the house. (Doc. 97-4 (bodycam footage, at 06:15:32).) Noting that Shane's hand was bleeding, Berkshire called an ambulance. Shane continued to speak loudly and mostly incoherently. (*See, e.g.*, bodycam footage, at 06:16:12; 06:17:47)

---

[2] All page numbers are those generated by the Court's CM/ECF system and may not correspond to the documents' original pagination.
[3] The bodycam footage timestamps refer to the time of day when the footage was captured, not the time after Berkshire began recording.

2

While waiting for the ambulance to arrive, Berkshire searched the residence and conversed with Shane's relatives, who indicated they did not want to press charges. (Doc. 97-4 (bodycam footage at 06:17:27).) Berkshire also asked Shane's mother what Shane was "on" that might explain his behavior; she indicated that, as far as she was aware, Shane had not consumed any intoxicating substance other than vodka. (Doc. 97-4 (bodycam footage at 06:17:51).) Berkshire then asked Shane whether he was on drugs, to which Shane replied he was not. (Doc. 97-4 (bodycam footage at 06:18:53).) At that point, Shane was still sitting on the front steps. (*Id.*)

Between timestamps 06:20:00 and 06:21:00 of the bodycam footage, Shane became increasingly agitated. At approximately 06:21:20, Shane threatened to "kill this neighborhood." Berkshire then repositioned Shane so that he was lying face down on the ground, with his hands cuffed behind his back, and attempted to search his pockets. (Doc. 97-4 (bodycam footage, at 06:21:46).) Shane struggled and continued to yell incoherently, and Berkshire knelt on Shane's back to restrain him. (Doc. 97-4 (bodycam footage, at 06:21:55).)

About a minute later, Defendant Stephen Wood, who is an EMT for Defendant Lester E. Cox Medical Centers ("Cox"), arrived on the scene in an ambulance. (Doc. 97-4 (bodycam footage, at 06:22:36).) Berkshire remarked to Wood that Shane was "gone. He's threatening to kill everybody. He's supposedly drunk right now . . . ." (Doc. 97-4 (bodycam footage, at 06:22:36-06:22:40).) While Berkshire was talking to Wood, Shane continued yelling and telling Berkshire to get off his back, and the video suggests Shane was continuing to struggle; Berkshire replied he would let Shane up if he "stop[ped]." (Doc. 97-4 (bodycam footage, at 06:23:14).) Shane started kicking Berkshire, leading Berkshire to restrain him more forcefully. (Doc. 97-4 (bodycam footage, at 06:23:34).) Catching sight of Wood, Shane said "please help me sir." (Doc. 97-4

3

(bodycam footage, at 06:23:55).) Shane continued struggling, and, at timestamp 06:24:24, muttered something indiscernible. Wood did not respond to Shane, and, instead, knelt on the ground and held down Shane's legs to stop him from kicking Berkshire. (Doc. 97-4 (bodycam footage, at 06:24:37).) Observing that Shane was bleeding, Wood remarked to Berkshire that Shane's injuries looked like "small [] wounds." (Doc. 97-4 (bodycam footage, at 06:24:48).)

Berkshire grew frustrated with Shane's kicking and yelling and told Shane that, if he kept struggling, Berkshire would tase him. (Doc. 97-4 (bodycam footage, at 06:25:01).) Shane continued yelling and struggling, albeit at a reduced volume. (*E.g.*, Doc. 97-4 (bodycam footage, at 06:25:43).) At timestamp 06:26:44 of the bodycam footage, Shane repeatedly asked Berkshire to "get off me," to which Berkshire replied "no, you keep kicking. You're kicking an officer and a paramedic." (Doc. 97-4 (bodycam footage, at 06:26:53).) Shane then fell silent and did not appear to move or speak at any later point. (*Id.*)

According to Plaintiff's medical expert, shortly after 06:27:00 in the bodycam footage, Shane suffered a cardiac arrest due to being held in a prone restraint. (Doc. 95-1, p. 16 (Morrow Dep., p. 55).) Thus, between the moment when Shane stopped struggling (06:26:53) and the moment Shane suffered a cardiac arrest ("shortly after" 06:27:00), no more than thirty seconds elapsed.

After about a minute of silence—at timestamp 06:28:03—Berkshire asked Shane "are you gonna be calm now?" Shane did not respond. Berkshire continued kneeling on Shane's back, and Wood continued restraining his legs, for the next several minutes. At timestamp 06:28:47, Shane's stepfather came over to and had a brief conversation with Berkshire about what had occurred that evening and whether Shane had acted violently in the past. Shortly thereafter—at approximately

4

06:29:55—Wood asked Berkshire whether Shane was still breathing. Berkshire replied "well, I think he is." (Doc. 97-4 (bodycam footage, at 06:30:00).) Berkshire then repositioned himself to check, and, a few seconds later, remarked "shit"—presumably because he discovered Shane had stopped breathing. (Doc. 97-4 (bodycam footage, at 06:30:05).) For the next minute, Berkshire attempted to elicit a response from Shane by telling him to "wake up" and "look at me." (*E.g.*, Doc. 97-4 (bodycam footage, at 06:30:10).) At 06:30:25, Berkshire checked Shane's pulse, and indicated that he did not feel one. Wood also checked and joined Berkshire in telling Shane to "wake up." (Doc. 97-4 (bodycam footage, at 06:30:35).)

Wood subsequently returned to his ambulance to get medical equipment to test Shane's vital functions. (Doc. 97-4 (bodycam footage, at 06:31:00).) The equipment indicated Shane needed resuscitation; for the next several minutes, Berkshire and Wood struggled to remove Shane's clothes and handcuffs and began attempting chest compressions and other life-saving medical procedures. (Doc. 97-4 (bodycam footage, at 06:31:10-06:35:31).) These were apparently ineffective, and, approximately 30 minutes later, a coroner arrived on the scene and declared Shane deceased.

The parties contest which parts of Berkshire's body were in contact with which parts of Shane's body throughout the encounter, and the bodycam footage is not always completely clear. But the Record, viewed in the light most favorable to Plaintiff, reveals that, for at least a significant amount of the time Shane was lying prone on the ground, Berkshire had his knee on Shane's back. (*E.g.*, Doc. 102-2, p. 9 (Wood's witness statement, indicating Berkshire "had his knee in the male's back"); Doc. 102-2, p. 5 (Berkshire's incident report, indicating he "plac[ed] [his] right knee into the middle of [Shane's] back").)

5

After Shane died, a medical examiner performed an autopsy and toxicology report. The toxicology report revealed Shane had methamphetamine in his blood, at a level of 484 ng/mL. (Doc. 97-6, p. 7.) The medical examiner's report states the cause of death was "excited delirium," with "acute methamphetamine intoxication" as a contributing factor. (Docs. 97-6, p. 1; 97-7.)

Plaintiff has supplied much medical evidence suggesting the way Berkshire and Wood restrained Shane caused his demise. One of Plaintiff's designated experts is Lee Morrow, M.D., a pulmonary care critical care physician. At his deposition, Dr. Morrow, in response to Defendants' inquiry regarding whether "Shane . . . [bore] some responsibility for his death" due to his methamphetamine ingestion, stated that "the ingestion of methamphetamine *contributed to* Shane's death" but "taking the drugs in and of itself didn't result in his death. There had to be a subsequent cascade of events that led to the cardiac arrest." (Doc. 95-1, p. 8 (Morrow Dep., pp. 22).) That "cascade of events," according to Dr. Morrow, was being restrained in a prone position by Berkshire and Wood. As referenced above, Dr. Morrow also opined the cardiac arrest that led to Shane's death occurred "shortly after 6:27:00" on the bodycam footage. (*Id*. at p. 16 (Morrow Dep., p. 55).)

During his deposition, Wood's attorneys asked Dr. Morrow whether Shane would have survived had Wood started initiating life-saving measures, such as cardio-pulmonary resuscitation ("CPR"), during the minutes before Berkshire noticed Shane was not breathing. Dr. Morrow responded that he "cannot say [Shane would have survived] with medical certainty because that's a hypothetical scenario" but observed "the likelihood of successful CPR goes up substantially if it is started as soon as possible relative to the" cardiac arrest. (Doc. 95-1, p. 16 (Morrow Dep., pp. 56-57).) Further, he could not state with reasonable medical certainty that, if "CPR [had] started

6

three minutes or four minutes earlier, [Shane] would have survived." (*Id.*) Plaintiff has also supplied an EMT expert, Joshua Deese, who testified Wood failed to meet a reasonable standard of care when he did not perform any sort of medical care until Shane had evidently stopped breathing. (Doc. 95-3, p. 9 (Deese Dep., pp. 28-29).)

The parties also contest the propriety of the holds Berkshire used to restrain Shane. To support her position, Plaintiff has supplied the testimony of a purported expert witness, Hugh Mills, who is a law enforcement executive and former member of the military. (Doc. 98-2, p. 1 (Mills's report).) Mills opined that (1) Berkshire should have known keeping Shane in a "prone restraint" position for as long as he did was dangerous; (2) Wood should have treated Shane for his blood loss immediately; (3) Berkshire's report of the incident is unreliable; (4) the Ava police department should have investigated and completed a use-of-force report on the incident; and (5) the Ava police department's policies "were poorly interpreted by Ava police personnel on this case." (Doc. 98-2, pp. 4-5.)

The Amended Complaint, which is the operative pleading in this case, asserts the following Counts and theories against the various Defendants:

- Count I: Berkshire (1) used excessive force and (2) exhibited deliberate indifference to Shane's serious medical needs by restraining him in a prone position and failing to provide prompt medical care once he stopped breathing;

- Count II: Ava maintained policies or customs that contributed to Berkshire's violation of Shane's rights and/or failed to adequately train and supervise Berkshire; and

- Count III: Berkshire, Cox, and Wood are liable for causing the wrongful death of Shane.

7

Case 6:21-cv-03072-BP   Document 124   Filed 09/29/22   Page 7 of 17

Now, Berkshire and Ava have filed a motion for summary judgment, (Doc. 96), as have Wood and Cox. (Doc. 94.) Plaintiff opposes the motions. (Docs. 102 & 101.) The Court resolves these issues below.

## II. DISCUSSION

### a. Berkshire and Ava's Motion for Summary Judgment

Berkshire and Ava's motion requests that summary judgment be entered on all the claims and legal theories against them—namely, (1) the excessive force and deliberate indifference claims against Berkshire in Count I, (2) the municipal liability claim against Ava in Count II, and (3) the wrongful death claim against Berkshire in Count III. The Court addresses their arguments with respect to each of these theories in turn.

#### 1. Count I

The two legal theories in Count I stem from Berkshire's treatment of Shane during the encounter and concern different, but overlapping, periods of time. The excessive force claim, Plaintiff explains, asserts Berkshire's use of a prone restraint on Shane was disproportional to the needs of the situation; thus, this claim encompasses the period of time from when Berkshire initially restrained Shane to when Berkshire stopped restraining Shane and began attempting to give him aid. (Doc. 102, pp. 39-40.) The deliberate indifference claim arises from the period of time when Berkshire continued to restrain Shane after he had stopped struggling and, apparently, breathing through when Shane passed away. (Doc. 102, pp. 41-42.) As detailed below, different legal standards apply to these claims.

Berkshire, however, argues he is entitled to qualified immunity on both claims. In suits under § 1983, "[q]ualified immunity shields . . . state officials from money damages unless a

plaintiff [proves] facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). The Court can address these prongs in either order. *E.g.*, *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

      i. *Excessive Force*

Berkshire argues he is entitled to summary judgment on Plaintiff's excessive force claim because the technique he used to control Shane—a prone restraint—is not *per se* unconstitutional, and, thus, Berkshire did not violate Shane's clearly established right. (Doc. 97, pp. 17-18.) This is consistent with the law in the Eighth Circuit, which has held that a "prone restraint [is not] unconstitutional in and of itself" and that "there is no clearly established right against the use of prone restraints for a suspect that has been resisting." *Hanson as Trustee for Layton v. Best*, 915 F.3d 543, 548 (8th Cir. 2019).[4] The Eighth Circuit, though, has also observed that "unnecessary violence against a handcuffed and compliant detainee" violates the detainee's clearly established rights. *E.g.*, *Blazek v. City of Iowa City*, 761 F.3d 920, 926 (8th Cir. 2014) ("If [the plaintiff] can prove at trial that he was subdued and compliant, but that the officers grabbed him by the arms and gratuitously 'jerked' him from the floor onto the bed . . . then . . . a reasonable jury could find a violation of the Fourth Amendment."). Thus, the question is whether Berkshire's use of a prone restraint on Shane was "unnecessary violence against a handcuffed and compliant detainee."

---

[4] Berkshire also references *Lombardo v. City of St. Louis, Missouri*, 141 S.Ct. 2239 (2021), a Supreme Court case concerning the constitutionality of prone restraints. The Court cannot consider that case because it post-dates the encounter between Shane and Berkshire. Consequently, it cannot have "clearly established" any law at the time when the relevant events occurred.

Two facts are clear from the Record. First, when Berkshire initially placed Shane in a prone restraint, he was resisting, and a reasonable officer could have perceived Shane as a threat to himself or others. At 06:21:20 in the bodycam footage, Shane threatened to "kill this neighborhood," and Berkshire initially moved him onto the ground to search his pockets for weapons—a reasonable decision given that Berkshire had reason to believe Shane had attacked his mother with a knife earlier. Shane continued to yell and kick for several minutes, which is inarguably a form of "resisting," and, therefore, warranted Berkshire's use of the prone restraint. *See Hanson*, 915 F.3d at 548. Plaintiff argues there is a "genuine issue of material fact as to whether Shane was 'resisting arrest' or 'trying to breath[e].'" (Doc. 102, p. 41.) But, for purposes of qualified immunity, the proper question is: could a reasonable officer in Berkshire's position have interpreted Shane's actions as resistance? *E.g.*, *Kelsay v. Ernst*, 933 F.3d 975, 981-82 (8th Cir. 2019) (if a "reasonable officer [c]ould interpret the subject's behavior as 'noncompliant'" or the subject "'appeared to be resisting,'" the officer is entitled to qualified immunity). And, even viewed in the light most favorable to Plaintiff, the Record shows a reasonable officer could have perceived Shane as noncompliant.

Second, Shane stopped speaking and struggling—and, thus, was in a sense "compliant"—before the cardiac arrest that resulted in his death occurred. Yet the window of time between Shane (1) becoming compliant and (2) suffering the cardiac arrest is extremely narrow. Shane last appears to move at 06:26:53 in the bodycam footage, and Plaintiff's own expert indicates he likely suffered a cardiac arrest shortly after 06:27:00—in other words, thirty seconds or less after he stopped struggling. The Court does not believe the law "clearly establishes" that an officer who has used a prone restraint on a resisting detainee must immediately end the prone restraint as soon

10

as the detainee appears to stop struggling. This is especially true where, as here, Shane alternated between being relatively still and yelling or struggling. The cases Plaintiff cites, which could be read to the contrary, are from other circuits and appear to contradict established Eighth Circuit law. (*See* Doc. 102, pp. 40-41 (citing cases from the Fifth, Sixth, Ninth, and Tenth Circuits or district courts in those Circuits).)

Thus, the Court concludes the law in the Eighth Circuit did not clearly establish Berkshire needed to end the prone restraint very shortly after Shane stopped struggling. Furthermore, if Plaintiff argues the law clearly established Berkshire needed to end the prone restraint at a later time—say, a minute or two minutes after Shane stopped struggling—Plaintiff cannot establish but-for causation. *See Brewington v. Keener*, 902 F.3d 796, 803 (8th Cir. 2018) (explaining that, under § 1983, one must establish the unconstitutional action caused the injury). Dr. Morrow admitted in his deposition that he "cannot say [Shane would have survived] with medical certainty" even if Wood or Berkshire had begun administering CPR three to four minutes earlier. (Doc. 95-1, p. 16 (Morrow Dep., pp. 56-57).) Thus, even if the law required Berkshire to terminate the prone restraint at, for example, a minute after Shane stopped struggling (roughly 6:27:53), no medical evidence demonstrates he would have survived.

For these reasons, the Court concludes the facts in the Record, viewed in the light most favorable to Plaintiff, do not show that Berkshire violated Shane's clearly established rights. As a result, Berkshire is entitled to summary judgment on the excessive force aspect of Count I.

  *ii.* *Deliberate Indifference*

The second facet of Count I asserts Berkshire exhibited deliberate indifference to Shane's serious medical needs. A police officer acting under the color of state law is liable for failing to

treat a pretrial detainee if the detainee "suffered an objectively serious medical need" and if the officer "had actual knowledge of those needs but deliberately disregarded them"; "[a] showing of negligence is not sufficient to meet this burden." *Carpenter v. Gage*, 686 F.3d 644, 650 (8th Cir. 2012). This test includes both an objective and a subjective component. The objective component requires that there be "an excessive risk to [one's] health or safety," which was "known or obvious" to the defendant "from [his or her] perspective at the time in question, not with hindsight's perfect vision." *Jackson v. Everett*, 140 F.3d 1149, 1152 (8th Cir. 1998). The subjective component requires that the defendant acted under "a mental state akin to criminal recklessness," which can be "inferred . . . from facts that demonstrate that a medical need was obvious and that the [defendant's] response was obviously inadequate." *Barton v. Taber*, 820 F.3d 958, 965 (8th Cir. 2016) (cleaned up).

Berkshire contends no evidence in the Record suggests he exhibited a conscious disregard of Shane's obvious medical need. The Court agrees. Although Shane was bleeding from his hands and acting somewhat delirious when Berkshire encountered him, there was nothing to indicate any sort of imminent danger to Shane's life. Despite this, Berkshire immediately called an ambulance to attend to Shane's mother and Shane, should the need arise. Then, when Shane began acting erratically, Berkshire restrained him—but, at that point, nothing indicated Shane was undergoing a medical crisis, or, at least, nothing obvious to a layperson. Shane eventually stopped moving at 06:26:53 in the bodycam footage, but the footage does not show Shane exhibited any noticeable distress at that moment or in the thirty seconds thereafter when, according to his medical expert, he suffered a cardiac arrest. In the bodycam footage, Shane does not appear noticeably in distress after the cardiac arrest, either. Indeed, a reasonable officer in Berkshire's position may well have

interpreted Shane's silence as a desire to comply, rather than a medical emergency. Moreover, as Defendants point out, the presence of Wood—a paramedic who did not suggest the possibility that Shane's life was in danger until well after he suffered the cardiac arrest— at the scene undercuts any argument that Shane had an obvious medical need of which Berkshire was aware. *See Hanson*, 915 F.3d at 549 ("Because medical professionals never suggested [the decedent] had emergency medical needs, the urgent nature of [his] condition could not have been 'obvious' to a layperson.").

Plaintiff contends Shane's statements that he could not breathe and requests for help should have alerted Berkshire that Shane was suffering a medical crisis. (Doc. 102, p. 42.) The Court disagrees. Notably, Wood never indicated to Berkshire that he should change his behavior or that Shane was in any kind of medical danger, which undermines the notion that Berkshire had actual knowledge of any serious medical need on Shane's part. *See Hanson*, 915 F.3d at 549. Additionally, a reasonable officer in Berkshire's position might well have been skeptical of anything Shane said because, in the bodycam footage, he appears to talk with people who were not present and makes incoherent threats.

In sum, the Record shows Berkshire did not have actual knowledge of Shane's serious medical needs until he checked to see whether Shane was breathing and, at that point, sought to provide Shane with as much medical care as possible under the circumstances. Therefore, the Court concludes Berkshire is entitled to summary judgment on Plaintiff's deliberate indifference claim.

### 2. Count II

Count II asserts Ava's policies and customs contributed to Berkshire's actions and, consequently, Shane's death. However, "in order for municipal liability to attach, individual

13

liability first must be found on an underlying substantive claim." *Moore v. City of Deslodge, Mo.*, 647 F.3d 841, 849 (8th Cir. 2011) (internal quotation omitted). Consequently, Plaintiff's claims against Ava rise and fall with her claims against Berkshire. Because Berkshire is entitled to summary judgment on all of Plaintiff's constitutional claims, Ava is as well.

### 3. Count III

Count III asserts Berkshire is liable under Missouri law for negligently causing Shane's death. Berkshire contends he is entitled to official immunity against this claim. (Doc. 97, pp. 28-30.) The doctrine of official immunity "protects public employees from liability for alleged acts of negligence committed during the course of their official duties for the performance of discretionary acts." *Southers v. City of Farmington*, 263 S.W.3d 603, 610 (Mo. 2008) (en banc). A discretionary act involves "the exercise of reason in the adaptation of means to an end and discretion in determining how or whether an act should be done or course pursued." *Fonseca v. Collins*, 884 S.W.2d 63, 66 (Mo. App. 1994) (internal quotation omitted). The doctrine extends to police officers, including their choice of whether to use force in the course of their duties. *Boude v. City of Raymore, Missouri*, 855 F.3d 930, 935 (8th Cir. 2017). An officer only loses the protection of official immunity if he "act[s] in bad faith or with malice, which ordinarily requires actual intent to cause injury." *Id*. (internal quotation omitted).

Here, Berkshire's encounter with Shane was undoubtedly in the course of his official duties, and his decision to use force on Shane was a discretionary act. Plaintiff does not dispute this; instead, she contends that Berkshire acted in bad faith or with malice. (Doc. 102, pp. 45-46.) Plaintiff's argument on this point does not accurately summarize the standard for bad faith: she contends "[a] jury may well conclude that Defendant Berkshire's decision to initiate a prone

14

Case 6:21-cv-03072-BP   Document 124   Filed 09/29/22   Page 14 of 17

restraint of Shane Aumick under these circumstances consciously ignored police protocol and the danger posed to him." (Doc. 102, p. 46.)  But to ignore protocol, or the danger posed to a citizen, is not enough; there must be evidence that Berkshire acted with "actual intent to cause injury." *Boude*, 855 F.3d at 935 (internal quotation omitted).  Plaintiff has pointed to no such evidence, and the Record reveals none.  For this reason, summary judgment for Berkshire is **GRANTED** with respect to Count III.

### b. Wood's and Cox's Motion for Summary Judgment

Wood and Cox are only named as defendants in Count III, which asserts Wood is liable (and Cox is vicariously liable) for negligently causing Shane's death.  Plaintiff's theory on this front is that, had Wood provided timely medical care to Shane (in the form of, for example, CPR when Shane stopped breathing), Shane would have survived.  (*E.g.*, Doc. 55, ¶ 137.)[5]

"To recover for wrongful death under Missouri law, [a plaintiff] must prove that [the] defendants' negligence was a direct cause of [the decedent's] death," which "requires, at minimum, a showing of 'but-for' causation, that is, causation in fact." *Graham v. Ozark Mountain Sightseeing, Inc.*, 181 F.3d 924, 926 (8th Cir. 1999).  If a plaintiff relies on medical experts, the testifying "doctors must testify *to a reasonable medical certainty* that but for defendants' negligence [the decedent's] death would not have occurred.  Expert testimony that defendants 'probably' or 'likely' caused the harm is insufficient . . . ." *Id*. (emphasis added).

---

[5] Plaintiff also argues Wood's failure to meet the standard of care for a paramedic and assure Shane's airway, breathing, and circulation were maintained at all times during his contact with Shane negligently caused his death. (Doc. 101, pp. 10-11.)  This claim is intertwined with the failure-to-intervene theory the Court previously dismissed. (Doc. 52, p. 12.)

15

Case 6:21-cv-03072-BP   Document 124   Filed 09/29/22   Page 15 of 17

Wood and Cox argue the only medical evidence suggesting Wood's failure to initiate CPR sooner was a "but-for" cause of Shane's death is Dr. Morrow's opinion, but, during his deposition, Dr. Morrow admitted he could not state with reasonable medical certainty that Shane would have survived had Wood begun CPR as soon as Shane fell silent. (Doc. 95, pp. 2-4.) Thus, they contend Plaintiff has not met her burden to survive summary judgment—even assuming that Wood was required to initiate CPR as soon as Shane fell silent.

In response, Plaintiff points to other portions of Dr. Morrow's testimony, including his statement that "the likelihood of successful CPR goes up substantially if it is started as soon as possible," as well as the testimony of her EMT expert, Deese, who testified Wood's actions at the scene were negligent. (*See generally* Doc. 101.)[6] This evidence, however, does not prove but-for causation to a standard of reasonable medical certainty—at best, it suggests Shane would "likely" have survived if Wood had timely initiated life-saving measures, which is not sufficient under Missouri law. *Graham*, 181 F.3d at 926. For these reasons, Plaintiff's wrongful death claim against Wood (and, vicariously, against Cox) cannot survive summary judgment.[7]

### III.  CONCLUSION

This is a tragic case, and the Court wishes the fatal encounter between Shane and Berkshire had not occurred or had transpired differently. Yet the facts, viewed in the light most favorable to

---

[6] Plaintiff also relies on Dr. Morrow's expert report to establish causation. (Doc. 101, pp. 9-10.) However, Federal Rule of Civil Procedure 56(c) limits the Court to considering only "pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits" when reviewing a summary judgment motion. Thus, the Court cannot properly consider statements from Dr. Morrow's report.
[7] This is an independent reason to dismiss Count III as asserted against Berkshire.

16

Case 6:21-cv-03072-BP   Document 124   Filed 09/29/22   Page 16 of 17

Plaintiff, establish Defendants are entitled to summary judgment on all of Plaintiff's claims. Consequently, their motions for summary judgment are **GRANTED**.[8]

**IT IS SO ORDERED.**

Date: September 29, 2022

/s/ Beth Phillips
BETH PHILLIPS, CHIEF JUDGE
UNITED STATES DISTRICT COURT

---

[8] In light of this conclusion, Berkshire and Ava's Motion to Exclude Mills's opinion, (Doc. 98), is **DENIED AS MOOT**.